## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| DANE DANIEL, JAMES GURTNER, and DEANNA NEASON, individually and on behalf of all others similarly situated,<br><br>*Plaintiffs,*<br><br>versus<br><br>JAKE LOUIS FRUGE, IAN JAMES PRUKNER, BRAD ROMERO, MELTON WEAVER, AND PFS INVESTMENTS, INC.<br><br>*Defendants.* | Case No.:<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## <u>PLAINTIFFS' CLASS ACTION COMPLAINT</u>

Plaintiffs Dane Daniel, James Gurtner, and Deanna Neason (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated ("Class Members"), by and through their attorneys, bring this class action complaint against Defendants Jake Louis Fruge ("Fruge"), Ian James Prukner ("Prukner"), Brad Romero ("Romero"), Melton Weaver ("Weaver"), and PFS Investments, Inc. Plaintiffs allege the following based upon personal knowledge as to their own acts and upon information and belief as to all other matters based on the investigation conducted by and through their attorneys, which included, among other things: a review of publicly-available marketing materials, consumer complaints, and other information regarding the claims asserted herein. Plaintiffs believe that substantial additional evidentiary support exists for the allegations set forth herein and will be available after a reasonable opportunity for discovery.

1

## INTRODUCTORY STATEMENT

1.      This case concerns a $33 million+ investment scheme masterminded by three former registered representatives of PFS Investments, Inc. ("PFS"), a wholly-owned broker-dealer and investment advisory subsidiary of Primerica, Inc..

2.      The fraudulent scheme involved the sale of unregistered and illegal securities in what the Federal Trade Commission ("FTC") refers to as "business opportunity" scams, which promise "guaranteed" passive income realized from investing in "turnkey" internet businesses.

3.      As set forth below, the scheme was masterminded and orchestrated by PFS agents and registered representatives Fruge, Prukner, and Weaver (collectively, the "PFS Representatives"), who hatched and ran the fraudulent scheme with ***PFS's full blessing and approval***.

4.      The PFS Representatives preyed on unsuspecting victims, including PFS's customers, by convincing them to convert their 401Ks and IRAs into so-called "passive income solutions" offering false promises of "guaranteed" profits.

5.      In March 2021, the PFS Representatives formed a limited liability entity named "Champion E-Com" ("Champion"), which issued and sold unregistered securities to hundreds, and likely thousands, of retail investors, including Plaintiffs and Class Members. Champion was co-owned by Defendant Romero.

6.      Champion was controlled by Fruge, who lived in Houston. Champion was likewise headquartered in Houston, Texas, and the vast majority of the misconduct described herein originated in and was orchestrated from Texas.

7.      Champion offered and sold two primary investments to Plaintiffs and Class Members: (1) "Digital Real Estate" securities, and (2) "E-Commerce Store" securities, both as

2

described in more detail below. Both offerings were "investment contracts" under relevant federal and state securities laws. These investments were widely solicited and sold to the general public, including to unaccredited investors, and were sold without any registration or exemption therefrom.

8.      The FTC has come down on hard on both digital real estate and e-commerce scams in recent years, and in particular, the false and unsubstantiated earnings claim and promises of "turnkey" and "passive income" that typically accompany these "business opportunities."

9.      False statements regarding passive income, supposed earnings, and guarantees were ***exactly*** how the PFS Representatives and Romero solicited Plaintiffs and Class Members to invest in Champion's offerings.

10.     Champion's Digital Real Estate offering charged investors up to $7,000 to invest in lead-generating websites that Champion would purportedly research, build, and scale on the investors' behalf. Champion would then manage sales of those leads to generate passive income in the amount of $400 - $600 per month after only 12 months.

11.     Champion also offered and sold its E-Commerce Store investments, forming limited liability companies that would purchase and operate Amazon or similar e-commerce storefronts. Investors would pay Champion a fixed sum of $45,000 or more to build, stock, manage, and service the storefront through a "dummy" affiliate, with investors receiving passive monthly income in the form of supposedly guaranteed 15% profit margins generated through online sales in return.

12.     In reality, neither investment was worth the paper its offering documents were written on. The offering materials misled potential investors by omitting the true, fraudulent nature of the investments and how they (supposedly) generated revenue. Income figures were fabricated,

greatly exaggerated far beyond any reasonable historical or other data-driven metric. At no point in time were revenues from Digital Real Estate and/or E-Commerce Store operations anywhere close to an amount necessary to support the promised returns. Any "income" the investments generated was derived primarily through recruitment of new members to participate – a disguised multi-level marketing or "pyramid" operation.

13.    Champion's guarantees that it would "buy back" investments from any and all investors who after two years were not satisfied with the returns were false as well. Champion never had the liquidity to honor these guarantees, and in fact, never intended to do so. Instead, when the going got tough and the two-year guarantee option triggered, the PFS Representatives and Romero planned to simply shutter the door and move on—which is exactly what occurred here.

14.    The PFS Representatives and Romero aggressively marketed their unregistered offerings to the general public by touting their success and lavish lifestyles replete with fancy clothes, jewelry, cars, trips and homes, promising investors that they, too, could be rich and successful by investing in one of Champion's schemes.

15.    The PFS Representatives and Romero developed and disseminated uniform solicitation materials that they used to market the investments in a consistent manner to the general public. These solicitations were both written and verbal, presented in webinars and in-person promotional events held across the country, and repeated the misleading statements regarding income, operations, and guarantees described above and detailed later in this Complaint.

16.    Throughout this time, PFS had actual knowledge that the PFS Representatives were selling the unregistered investments through misleading solicitation efforts – but nonetheless

approved the PFS Representatives' sale of these investments as an "outside business activity," and allowed and enabled it to continue for years thereafter.

17.    PFS granted this approval in violation of FINRA Rule 3270 by, *inter alia*, not requiring the PFS Representatives to provide written submissions detailing their outside business activities. If PFS had properly required these submissions, its compliance department would have unquestionably realized that the PFS Representatives were engaged in the unauthorized sale of securities in furtherance of a scam that the FTC has targeted as fraudulent. Had PFS acted properly, it would have stopped the sales immediately. Instead, PFS approved the PFS Representatives' activities and therefore assumed the obligation to supervise those activities as private securities transactions under FINRA Rule 3280—an obligation that PFS clearly breached.

18.    Champion's Digital Real Estate investment underperformed by at least 90% of what was represented to investors, generating only a nominal dollar amount per month, entirely contrary to the representations made by Champion. Income streams from Champion's E-Commerce Store offerings performed just as poorly.

19.    Eventually the PFS Representatives' and Romero's lavish lifestyles—funded by investors' retirement funds—caught up with them and the Champion scheme was no longer sustainable.

20.    The true nature of the Champion scheme was finally exposed when the PFS Representatives and Romero purportedly "sold" the company to another firm, iMark Digital Solutions ("iMark"), in December 2024.

21.    Both the Digital Real Estate and E-Commerce Store investments were performing poorly at this time, and investors, tired of the PFS Representatives' and Romero's stall tactics, were attempting to exercise their purported guarantees. Their hopes were dashed when iMark took

the position that the Digital Real Estate and E-Commerce offerings were effectively worthless and advised that it would not be honoring the purported guarantees offered by Champion, causing Plaintiffs and the Class Members to scramble in search of information and an exit strategy.

22.     Thereafter, Plaintiffs and the Class Members went on to discover the Defendants' blatant misrepresentations, material omissions, and reckless mismanagement of funds as described above.

23.     As a result of the Defendants' misconduct, Plaintiffs and the Class Members have lost all, or a substantial portion of their principal investments, and now seek to recoup their losses through this Class Action.

## PARTIES & RELEVANT NON-PARTIES

24.     Plaintiff Dane Daniel is an individual residing in Lubbock, Texas who invested $90,000 in Champion's E-Commerce Store securities in November 2023 through December 2023.

25.     Plaintiff James Gurtner is an individual residing in Red Bank, Tennessee who invested $150,000 in Champions' Digital Real Estate securities in June 2023.

26.     Deanna Neason is an individual residing in Saint Cloud, Florida who invested funds from her IRA through a limited liability company she formed. Neason invested $22,500 in Champion's Digital Real Estate securities in June 2023 through July 2023.

27.     Defendant Jake Louis Fruge is a co-owner and control person of Champion and is the "mastermind" behind the Champion Scheme. He is a resident of Spring, Texas, and all conduct alleged herein took place within the State of Texas unless otherwise stated. Fruge is former broker who was registered with PFS Investments, Inc. from December 2014 to August 2022. **In November 2023, FINRA imposed a $10,000 fine and a 2-year suspension on Fruge for misconduct related to his operation of Champion concerning the same facts alleged herein.**

28.     Defendant Brad Romero is an individual residing in Conroe, Texas and was a co-owner of Champion with Fruge,  Prukner, and Weaver. At all relevant times hereto, Romero was a was a resident of the State of Texas, and all conduct alleged herein took place within the State of Texas unless otherwise stated.

29.     Defendant Melton Weaver is an individual residing in Youngsville, Louisiana who was a co-owner of Champion with Fruge, Romero and Prukner. Weaver is a former PFS broker who publicly held himself out as a Regional Vice President for PFS or Primerica. He began working as a PFS agent in 2007 and was registered with PFS until March 24, 2023. **In November 2023, FINRA imposed a $10,000 fine and a 24-month suspension on Weaver for his misconduct associated with his role at Champion arising out of the same facts alleged herein.**

30.     Defendant Ian Prukner is an individual residing in Sarasota, Florida. Prukner was a co-owner of Champion alongside Fruge, Weaver and Romero. Prukner, too, is a former PFS broker. **In November 2023, FINRA imposed a $10,000 fine and 24-month suspension on Prukner for his misconduct associated with his role as co-CEO of Champion arising out of the same facts alleged herein.**

31.     Defendants Fruge, Prukner, Romero, and Weaver substantially operated their activities in and through the State of Texas through a web of interrelated companies. For instance, Champion E-Com, LLC was a Texas Limited Liability Company with its address registered at 609 Main Street, Suite 2500A, Houston, Texas 77002. Champion's registered agent was Melton Weaver. Champion E-Com LLP was a Texas Limited Partnership that was converted to Champion E-Com, LLC in April 2023. Champion Property Management, LLC, was a subsidiary of Champion E-Com, LLC, with its address listed as 1725 Hughes Landing Blvd., Suite 970, The Woodlands, Texas 77380. Fruge E-Com LLC was a Texas Limited Liability company formed in January 2022

with an address of 1725 Hughes Landing Blvd., Suite 970, The Woodlands, Texas 77380. JFJ Holdings, Inc. was the Managing Member of Fruge E-Com LLC, and JFJ Holdings, Inc. was a Texas Corporation formed in February 2022 by Jake Fruge also with the address of 1725 Hughes Landing Blvd., Suite 970, The Woodlands, Texas 77380.

32.     PFS Investments, Inc. is a registered brokerage firm incorporated in Georgia and headquartered in Duluth, Georgia. PFS is a securities broker-dealer firm and a member of the Financial Industry Regulatory Authority ("FINRA"), an organization that regulates securities broker-dealer firms in the United States and has enacted rules of conduct that such firms must follow in their securities business. PFS has been the subject of 22 regulatory events since its formation in 1981. **Most notably, in July 2024, FINRA imposed a $60,000 fine on PFS for its failure to supervise the activities of Fruge, Prukner and Weaver, i.e., the PFS Representatives defined above, in connection with their operation of Champion**. As reflected therein, FINRA found that PFS was aware of the PFS Representatives' involvement in Champion as of April 2021, that PFS specifically approved Champion as an outside business activity in August 2021, and that PFS was aware that one or more of its Representatives continued to market Champion investments through the termination of their relationship in March 2023.

## JURISDICTION AND VENUE

33.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(d) because: (1) Plaintiffs in this putative class action resides in a different state from at least one defendant; (2) there are more than 100 putative class members; and (3) there is more than $5 million in controversy.

34.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because the PFS Representatives resided or operated in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred herein.

## FACTUAL BACKGROUND

### The Birth of the Champion Scheme

34.     Defendants Fruge, Prukner, and Weaver (previously defined as the "PFS Representatives") and Romero launched Champion in March 2021.

35.     Champion operated out of Houston, Texas, which is where its owner and CEO, Fruge, resided.

36.     Champion offered two types of investments: Digital Real Estate investments, and E-Commerce Store investments. As described in more detail below, both were classic "business opportunity scams" pitching investors on the opportunity to realize "guaranteed" profits from "turnkey" internet businesses. Together, these two securities offerings are sometimes referred to as the "Champion Scheme."

37.     Both the Digital Real Estate and E-Commerce Store securities were marketed as investments that would generate purely "passive income" in the form of returns generated through the efforts of the PFS Representatives, Romero, and others on the Champion team.

38.     The PFS Representatives and Romero specifically solicited investors' retirement funds, claiming that the Digital Real Estate and E-Commerce Store investments were particularly well-suited for IRAs and 401(K) accounts.

39.     The PFS Representatives and Romero developed and disseminated uniform, written solicitation materials used to solicit investments in the offerings that comprised the Champion Scheme. As set forth herein, these written materials misled investors by misrepresenting facts and

omitting information about the offerings, including their past and projected profitability, that they were operating as undisclosed multi-level marketing or "pyramid" schemes, and that they were backed by a 24-month guarantee.

40.     These written materials were developed by Fruge and others at Champion's office in Houston, from which they were then disseminated to investors around the country through online and other mechanisms. The same misstatements they contained were repeated in frequent live "webinars" open to the general public, including Plaintiffs and Class Members.

41.     Because of these public solicitations, the Digital Real Estate and E-Commerce Store offerings were required by the Texas Securities Act ("TSA") to be registered as securities, or alternatively, offered pursuant to an applicable exemption from registration. Neither occurred here.

42.     The PFS Representatives and Romero aggressively marketed their unregistered offerings to the general public on social media and elsewhere, touting their success and lavish lifestyles replete with fancy clothes, jewelry, cars, trips and homes, and promising investors that they, too, could be rich and successful by investing in the Champion Scheme.

43.     The PFS Representatives and Romero induced Plaintiffs and the Class Members to invest in the unregistered securities offered through the Champion Scheme on the basis of the misleading statements described herein.

44.     The PFS Representatives were registered representatives of PFS, a FINRA-registered broker, when they formed Champion and developed the Champion Scheme, and they continued to solicit participation in that Scheme throughout the duration of their relationships with PFS, utilizing resources and connections within PFS, including inducing a number of other PFS representatives to become victims of the Champion Scheme.

10

45.     PFS was therefore obligated to, inter alia, comply with all FINRA Rules and Regulations and supervise the PFS Representatives' activities, including any so-called "Outside Business Activities" like Champion, pursuant to FINRA Rules 3270 and 3280. PFS failed to do so.

46.     PFS had actual knowledge of the PFS Representatives' activities with Champion, including their solicitation and sale of the unregistered Digital Real Estate and E-Commerce Store investments, and incredibly, ***approved the sale of both***. However, in doing so PFS failed to comply with FINRA Rules 3270 and 3280, as well as PFS's own policies and procedures, requiring written disclosure and meaningful review of those activities. PFS essentially approved both offerings, sight-unseen and without further analysis—and in the process, became liable for the Digital Real Estate and E-Commerce Store offerings as offerings of the firm.

47.     As a direct result of PFS's actions and inaction, Champion, through the PFS Representatives and Romero, solicited and sold fraudulent and unregistered securities in the form of Digital Real Estate and E-Commerce Store investments.

***The Fraudulent Digital Real Estate Investments***

48.     The PFS Representatives and Romero developed, solicited, and sold Champion's Digital Real Estate securities to Plaintiffs and the Class Members.

49.     Digital Real Estate securities were marketed as investments for purchase through self-directed retirement accounts. The PFS Representatives and Romero developed uniform solicitation materials soliciting investors to use funds from their "old 401Ks or IRAs" to purchase Digital Real Estate investments as a way to "protect against market risk."

50.     The PFS Representatives and Romero's claims of protecting against market risk were false and misleading.

51.    These Digital Real Estate investments were presented as purportedly tax deductible, revenue-generating, passive investments whereby investors paid Champion to purchase a website that Champion or its affiliates would develop into a lead-generating website that Champion would then scale and manage, selling leads to generate income that would in turn be paid to investors as purported returns on a recurring/monthly basis.

52.    Investors paid $5,000 - $7,000 to purchase Champion's Digital Real Estate units. Each unit provided an investor with a single lead-generating website that Champion claimed would generate passive income.

53.    Purchases of Digital Real Estate units were made through written "subscription agreements" commonly used to purchase private placement investments.

54.    The PFS Representatives developed uniform solicitation and marketing materials that they used to solicit Digital Real Estate investments.

55.    Digital Real Estate investments were represented as "completely passive." Written marketing materials prepared and disseminated by the PFS Representatives stated, "there are no responsibilities on your end. Your check will be deposited monthly into the account you provide via direct deposit."

56.    These same materials stated that investors could expect to receive between $400 to $600 per month, per unit,  beginning approximately 12 months from the purchase date.

57.    All representations concerning expected returns were false when made. Champion had no reasonable factual or historical basis supporting these projections, and consistent therewith, Champion/the PFS Representatives failed to provide investors with the accompanying historical data and other metrics supporting Champion's earnings projections required by the FTC. In reality, Champion knew, but concealed, that it did not have the ability to support the promised returns.

58.     Any dividends or other income generated from Digital Real Estate Investments was primarily, if not entirely, the result of the PFS Representatives' ability to recruit others to invest, and for those new recruits to find investors of their own—a classic, and undisclosed, multi-level marketing model. In fact, the vast majority of investors' funds were actually paid as "commissions."

59.     The PFS Representatives and Romero sweetened the pot with promises of a "24-month guarantee" purportedly affording investors the right to sell their investments back to Champion for the full, original purchase price, less any income generated to date after 24 months had passed since their original purchase.

60.     The 24-month guarantee was memorialized in Champion's "Subscription Agreement," which the PFS Representatives provided to each investor:

> **24 Month Guarantee**. After 24 months from the date of this agreement, the Client can elect to either renew their contract or sell **ALL** digital assets referenced in the signature block on this agreement back to Champion. Champion will repurchase these assets for the amount of the original purchase price reduced by the amount of gross income produced by the Digital Assets. The gross income will not be reduced by the Service Fee paid to Champion for monitoring and servicing the Digital Assets for the previous 24 months. All client will have 30 days from the 24-month mark to notify Champion of their choice in writing. After 30 days, this offer expires.

61.     This "guarantee" was further confirmed in other written marketing materials that the PFS Representatives and Romero disseminated to prospective investors, and was likewise given verbally in various webinars and other presentations around the country.

62.     The promised "guarantee" was misleading. Champion did not possess anywhere close to the liquidity necessary to repurchase Digital Real Estate investments.

***The Fraudulent E-Commerce Store Investments***

63.     The PFS Representatives also developed, solicited, and sold Champion's E-Commerce Store securities to Plaintiffs and the Class Members.

13

64.     As with Digital Real Estate securities, the PFS Representatives and Romero promoted E-Commerce Store securities as investment vehicles to be purchased with investors' retirement funds.

61.     E-Commerce Store investments were marketed as an opportunity to make a passive investment in an Amazon e-storefront by "partnering" with Champion, which would manage and operate the storefront on investors' behalf, with investors receiving monthly returns derived from online sales.

62.     The PFS Representatives and Romero created uniform written solicitation materials that were made available to prospective investors through Champion's website. As set forth below, these solicitations highlighted E-Commerce Store investments as a "partnership" with Champion and repeatedly emphasized the "passive income" that would supposedly by realized through the investment:

> We are the #1 fastest growing Amazon **partner** in the US, helping thousands of online retailers with the best commerce automation services. We run both new and aged stores on Amazon.com, and of course with **100% passive income solutions**. Our expert perform: market research, Amazon product SEO, listing win-win products, customer service, inventory management, accounting, order processes, and much more! **A truly passive income experience**. We do fulfillment by Amazon (FBA) the right way! No games, no gimmicks, and no hidden fees or requirements.

(emphases added).

63.     The "passive" investment supposedly worked as follows. First, Plaintiffs and Class Members purchased Champion's E-Commerce Store securities through written contracts requiring the payment of $45,000 or more to a Champion affiliate, which was also owned and controlled by PFS Representative Fruge, named Jungle Consulting Group (hereafter, "Jungle").

64.     The PFS Representatives and Romero, acting on behalf of Champion, would establish LLCs to hold the E-Commerce Store investment.

65.     Investors were then directed to designate Jungle as the "authorized user" on their storefront accounts. Jungle was to manage the e-commerce store, generating passive income in the form of monthly sales revenue which would then be returned to the investor.

66.     The uniform written marketing materials that the PFS Representatives and Romero prepared and disseminated to solicit new investors in Champion's E-Commerce Store LLCs contained misleading statements intended to induce investors into purchasing Champion's securities.

67.     For example, the offering materials stated that Champion had "a record of 100% successfully (sic) ecommerce seller accounts with minimum 15% profit margin at least."

68.     Statements representing a prior history of 15% profits and a 100% success record were false when made. Neither the PFS Representatives nor Romero, or Champion, had any such record.

69.     Consistent therewith, the PFS Representatives and Romero were required by the FTC's Business Opportunity Rule to furnish prospective investors with disclosure documents supporting the anticipated earnings associated with E-Commerce Store investments, but did not do so – and indeed could not have done so, as documents supporting these figures did not exist.

70.     E-Commerce Store securities were also sold with promises that an experienced team would work to optimize the investment using "modern techniques and marketing tactics." These statements were included in the uniform written solicitation materials developed and disseminated by the PFS Representatives and Romero, and were also repeated in webinars they presented for prospective investors.

71.     These statements regarding marketing techniques and tactics to optimize sales were false when made. As with the Digital Real Estate Investments, the primary source of investor

repayment came not through operation of e-commerce storefronts, but through recruitment of additional E-Commerce Store investors. All or virtually all of investors' money was paid to Champion and its sales representatives as commissions. Champion knew, but concealed, that it had nowhere near the capability to support Digital Real Estate and E-Commerce Store offerings as promised.

72.    Again similar to Digital Real Estate investments, E-Commerce Store securities were also sold with a "contractual guarantee," triggered 24 months after purchase, that Champion could not, and never intended to, honor due to lack of liquidity.

***PFS Approves the Champion Scheme***

73.    PFS learned of the Champion Scheme in April 2021—less than a month after the PFS Representatives and Romero registered Champion with the State of Louisiana—after Defendants Fruge and/or Prukner orally disclosed their solicitation of E-Commerce Store securities to PFS's outside business activity team.

74.    Prukner again disclosed the PFS Representatives solicitation of Champion investments as part of a verbal conversation with PFS's senior compliance personnel in July 2021.

75.    PFS's outside business activity team is tasked with approving and supervising any outside business activities conducted by its brokers/registered representatives in accordance with FINRA Rules 3110 (the "Supervision Rule") and 3270 (the "Outside Business Activity Rule").

*76.*    FINRA Rule 3270, and PFS's own written supervisory procedures, required formal ***written disclosure*** of the PFS Representatives' outside business activities in a specific format that would allow PFS's compliance team to analyze and approve—or reject—the proposed activity. No such disclosure was ever provided or required to be provided by PFS.

77.    Nonetheless, in August 2021, PFS formally blessed the PFS Representatives' sale of Champion securities as an approved outside business activity.

16

78.     PFS's approval was given in violation of FINRA Rules, and in violation of PFS's own written supervisory procedures.

79.     By this time, the PFS Representatives and Romero had already solicited dozens of investments into the Champion Scheme.

80.     Around this same time, PFS learned that the PFS Representatives were engaged in the widespread marketing E-Commerce Store securities on social media, as well as to other PFS registered representatives.

81.     The PFS Representatives also published other social media posts seeking new "employees" to sell Champion securities, consistent with its status as an undisclosed multi-level marketing operation, including posts similar to the following:



Jake Fruge Jr ✔
January 16, 2023 · 🌐

NOW HIRING!!!!

CHAMPION PASSIVE INCOME SOLUTIONS IS GROWING BY 7-20 ASSOCIATES A WEEK RIGHT NOW. AND WE ARE NEEDING TO FILL TWO SALARIED REMOTE POSITIONS.

Ok, 1. Will be Managing VAs and store operations working in our store fulfillment department. Will need leadership experience as well as organized and logistically inclined.

2. Will be a brand specialist Calling and negotiating brands for us to sale in our stores. Needs to be detail oriented but also have a sales background or personality so they can close and approve purchase order proposals.

IF THIS IS YOU OR YOU KNOW SOMEONE DM ME THE WORD "INTERVIEW" AND I'LL CONNECT YOU TO MY HR DEPARTMENT.

THESE POSITIONS WILL FILL QUICKLY SO DO NOT  HESITATE.

THANKS

 38                                      4 comments   2 shares

82.     Notwithstanding its actual knowledge of the PFS Representatives' extensive marketing of the Champion Scheme, at no point in time did PFS require them to provide written

notice to the firm detailing the extent and scope of their outside business activities conducted through Champion.

83.     This failure was directly contrary to PFS's written supervisory procedures requiring representatives to disclose the outside business activities to the firm in writing consistent with FINRA Rule 3270. PFS simply chose not to enforce that requirement.

84.     As FINRA has made clear, in considering whether to approve an outside business activity like Champion, PFS was required to analyze, *inter alia*, whether the proposed activity posed a potential conflict of interest with the registered person's responsibilities to the firm, as well as to the general public.

85.     Critically, PFS was also required to determine whether the PFS Representatives' sales of Digital Real Estate and E-Commerce Store investments were private securities transactions.

86.     PFS failed to engage in any of these required analyses prior to approving Champion as an outside business activity. PFS's approval was therefore negligent and ill-informed.

87.     Pursuant to FINRA Rule 3280, after PFS approved the PFS Representatives solicitation and sale of Champion's securities, PFS was obligated to supervise its Representatives' participation in Champion's transactions as if they were executed on behalf of PFS itself.

88.     PFS failed to supervise the PFS Representatives' participation in the Champion private securities transactions.

89.     Throughout the foregoing failures, PFS violated FINRA Rules 3270, 3110, and 2010.

*PFS Conceals and Attempts to Distance Itself From the Scheme*

90.    As time went on, PFS's senior management affirmatively sought to silence other brokers and employees from discussing the PFS Representatives' activities in connection with the Champion Scheme.

91.    For instance, Mario Arrizon, PFS's Senior National Sales Director and one of the top producing brokers at PFS, instructed a junior broker who worked with PFS's affiliate, Primerica, not to talk about the Champion Scheme with other employees at PFS.

92.    This "course correction" was put into motion after other PFS registered representatives began to voice complaints about the Champion Scheme in late 2021. In response to these complaints, PFS's compliance/outside business activity team directed the PFS Representatives to disclose the identities of any and all PFS representatives and customers who had invested the Champion Scheme.

93.    At no point in time did PFS inform regulators, or its customers, of the fraudulent sales of unregistered securities that PFS had allowed to occur. Nor did PFS take steps to stop the sales, or to suspend or terminate the PFS Representatives.

94.    The PFS Representatives continued to ramp up their solicitation efforts throughout the end of 2021 and early 2022, via social media and otherwise. PFS was aware of these efforts.

95.    Throughout February 2022, PFS continued discussions with one of the PFS Representatives regarding their ongoing marketing of Champion Scheme.

96.    Through these conversations PFS learned that more than 1,000 investors had already invested in the Champion Scheme. Incredibly, PFS still did not require the three representatives to provide written the FINRA-required written disclosures detailing the Champion Scheme.

97.     In April 2022, PFS advised the PFS Representatives that there would soon come a time where they could no longer remain associated with PFS unless they terminated their involvement with Champion. Defendant Fruge mocked PFS's ultimatum on the Champion website.

98.     Nonetheless, the PFS Representatives continued to actively solicit sales of Champion securities—and continued to make significant sales to investors for several months thereafter, all while still affiliated with PFS.

99.     Defendants Fruge and Prukner's registration with PFS terminated in August 2022, and Defendant Weaver's registration with PFS terminated in March 2023. By this time, hundreds of investors – including Plaintiffs and Class Members – had purchased approximately $33 million in fraudulent and unregistered E-Commerce Store and Digital Real Estate investments.

100.    Defendant Fruge publicly announced his termination from PFS in a public social media post reminiscent of Scorsese's "The Wolf of Wall Street," assuring the public that "All was approved by [PFS] with OUTSIDE BUSINESS was legal":



101.    The conduct described above directly facilitated the improper and illegal sale of $33 million or more in unregistered securities sold on the basis of material misstatements.

102.    The conduct described above also violated numerous FINRA rules.  Each of the PFS Representatives violated FINRA Rule 3270 by failing to provide proper (or any) written notice of their outside business activities to their registered brokerage firm, PFS.  The PFS Representatives also violated FINRA Rule 2010, which requires that registered representatives observe high standards of commercial honor and just and equitable principles of trade.

103.    PFS had the actual ability to control the PFS Representatives at all times while the PFS Representatives were registered with PFS, including but not limited to through PFS's own training, its contracts with the representatives, its ongoing supervision of those representatives, and its regulatory notices and filings.

104.    PFS is liable for the misconduct of its registered representatives under *respondeat superior*, vicarious liability, principal/agency, and/or control person theories.

105.    PFS violated FINRA Rules 3270, 3110 and 2010 by approving the outside business activity without requiring a written disclosure from the PFS Representatives, PFS's approval of Champion was thus negligent and ill-informed. Nonetheless, once the sale of Champion security was approved, FINRA Rule 3280 required that PFS supervise the transactions on its own books and records as if the transactions were executed on its own behalf. PFS failed to do so.

**PFS Perpetuates the Champion Scheme**

106.    Defendants Fruge's and Prukner's PFS registrations were terminated in August 2022, while Defendant Weaver's registration was terminated in March 2023.

107.    PFS was required by applicable state law and also by FINRA rules to truthfully and accurately report the reasons for their terminations, as well as any other details of known

misconduct, including any illegal or unprofessional activity. This information is supposed to be disclosed on Forms U-4 and U-5, which are filed with PFS's regulatory and licensing authorities and made available to the general public.

108.    These disclosure obligations are prompt. FINRA requires that Form U-5 be filed within 30 thirty days after an individual's registration is terminated. Louisiana, Texas, and Florida – the three states in which the PFS Representatives were based – impose similar requirements.[1]

109.    These disclosure obligations are also continuing, requiring updates upon discovery of any facts or circumstances rendering a previously-filed Form U-4 or U-5 inaccurate or incomplete.

110.    FINRA has stressed the importance of brokerage firms' verification of the accuracy and completeness of Forms U-4 and U-5, expressly acknowledging that regulators and the investing public use the information in considering whether to invest with the terminated individual.[2]

111.    For this same reason, FINRA has also instructed firms to fully and accurately answer each question on Form U-5, as each question "stands on its own," and further, to avoid "parsing through" questions regarding termination and/or disclosures in an attempt to avoid answering them.

112.    For these reasons, firms like PFS who fail to provide complete and accurate information on Form U-5 may be subject to administrative or civil penalties. Relevant state law includes similar prohibitions.

---

[1]    *See* La. R.S. 51:703; Rule § 115.4(d) of the Texas State Securities Board (adopted pursuant to Section 28-1 of the Texas Securities Act);  Fla. Stat. § 517.12.

[2]    FINRA    Regulatory    Notice    10-39    (September    2010),    available    at https://www.finra.org/sites/default/files/NoticeDocument/p122040.pdf.

113.    Instead of complying with these obligations, PFS hid the truth in an effort to avoid accountability, and liability, for its regulatory failures and other misconduct.

114.    Consistent therewith, rather than disclose the truth behind the PFS Representatives' widespread, fraudulent sale of unregistered securities, PFS filed misleading Form U-5s that omitted this material information and thus actively misrepresented and misled regulators and the investing public (including Plaintiffs) regarding the PFS Representatives' misconduct and ultimate termination.

115.    PFS misleadingly suggested that the PFS Representatives did not commit any wrongdoing, and instead, labeled their termination as "voluntary."

116.    PFS denied the existence of any ongoing investigations or other proceedings, and also denied that the PFS Representatives had been/were under internal review for fraud or violating investment-related statutes, regulations, rules, or industry standards of conduct.

117.    PFS further denied that any allegations had been made that accused the agents of investment-related misconduct.

118.    Finally, PFS affirmed that "there is no additional information to be reported at this time."

119.    All of these statements were false when made. In truth, PFS had actual knowledge that the PFS Representatives were actively misrepresenting and selling unregistered securities, and were also soliciting other PFS representatives to do the same.

120.    PFS also knew that it had investigated the PFS Representatives' activities through Champion for months, warned others not to participate in such activities, and ultimately, terminated its relationship with the PFS Representatives on account of those activities.

121.    In short, PFS knew that the PFS Representatives' terminations were not actually "voluntary."

122.    The U-5s for Fruge on August 23, 2022 and for Prukner on August 9, 2022 were signed by Tracy Murdock (a PFS Vice President), who under the "Firm Acknowledgment" section affirmed that "I verify the accuracy and completeness of the information contained in and with this form."

123.    These false filings affirmatively suppressed the truth from the investing public and prevented them from discovering the PFS Representatives' on-going sale of unregistered securities through misrepresentations and material omissions of fact.

124.    PFS also knew that FINRA and state securities regulators, including the State of Texas, would rely on the information disclosed in its Form U-5 filings regarding the PFS Representatives.

125.    PFS made these misrepresentations in an effort to protect their own business interests, to avoid liability from customers that PFS knew had been harmed due to PFS's actions and inactions, and to otherwise limit the regulatory sanctions they might receive due to the misconduct.

126.    In failing to accurately and truthfully provide information regarding the PFS Representatives' termination, PFS violated FINRA Rules, SEC Rules, and Texas law, among others.

127.    The harm caused by the PFS Representatives was foreseeable to PFS. PFS knew that thousands of investors had invested in the Champion Scheme while the PFS Representatives were registered with PFS.

24

128.    PFS also knew that the investing public would rely on the information disclosed in its Form U-5 filings regarding the PFS Representatives in considering whether to do future business with them—indeed, FINRA has explicitly instructed PFS and others of this fact.

129.    Accordingly, PFS knew that its false statements and inaction would cause continuing harm to current and future investors in the Champion Scheme, including Plaintiffs and the Class Members.

130.    As of this filing, PFS still has not updated its Form U-5 filings to reflect its actual knowledge of the above.

131.    Plaintiffs' and the Class Members' losses would have been avoided had PFS acted appropriately at any point in time during or after its relationship with the PFS Representatives. PFS's compliance department would have stopped the solicitation and sale of unregistered securities in so-called "business opportunities" that the FTC has deemed fraudulent, and that information would then have been disclosed to the general public.

132.    The reporting requirements under the aforementioned statutes and rules are designed to enable regulators to timely obtain truthful information regarding registered individuals' misconduct in order to investigate, prosecute, discipline, or prevent those individuals from being registered or foisting a fraud upon the investing public, like Plaintiffs and the Class Members. PFS prevented that from happening.

133.    Plaintiffs and the Class Members were damaged by PFS's actions by, inter alia, being induced to purchase worthless unregistered securities sold through materially misleading information, and engaging and continuing to engage with individuals that PFS knew were violating the securities laws.

*The Champion Scheme Unravels*

134.    Champion's Digital Real Estate and E-Commerce Store offerings began to unravel in 2024, when Champion was unable to generate the promised returns even after allowing Champion the timing runways suggested in the offering documents.

135.    Plaintiffs and other Class Members attempted to invoke Champion's 24-month guarantee.

136.    Champion stalled, eventually admitting in December 2024 that Plaintiffs and Class Members would not be refunded any of their principal, as Champion was unable to honor the promised guarantee.

137.    Around this same time, Plaintiffs and Class Members also learned that the PFS Representatives and Romero had sold Champion to non-party iMark Digital Solutions and were moving on to a new business venture, attempting to escape their responsibilities to Plaintiffs and Class Members.

*The Digital Real Estate and E-Commerce Store Investments are "Securities"*

138.    The United States Supreme Court has comprehensively defined an "investment contract" as a "contract, transaction, or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise. The critical factors in defining a financial arrangement as an "investment contract " and thus, a "security" have been traditionally designated by the courts and commentators as (1) an investment of money, (2) in a common

enterprise, (3) with an expectation of a profit, and (4) reliance by the investor upon the efforts of others.[3]

139.    Here, the Champion products easily meet all of the elements of a security under the relevant state and federal standards.

140.    First, Plaintiffs all invested money in varying amounts for the Digital Real Estate and E-Commerce Store offerings.

141.    Second, both offerings were marketed as a common enterprise whereby each investment would profit from Champion's efforts. The offerings were pitched by Champion in the same manner, on joint sales calls or webinars with numerous investors at once.

142.    Third, Champion heavily marketed the expected profits, even providing direct estimates of the reasonably anticipated profits the Class Members could expect.

143.    Fourth, the Class members relied upon the efforts of others, namely Champion and the PFS Representatives and Weaver, along with their affiliates and agents, to operate the businesses  to generate income. Defendants consistently presented the "passive" nature of the investments to Plaintiffs and the class members and repeatedly emphasized this in their marketing materials.

## CLASS ACTION ALLEGATIONS

144.    Plaintiffs seek to pursue their claims on behalf of a class of similarly situated persons pursuant to Fed. R. Civ. P. 23.  The parameters of the class may be refined through discovery and will be subject to Court approval and modification, but for purposes of this complaint, Plaintiffs propose the following class definition:

> All persons and/or entities who purchased Digital Real Estate and/or E-Commerce Store interests from the PFS Representatives, Romero, Champion, and/or any of their affiliates or representatives.

---

[3] *See SEC v. W. J. Howey*, 328 U.S. 293 (1946).

145.    Plaintiffs further propose that the following persons be excluded from any certified class: (i) Defendants and their current or former officers, directors, legal representatives, employees, parent companies, subsidiaries, predecessors, successors, or assigns; and (ii) all judicial officers and associated court staff assigned to this case and their immediate family members.

146.    The proposed class meets the requirements for class certification pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3).

147.    *Numerosity*: The class is sufficiently numerous such that individual joinders are impracticable. $33 million+ worth of Digital Real Estate and/or E-Commerce Store securities were sold to several hundred investors or more.

148.    *Commonality*: Plaintiffs' and Class Members' claims against Defendants present common questions of law and fact, including:

  a.  Whether the Digital Real Estate and/or E-Commerce Store investments are "securities" within the meaning of Texas law;

  b.  Whether the Digital Real Estate and/or E-Commerce Store securities should have been registered with applicable federal and/or state regulators prior to sale;

  c.  Whether the Digital Real Estate and/or E-Commerce store securities were offered for sale on the basis of false and/or misleading statements concerning, *inter alia*,

    i.  "Passive income" supposedly generated through ownership of the securities;

    ii.  Champion's and/or its affiliates' ability provide the promised services necessary to generate those returns;

    iii.  The purported 24-month guarantee whereby Champion would refund investors' purchases if they were unhappy with their performance after two years had passed; and

    iv.  The fact that the Champion Scheme in reality operated as an undisclosed pyramid and/or multi-level marketing model whereby the vast majority of any revenue returned to investors was the result of other investors being

induced to purchase Digital Real Estate and/or E-Commerce Store securities;

d. Whether PFS violated its legal and regulatory duties in connection with its approval of the PFS Representatives' participation in the Champion Scheme;

e. Whether PFS is liable for the PFS Representatives' misconduct under respondeat superior, vicarious liability, principal/agency law, and/or control person theories; and

f. Whether PFS provided material aid to the PFS Representatives in support of the Champion Scheme.

149.    *Typicality*: Plaintiffs' claims are typical of the class's claims. Plaintiffs and the Class Members were all victims of the Champion Scheme, and each has claims against the PFS Representatives, Romero, and PFS on account of their respective roles in connection with that Scheme. Each claim will depend on common proof concerning the Defendants' misconduct.

150.    *Adequacy*: Plaintiffs are members of the class and will fairly and adequately protect its interests. Plaintiffs' interests are aligned with those of the class, as each seeks to recover damages from the Defendants for selling worthless securities in the Champion Scheme.

151.    *Predominance*: The common questions identified above are likely to predominate at trial when compared to any individualized issues that may arise. The major issues upon which Defendants' liability depends are each susceptible to generalized proof that would establish liability as to all class members through a single trial.

152.    *Superiority*: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Successfully prosecuting class members' claims is likely to require intensive discovery of a multi-billion dollar financial institution, review of large amounts of electronically stored information, and hiring of regulatory and financial experts to explain and interpret the significance of both Defendants' misconduct. These matters are best handled through unified class-wide representation, which can be conducted on a contingency fee basis and offers

class members economies of scale unavailable in individual proceedings. A class action also has the benefit of comprehensive supervision by a single court and will avoid the risk of inconsistent results.

153.    In the alternative, the Class may be also certified because the prosecution of separate actions by individual investors would create a risk of inconsistent or varying adjudication with respect to individual Class members that would establish incompatible standards of conduct for the Defendants; and/or the prosecution of separate actions by individual investors would substantially impair or impede their ability to protect their interests.

154.    Adequate notice can be given to Class members directly using information maintained in Defendants' records and/or through notice by publication.

155.    Compensatory damages may be calculated, in part, from the information maintained in Defendants' records, as well as the records of members of the Class, so that the cost of administering a recovery for the Class can be minimized.  However, the precise amount of damages available to Plaintiffs and the other members of the Class is not a barrier to class certification.

## CAUSES OF ACTION

### COUNT I
**Violations of the Texas Securities Act,**
**Tex. Rev. Civ. Stat. Ann. art. 581-7 and 581-33(A)(1)**
**(Against the PFS Representatives and Weaver)**

156.    Plaintiffs incorporate by reference the preceding paragraphs as if set forth in full herein.

157.    The Digital Real Estate and E-Commerce Store investments are "securities" within the meaning of this statute.

158.　The PFS Representatives and Weaver solicited Plaintiffs and the Class Members to purchase Digital Real Estate and E-Commerce Store securities.

159.　The PFS Representatives and Weaver received monetary compensation for successful solicitation of Digital Real Estate and E-Commerce Store securities.

160.　TSA Section 33(A)(1) provides that "[a] person who offers or sells a security in violation of Section 7 . . . of this Act is liable to the person buying the security from him, who may sue either at law or in equity for rescission or for damages if the buyer no longer owns the security."

161.　TSA Section 7(A) provides "No dealer or agent shall sell or offer for sale any securities . . . except those which have been registered . . . and except those which come within the classes enumerated in Section 5 [(Exempt Transactions)] or Section 6[(Exempt Securities)] of this Act, until the issuer of such securities or a dealer registered under the provisions of this Act shall have been granted a permit by the Commissioner . . . ."

162.　The transactions and securities described herein do not qualify as exempt under TSA Sections 5 or 6. Thus, as described herein, Digital Real Estate and E-Commerce Store securities were required to be registered before they were sold and offered for sale to Plaintiffs and the Class Members, and the failure to do so violated Section 7 of the TSA.

163.　As discussed above, the sale of the securities was not exempt from registration under TSA Section 7, as it was not exempt under the Securities Act of 1933. The National Secs. Markets Improvement Act ("NSMIA") does not apply to such securities as they were not exempt from registration under Regulation D.

164.　Plaintiffs and the Class Members now seek to rescind their purchase of the securities described herein, or, in the alternative, to recover the damages allowed pursuant to TSA Section 33(D).

## COUNT II
### Violations of the Texas Securities Act,
### Tex. Rev. Civ. Stat. Ann. art.  581-7, 581-33(A)(1), and 581-33F(1)
### (Against Defendant PFS)

165.    Plaintiffs incorporate by reference the preceding paragraphs as if set forth in full herein.

166.    As shown above, the Digital Real Estate and E-Commerce Store securities were required to be registered before they were sold to Plaintiffs and the Class members, but were not.

167.    The PFS Representatives solicited the unregistered sale of Digital Real Estate and E-Commerce Store securities and are therefore liable under TSA Section 33A(1).

168.    TSA Section 33(F)(1) provides that "[a] person who directly or indirectly controls a seller . . . of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller . . . and to the same extent as if he were the seller . . . unless the controlling person sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist."

169.    Defendant PFS was aware of, and had the ability to directly and indirectly control, the PFS Representatives' solicitation and sale of Digital Real Estate and E-Commerce Store securities. PFS exercised its control over the PFS Representatives' sale of those securities by inter alia, permitting that sale as an approved "outside business activity" in accordance with FINRA Rule 3270.

170.    Defendant PFS is liable as a control person of the PFS Representatives for all violations committed by the PFS Representatives during the time(s) each was affiliated with PFS, pursuant to TSA Section 33(F)(1).

171.    Additionally and/or alternatively, PFS is liable for all violations committed by the PFS Representatives during the time(s) each was affiliated with PFS under principles of vicarious liability, *respondeat superior*, and principal/agency law.

172.    Plaintiffs and the Class Members now seek to rescind their purchase of the securities described herein, or, in the alternative, seek to recover the damages allowed pursuant to TSA Section 33(D), for which PFS is jointly and severally liable.

**COUNT III**
**Control Person Violations of the Texas Securities Act,**
**Tex. Rev. Civ. Stat. Ann. art. 581-7, 581-33(A)(1), and 581-33F(2)**
**(Against PFS)**

173.    Plaintiffs incorporate by reference the preceding paragraphs as if set forth in full herein.

174.    As shown above, the Digital Real Estate and E-Commerce Store securities were required to be registered before they were sold to Plaintiffs and the Class members, but were not.

175.    The PFS Representatives solicited the unregistered sale of Digital Real Estate and E-Commerce Store securities and are therefore liable under TSA Section 33A(1).

176.    TSA Section 33(F)(2) provides that "[a] person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer."

177.    Defendant PFS was aware of, and had the ability to directly and indirectly control, the PFS Representatives' solicitation and sale of Digital Real Estate and E-Commerce Store securities. PFS exercised its control over the PFS Representatives' sale of those securities by inter alia, permitting that sale as an approved "outside business activity" in accordance with FINRA Rule 3270.

178.    PFS granted that approval with knowledge and/or reckless disregard for the fact that the Digital Real Estate and E-Commerce Store investments were required to be registered, and that the solicitation and sale of those securities was done in violation of Texas law. PFS's approval under these circumstances allowed the PFS Representatives to continue perpetrating the Champion Scheme and constitutes "material aid" in furtherance of their violations of the Texas Securities Act.

179.    Even after the PFS Representatives' registration with PFS had been terminated, PFS continued to provide material aid in support of the PFS Representatives' illicit solicitation and sales of Digital Real Estate and E-Commerce Store investments by, inter alia, preparing and filing materially misleading and incomplete Forms U-4 and U-5 that mispresented the circumstances behind the PFS Representatives' terminations, thus allowing them to continue victimizing the general public through the Champion Scheme.

180.    Plaintiffs and the Class Members seek to rescind their purchase of the securities described herein, or, in the alternative, seek to recover the damages allowed pursuant to TSA Section 33(D), for which PFS is jointly and severally liable.

<u>COUNT IV</u>
**Violations of the Texas Securities Act,**
**Tex. Rev. Civ. Stat. Ann. art. 581-33(A)(2)**
**(Against the PFS Representatives and Romero)**

181.    Plaintiffs incorporate by reference the preceding paragraphs as if set forth in full herein.

182.    Section 33(A)(2) of the TSA provides:

A person who offers or sells a security (whether or not the security or transaction is exempt under Section 5 or 6 of this Act) by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the

34

statements made, in light of the circumstances under which they are made, not misleading, is liable to the person buying the security from him, who may sue either at law or in equity for rescission, or for damages if the buyer no longer owns the security.

183.    The Digital Real Estate and E-Commerce Store investments are "securities" within the meaning of this statute.

184.    The PFS Representatives solicited Plaintiff and Class Members to invest in Digital Real Estate and E-Commerce Store securities through the preparation and dissemination of uniform solicitation materials and offering documents that were misleading because they contained untrue statements of material fact and omitted material facts necessary to make the statements made not misleading, in violation of Section 33(A)(2) of the TSA.

185.    Each investor in the Champion Scheme, including Plaintiffs and the Class Members, received these substantially identical solicitation materials and offering documents.

186.    These documents misled potential investors by omitting the true, fraudulent nature of the Digital Real Estate and E-Commerce Store securities and how they (supposedly) generated revenue. These offerings were classic "business opportunity scams" as defined by the FTC.

187.    Consistent therewith, anticipated monthly income figures provided to Plaintiffs and the Class Members were fabricated, greatly exaggerated far beyond any reasonable historical or other data-driven metric. The PFS Representatives knew that at no point in time were revenues from Digital Real Estate and/or E-Commerce Store operations anywhere close to an amount necessary to support the promised returns of several hundred dollars per month.

188.    The solicitation materials and offering documents also failed to disclose that Digital Real Estate and E-Commerce Store investments operated as disguised multi-level marketing

operations where "income" was derived primarily through recruitment of new members to participate.

189.    The PFS Representatives and Romero relied heavily on purported guarantees that Champion would "buy back" investments from any and all investors who were not satisfied with the returns after 24 months had elapsed. These statements were misleading as well insofar as they failed to disclose that Champion never had the liquidity to honor these guarantees, and in fact, never intended to do so.

190.    The foregoing misstatements and omissions were not tailored to individual investors but were part of a standardized set of materials used to solicit investments from the public, ensuring that all investors were exposed to the same materially misleading statements and omissions.

191.    Plaintiffs and the Class Members reasonably considered and relied upon the solicitation materials and offering documents provided by the PFS Representatives in making their decisions to purchase Digital Real Estate and E-Commerce Store securities. Indeed, as these securities were not publicly-traded, the information contained in these materials was the only information available to Plaintiffs and the Class Members in connection with their purchase decisions.

192.    As a result of these material misstatements and omissions, Plaintiffs and the Class have suffered damages and are entitled to damages under TSA 33(D)(3), including the consideration each paid for their Digital Real Estate and E-Commerce Store investments less any returns received on those investments.

## COUNT V
### Violations of the Texas Securities Act,
### Tex. Rev. Civ. Stat. Ann. art. 581-33(A)(2) and 581-33F(1)
### (Against Defendant PFS)

193.    Plaintiffs incorporate by reference the preceding paragraphs as if set forth in full herein.

194.    As shown above, the Digital Real Estate and E-Commerce Store securities were solicited and sold by the PFS Representatives on the basis of misleading uniform solicitation materials and offering documents, in violation of TSA Section 33(A)(2).

195.    TSA Section 33(F)(1) provides that "[a] person who directly or indirectly controls a seller . . . of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller . . . and to the same extent as if he were the seller . . . unless the controlling person sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist."

196.    Defendant PFS was aware of, and had the ability to directly and indirectly control, the PFS Representatives' solicitation and sale of Digital Real Estate and E-Commerce Store securities. PFS exercised its control over the PFS Representatives' sale of those securities by inter alia, permitting that sale as an approved "outside business activity" in accordance with FINRA Rule 3270.

197.    Defendant PFS is liable as a control person of the PFS Representatives for all violations committed by the PFS Representatives during the time(s) each was affiliated with PFS, pursuant to TSA Section 33(F)(1).

198.    Additionally and/or alternatively, PFS is liable for all violations committed by the PFS Representatives during the time(s) each was affiliated with PFS under principles of vicarious liability, *respondeat superior*, and principal/agency law.

199.    Plaintiffs and the Class Members have suffered damages and are entitled to damages under TSA 33(D)(3), including the consideration each paid for their Digital Real Estate and E-Commerce Store investments less any returns received on those investments. PFS is jointly and severally liable for those damages.

**COUNT VI**
**Violations of the Texas Securities Act,**
**Tex. Rev. Civ. Stat. Ann. art.  581-33(A)(2) and 581-33F(2)**
**(Against Defendant PFS)**

200.    Plaintiffs incorporate by reference the preceding paragraphs as if set forth in full herein.

201.    As shown above, the Digital Real Estate and E-Commerce Store securities were solicited and sold by the PFS Representatives on the basis of misleading uniform solicitation materials and offering documents, in violation of TSA Section 33(A)(2).

202.    Section 33(F)(2) of the TSA states:

A person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law *materially aids* a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer.

203.    PFS, with intent to deceive or defraud, or with a reckless disregard for the truth and law, materially aided the PFS Representatives and Weaver in the misleading solicitation and sale of Digital Real Estate and E-Commerce Store securities by, *inter alia*, permitting that sale as an approved "outside business activity" in accordance with FINRA Rule 3270.

204.    PFS issued that approval with knowledge and/or reckless disregard for the fact that the Digital Real Estate and E-Commerce Store investments were required to be registered, and that

the solicitation and sale of those securities was misleading and in violation of Texas law. PFS's approval under these circumstances allowed the PFS Representatives to continue perpetrating the Champion Scheme and constitutes "material aid" in furtherance of their violations of the Texas Securities Act.

205.    Even after the PFS Representatives' registration with PFS had been terminated, PFS continued to provide material aid in support of the PFS Representatives' illicit solicitation and sales of Digital Real Estate and E-Commerce Store investments by, inter alia, preparing and filing materially misleading and incomplete Forms U-4 and U-5 that mispresented the circumstances behind the PFS Representatives' terminations, thus allowing them to continue victimizing the general public through the Champion Scheme.

206.    Plaintiffs and the Class Members have suffered damages and are entitled to damages under TSA 33(D)(3), including the consideration each paid for their Digital Real Estate and E-Commerce Store investments less any returns received on those investments. PFS is jointly and severally liable for those damages.

## COUNT VII
### Negligence
### (Against All Defendants)

207.    Plaintiffs incorporate by reference the preceding paragraphs as if set forth in full herein.

208.    The PFS Representatives and Romero owed duties to the investors they solicited to invest in Digital Real Estate and E-Commerce Store securities. They were required to know each investor (*i.e.*, Plaintiffs and the other Class Members herein) as required by FINRA Rules, and further required to comply with applicable standards in issuing and soliciting the securities.  They

were also required to adhere to state and federal laws with respect to the issuance and solicitation of the securities.

209.    The PFS Representatives were also required to provide complete, accurate, and truthful information to Plaintiffs and the Class Members in connection with their solicitation and sale of Digital Real Estate and E-Commerce Store securities.

210.    The PFS Representatives and Romero did not live up to any of these duties.

211.    As FINRA made clear in its AWC censuring and fining PFS, upon receiving notice of the outside business activities of the PFS Representatives, PFS owed a duty to the investing public to determine whether their solicitation and sale of Digital Real Estate and E-Commerce Store securities posed a conflict of interest with its registered representatives' responsibilities to PFS or the public, and also to determine whether Champion should be characterized as an outside securities transaction subject to FINRA Rule 3280.

212.    FINRA Rules and PFS's own written supervisory procedures prescribe specific requirements for making these determinations—including requiring written disclosure of the proposed outside business activity. PFS ignored and violated these duties requirements—as FINRA explained in its AWC, "[d]espite repeatedly receiving new information suggesting that the [PFS] representatives' involvement in the OBA [i.e., the Champion Scheme] was significant and ongoing, PFSI did not require the representatives to make any written disclosure of the OBA."

213.    PFS also failed to comply with FINRA Rule 3280, which required Defendant PFS to supervise the PFS Representatives' sale of Digital Real Estate and E-Commerce Store securities as if they were PFS's own transactions.

214.     PFS's failures to insist on written disclosures, ill-informed and negligent approval of the Champion Scheme as an outside business activity, and subsequent failure to supervise the sale of the securities also violated FINRA Rule 3110.

215.     PFS owed duties to its regulators, Plaintiffs and the Class Members, and to the investing public at large to comply with FINRA, SEC, and State rules, regulations, and statutes requiring the proper and accurate reporting of misconduct described above and the truth behind the PFS Representatives' termination.

216.     PFS breached these by failing to file accurate Forms U-4 and/or U-5 when the PFS Representatives for refusing to stop their outside business activities in furtherance of the Champion Scheme.

217.     PFS's breaches facilitated and enabled the sale of Digital Real Estate and E-Commerce Store securities and further perpetuated the Champion Scheme by allowing these sales to continue long after the PFS Representatives had been terminated.

218.     As a direct and proximate result of the Defendants' negligence and role in the sale of Digital Real Estate and E-Commerce Store securities, Plaintiffs and the Members of the Class were damaged in an amount to be proven at trial.

219.     Defendants' actions were negligent, grossly negligent, and reckless.

**<u>COUNT VIII</u>**
**Fraud**
**(Against All Defendants)**

220.     Plaintiffs incorporate by reference the preceding paragraphs as if set forth in full herein.

221.    The PFS Representatives and Romero knowingly made materially false representations and omissions regarding the Digital Real Estate and E-Commerce store investments that Plaintiffs and Class Members purchased, as alleged herein.

222.    The PFS Representatives and Romero made the false representations and omitted material facts to induce Plaintiffs and the Class Members to rely on those statements in determining whether to purchase Digital Real Estate and/or E-Commerce Store investments.

223.    Plaintiffs and the Class Members reasonably considered and relied upon the solicitation materials and offering documents provided by the PFS Representatives in making their decisions to purchase Digital Real Estate and E-Commerce Store securities. Indeed, as these securities were not publicly-traded, the information contained in these materials was the only information available to Plaintiffs and the Class Members in connection with their purchase decisions.

224.    Plaintiffs and the Class Members were damaged by the false representations and non-disclosures by the PFS Representatives and Romero and, as a result, were injured through their purchase of worthless investments in "business opportunity scams."

225.    PFS knew that the PFS Representatives and Romero were engaged in the fraudulent sale of unregistered securities. Nonetheless, PFS, with intent to deceive or defraud, or with a reckless disregard for the truth and law, materially aided the PFS Representatives and Weaver in the misleading solicitation and sale of Digital Real Estate and E-Commerce Store securities by, *inter alia*, permitting that sale as an approved "outside business activity" in accordance with FINRA Rule 3270.

226.    PFS issued that approval with knowledge and/or reckless disregard for the fact that the Digital Real Estate and E-Commerce Store investments were required to be registered, and that

the solicitation and sale of those securities was misleading and in violation of Texas law. PFS's approval under these circumstances allowed the PFS Representatives to continue perpetrating the Champion Scheme and constitutes "material aid" in furtherance of their fraud.

227.    Even after the PFS Representatives' registration with PFS had been terminated, PFS continued to provide material aid in support of the PFS Representatives' illicit solicitation and sales of Digital Real Estate and E-Commerce Store investments by, inter alia, preparing and filing materially misleading and incomplete Forms U-4 and U-5 that mispresented the circumstances behind the PFS Representatives' terminations, thus allowing them to continue victimizing the general public through the Champion Scheme.

228.    As a direct and proximate result of the Defendants' fraudulent conduct, Plaintiffs and the Members of the Class were damaged in an amount to be proven at trial.

229.    Accordingly, Plaintiffs and the Class members seek damages in an amount to be proven at trial.

## JURY DEMAND

230.    Plaintiffs and the Class Members demand a trial by jury on all claims asserted herein.

## RESERVATION OF RIGHTS

231.    Plaintiffs reserve their right to amend this Complaint, upon completion of their investigation and discovery, to assert any additional claims for relief against the Defendants as may be warranted under the circumstances allowed by law.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs and the Class seek, individually and on behalf of the Class, an Order:

a.    Certifying the Class under the appropriate provisions of Rule 23 and appointing Plaintiffs and their counsel to represent the Class;

b.    Entering a judgment against Defendants for actual compensatory, consequential, incidental, special, and, if appropriate, exemplary/punitive damages in an amount to be proven at trial;

c.    Granting such civil penalties as allowed by law;

d.    Awarding Plaintiffs' their attorneys' fees, costs, and other expenses as allowed by law;

d.    Granting pre-judgment and post-judgment interest and costs as allowed by law; and

e.    Granting any other relief the Court deems just and proper.


Dated: October 10, 2025                    Respectfully Submitted,

By:    */s/ Andrew Ready Tate*
                    PEIFFER WOLF CARR KANE CONWAY & WISE LLP
                    Andrew Ready Tate
                    Attorney in Charge
                    GA Bar No. 518068
                    SDTX Federal ID No. 3854167
                    235 Peachtree St. NE, Suite 400
                    Atlanta, GA 30303
                    Main: 314-669-3600
                    Direct: 404-282-4806
                    atate@peifferwolf.com

                    Daniel Centner (will seek admission pro hac vice)
                    PEIFFER WOLF CARR KANE CONWAY & WISE LLP
                    935 Gravier St., Suite 1600
                    New Orleans, LA 70112
                    dcentner@peifferwolf.com
                    T (504) 523-2434

Jason J. Kane (will seek admission pro hac vice)
PEIFFER WOLF CARR KANE CONWAY & WISE LLP
160 Linden Oaks
Rochester, NY 14625
T (585) 310-5140
F (585) 397-3745
jkane@peifferwolf.com

Albert Copeland (will seek admission pro hac vice)
PEIFFER WOLF CARR KANE CONWAY & WISE LLP
2100 Southbridge Parkway, Suite 650, #2636
Birmingham, AL 35209
T (205) 203-0363
acopeland@peifferwolf.com

*AND*

Michael C. Bixby (will seek admission pro hac vice)
BIXBY LAW, PLLC
4300 Bayou Blvd Suite 16
Pensacola, FL 32503
T (850) 332-6945
michael@bixbylawfirm.com