**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

DANE DANIEL, JAMES GURTNER, and
DEANNA NEASON, individually and on behalf of
all others similarly situated,

*Plaintiffs,*

v.

JAKE LOUIS FRUGE, IAN JAMES PRUKNER,
BRAD ROMERO, MELTON WEAVER, AND PFS
INVESTMENTS, INC.,

*Defendants.*

Case No.: 4:25-cv-04857

Hon. Keith P. Ellison

**DEFENDANT PFS INVESTMENTS INC.'S APPENDIX OF EXHIBITS IN SUPPORT
OF ITS MOTION TO DISMISS**

1

AA 001

## DEFENDANT PFS INVESTMENTS INC.'S APPENDIX OF EXHIBITS IN SUPPORT OF ITS MOTION TO DISMISS

| Tab | Ex. | Description | Pages |
|-----|-----|-------------|-------|
| A |  | Declaration of Brian M. Lutz | App. 4-App. 5 |
|  | A | FINRA Letter of Acceptance, Waiver, and Consent No. 2022074939304 | App. 6-App. 13 |
|  | B | Dane Daniel Champion Agreement | App. 14-App. 32 |

Dated: December 19, 2025

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

*/s/ Brian M. Lutz*
BRIAN M. LUTZ (*pro hac vice*)
One Embarcadero Center #2600
San Francisco, CA 94111
Telephone: (415) 393-8200
Facsimile: (415) 393-8306
BLutz@gibsondunn.com

COLLIN J. COX
Texas Bar No. 24031977
SDTX Federal No. 654469
811 Main Street, Suite 3000
Houston, TX 77002
Telephone: (346) 718-6600
Facsimile: (346) 718-6620
CCox@gibsondunn.com

MICHAEL J. KAHN (*pro hac vice*)
One Embarcadero Center #2600
San Francisco, CA 94111
Telephone: (415) 393-8200
Facsimile: (415) 393-8306
MJKahn@gibsondunn.com

*Attorneys for Defendant*
*PFS Investments Inc.*

2

3

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Civ. L.R. 5.3, I hereby certify that on December 19, 2025, I caused a

copy of the foregoing to be electronically filed with the Clerk of the Court by using the

CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Brian M. Lutz*
Brian M. Lutz

AA 003

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| |
|---|
| DANE DANIEL, JAMES GURTNER, and DEANNA NEASON, individually and on behalf of all others similarly situated, <br><br> *Plaintiffs,* <br><br> v. <br><br> JAKE LOUIS FRUGE, IAN JAMES PRUKNER, BRAD ROMERO, MELTON WEAVER, AND PFS INVESTMENTS, INC., <br><br> *Defendants.* |

Case No.: 4:25-cv-04857

Hon. Keith P. Ellison

**DECLARATION OF BRIAN M. LUTZ IN SUPPORT OF PFS INVESTMENTS INC.'S MOTION TO DISMISS**

I, Brian M. Lutz, declare as follows:

1.      I am an attorney licensed to practice in the State of California, and I am admitted to practice before this Court *pro hac vice* in the above-captioned matter (the "Action"). I am a partner with the law firm of Gibson, Dunn & Crutcher LLP, attorneys for Defendant PFS Investments Inc. ("PFSI") in the Action. My business address is One Embarcadero Center #2600, San Francisco, CA 94111. I respectfully submit this declaration in support of PFSI's Motion to Dismiss (the "Motion to Dismiss").

2.      Attached hereto as Exhibit A is a true and correct copy of the FINRA Letter of Acceptance, Waiver, and Consent No. 2022074939304, dated July 12, 2024.

3.      Attached hereto as Exhibit B is a true and correct copy of plaintiff Dane Daniel's Champion Agreement, dated November 6, 2023.

1

AA 004

2

I declare pursuant to 28 U.S.C. § 1746 and under penalty of perjury under the laws of the

United States of America that the foregoing is true and correct.

Executed on this, the 19th day of December, 2025, in San Francisco, California.

/s/ Brian M. Lutz
BRIAN M. LUTZ (*pro hac vice*)
One Embarcadero Center #2600
San Francisco, CA 94111
Telephone: (415) 393-8200
Facsimile: (415) 393-8306
BLutz@gibsondunn.com

2

AA 005

# EXHIBIT A

**FINANCIAL INDUSTRY REGULATORY AUTHORITY**
**LETTER OF ACCEPTANCE, WAIVER, AND CONSENT**
**NO. 2022074939304**

TO:   Department of Enforcement
       Financial Industry Regulatory Authority (FINRA)

RE:   PFS Investments Inc. (Respondent)
       Member Firm
       CRD No. 10111

Pursuant to FINRA Rule 9216, Respondent PFS Investments Inc. (PFSI) submits this Letter of Acceptance, Waiver, and Consent (AWC) for the purpose of proposing a settlement of the alleged rule violations described below. This AWC is submitted on the condition that, if accepted, FINRA will not bring any future actions against Respondent alleging violations based on the same factual findings described in this AWC.

**I.**

**ACCEPTANCE AND CONSENT**

A.   Respondent accepts and consents to the following findings by FINRA without admitting or denying them:

**BACKGROUND**

PFSI has been a FINRA member since 1981. The firm is headquartered in Duluth, Georgia and has approximately 19,000 registered representatives in 4,000 branch offices. PFSI's broker-dealer business includes sales of mutual funds and variable annuities.[1]

**OVERVIEW**

Between April 2021 and March 2023, PFSI was on notice that three of its registered representatives co-owned and operated an outside business activity (OBA). Although it maintained written supervisory procedures (WSPs) requiring representatives to disclose OBAs to the firm in writing consistent with FINRA Rule 3270, the firm did not enforce that requirement. By failing to require the representatives to submit written notice in compliance with FINRA Rule 3270, PFSI violated FINRA Rules 3110 and 2010.

**FACTS AND VIOLATIVE CONDUCT**

This matter originated from an anonymous complaint about the marketing of the OBA.

---

[1] For more information about the firm, including prior regulatory events, visit BrokerCheck® at www.finra.org/brokercheck.

AA 007

FINRA Rule 3110(a) provides that "[e]ach member shall establish and maintain a system to supervise the activities of each associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with applicable FINRA rules." FINRA Rule 3110(b) provides that "[e]ach member shall establish, maintain, and enforce written procedures to supervise the types of business in which it engages and the activities of its associated persons that are reasonably designed to achieve compliance with applicable securities laws and regulations, and with applicable FINRA rules." A violation of FINRA Rule 3110 constitutes a violation of FINRA Rule 2010, which requires a member firm to observe high standards of commercial honor and just and equitable principles of trade in the conduct of its business.

FINRA Rule 3270 prohibits registered persons from engaging in OBAs unless they provide prior written notice to the member firm, in such form as specified by the member. Once the member firm receives written notice, the firm must evaluate the proposed activity pursuant to Supplementary Material .01 to FINRA Rule 3270 (Rule 3270.01), including determining whether the OBA poses a potential conflict with the registered person's responsibilities to the firm or the public and whether the OBA should be characterized as an outside securities transaction subject to FINRA Rule 3280. The firm must also consider whether to impose specific conditions or limitations on the registered person's participation in the OBA.

PFSI's written supervisory procedures required representatives engaging in an OBA to report the nature of the activity in writing to the firm, which would then review the proposed activity. Once PFSI received the required written notice, PFSI's WSPs required the firm to complete the required review under FINRA Rule 3270.01.

In late March 2021, three PFSI registered representatives founded a company independent of PFSI that had two distinct lines of business. First, the company assisted customers with setting up and operating e-commerce storefronts, which offered products for sale on established e-commerce platforms. Second, the company offered to customers lead-generation websites (digital real estate), which advertised a particular service in a particular location and prompted consumers to provide their information if they were interested in that service. The e-commerce storefronts generated revenue when online consumers purchased products through the storefronts, and the digital real estate websites typically generated revenue on a per-lead basis through sales to third-party lead aggregators. The OBA's customers each paid an up-front fee per e-commerce storefront and per digital real estate website and then received a percentage of any income those storefronts and websites generated.

In April 2021, PFSI became aware of the e-commerce storefront component of the OBA after one of the three representatives orally disclosed it to the firm's OBA team. At PFSI's oral request, this representative orally provided the information contained on PFSI's OBA Form. PFSI did not discuss the information contained on the OBA Form with the other two representatives, and contrary to PFSI's WSPs, PFSI did not require any of the three representatives to provide written notice of the OBA. Instead, the Firm approved the OBA in August 2021 based on oral notice from the one representative. At

2

AA 008

that time, PFSI was aware that the OBA had already sold e-commerce storefront products but was unaware of the exact magnitude of these sales. PFSI was also unaware of the OBA's digital real estate line of business and was unaware that the three representatives would be involved in marketing the OBA.[2] By the time of PFSI's approval of the e-commerce storefront component of the OBA, the OBA had already received up-front fees from at least 33 customers, some of whom were e-commerce storefront customers, some of whom were digital real estate customers, and some of whom were both.

In the fall of 2021, shortly after PFSI's approval of the e-commerce storefront component of the OBA, PFSI began receiving complaints from several of its registered representatives that the three representatives were marketing the OBA on social media. These social media posts were visible to the public, including PFSI registered representatives and PFSI customers. Even with this additional information about the three representatives' involvement with the OBA, PFSI did not require any of them to submit written notice. After attempting to force the three representatives to identify all PFSI representatives and customers who were customers of the OBA, in October 2021, PFSI prohibited the three representatives from marketing the OBA. However, after the marketing suspension went into effect, PFSI received additional complaints from several of its registered representatives in late 2021 and early 2022 regarding the three representatives' continued marketing of their OBA on social media.

In February 2022, PFSI had a discussion with one of the registered representatives regarding the marketing of the OBA, and during this meeting, the registered representative orally disclosed the OBA's digital real estate line of business. Unbeknownst to PFSI, by this time, the OBA had already received up-front fees for over 900 digital real estate websites. PFSI still did not require the three representatives to provide written disclosure of the OBA, including the newly identified digital real estate component of the OBA.

In April 2022, PFSI instructed the representatives that they could no longer remain associated with PFSI unless they terminated their involvement with the OBA. By this time, PFSI was on notice that the representatives were continuing to market the OBA through public social media posts. PFSI was also on notice that other PFSI representatives were continuing to complain about the marketing of the OBA and that the representatives had refused to provide a list of PFSI customers who were also customers of the OBA. Although the three representatives continued actively working on the OBA—and the OBA continued to make significant sales to its customers—the three representatives did not immediately leave PFSI, nor did PFSI ever require them to provide written notice of their involvement with the OBA. Two of the representatives terminated their association with PFSI in August 2022, and the third did so in March 2023. Although PFSI was unaware of the precise volume of the OBA's sales, between

---

[2] FINRA sanctioned the three representatives for their failures to timely and completely disclose in writing the OBA's activities to PFSI (each consented to a 24-month suspension in all capacities and a $10,000 fine).

AA 009

April 2021 and March 2023, hundreds of OBA customers purchased approximately $33 million in e-commerce storefronts and digital real estate from the OBA.[3]

PFSI failed to comply with Rule 3110 because it failed to establish, maintain, and enforce a supervisory system that was reasonably designed to achieve compliance with FINRA Rules 3270 and 3270.01. In particular, the firm failed to enforce its WSPs for compliance with FINRA Rule 3270 by failing to require the representatives to provide a written disclosure of their OBA. Despite repeatedly receiving new information suggesting that the representatives' involvement in the OBA was significant and ongoing, PFSI did not require the representatives to make any written disclosure of the OBA, which was contrary to the firm's WSPs and the firm's obligations to evaluate the OBA under Rule 3270.01.

Therefore, PFSI violated FINRA Rules 3110 and 2010.

B.      Respondent also consents to the imposition of the following sanctions:

- a censure; and

- a $60,000 fine.

Respondent agrees to pay the monetary sanction upon notice that this AWC has been accepted and that such payment is due and payable. Respondent has submitted an Election of Payment form showing the method by which it proposes to pay the fine imposed.

Respondent specifically and voluntarily waives any right to claim an inability to pay, now or at any time after the execution of this AWC, the monetary sanction imposed in this matter.

The sanctions imposed in this AWC shall be effective on a date set by FINRA.

**II.**

**<u>WAIVER OF PROCEDURAL RIGHTS</u>**

Respondent specifically and voluntarily waives the following rights granted under FINRA's Code of Procedure:

A.      To have a complaint issued specifying the allegations against it;

B.      To be notified of the complaint and have the opportunity to answer the allegations in writing;

---

[3] Unbeknownst to PFSI, which received no complaints from identified customers and never received an OBA customer list from the representatives, certain PFSI customers were in fact also customers of the OBA.

4

AA 010

C.      To defend against the allegations in a disciplinary hearing before a hearing panel, to have a written record of the hearing made, and to have a written decision issued; and

D.      To appeal any such decision to the National Adjudicatory Council (NAC) and then to the U.S. Securities and Exchange Commission and a U.S. Court of Appeals.

Further, Respondent specifically and voluntarily waives any right to claim bias or prejudgment of the Chief Legal Officer, the NAC, or any member of the NAC, in connection with such person's or body's participation in discussions regarding the terms and conditions of this AWC, or other consideration of this AWC, including its acceptance or rejection.

Respondent further specifically and voluntarily waives any right to claim that a person violated the ex parte prohibitions of FINRA Rule 9143 or the separation of functions prohibitions of FINRA Rule 9144, in connection with such person's or body's participation in discussions regarding the terms and conditions of this AWC, or other consideration of this AWC, including its acceptance or rejection.

## III.

## OTHER MATTERS

Respondent understands that:

A.      Submission of this AWC is voluntary and will not resolve this matter unless and until it has been reviewed and accepted by the NAC, a Review Subcommittee of the NAC, or the Office of Disciplinary Affairs (ODA), pursuant to FINRA Rule 9216;

B.      If this AWC is not accepted, its submission will not be used as evidence to prove any of the allegations against Respondent; and

C.      If accepted:

1.      this AWC will become part of Respondent's permanent disciplinary record and may be considered in any future action brought by FINRA or any other regulator against Respondent;

2.      this AWC will be made available through FINRA's public disclosure program in accordance with FINRA Rule 8313;

3.      FINRA may make a public announcement concerning this agreement and its subject matter in accordance with FINRA Rule 8313; and

4.      Respondent may not take any action or make or permit to be made any public statement, including in regulatory filings or otherwise, denying, directly or indirectly, any finding in this AWC or create the impression

5

AA 011

that the AWC is without factual basis. Respondent may not take any position in any proceeding brought by or on behalf of FINRA, or to which FINRA is a party, that is inconsistent with any part of this AWC. Nothing in this provision affects Respondent's right to take legal or factual positions in litigation or other legal proceedings in which FINRA is not a party. Nothing in this provision affects Respondent's testimonial obligations in any litigation or other legal proceedings.

D.    Respondent may attach a corrective action statement to this AWC that is a statement of demonstrable corrective steps taken to prevent future misconduct. Respondent understands that it may not deny the charges or make any statement that is inconsistent with the AWC in this statement. This statement does not constitute factual or legal findings by FINRA, nor does it reflect the views of FINRA.

The undersigned, on behalf of Respondent, certifies that a person duly authorized to act on Respondent's behalf has read and understands all of the provisions of this AWC and has been given a full opportunity to ask questions about it; that Respondent has agreed to the AWC's provisions voluntarily; and that no offer, threat, inducement, or promise of any kind, other than the terms set forth in this AWC and the prospect of avoiding the issuance of a complaint, has been made to induce Respondent to submit this AWC.

July 11, 2024
_____
Date

*Lori Rivet*
_____
PFS Investments Inc.
Respondent

Print Name: Lori Rivet

Title: EVP and Deputy General Counsel

Reviewed by:

*Terry R. Weiss*
_____
Terry R. Weiss
Stefanie Wayco
Counsel for Respondent
Duane Morris LLP
1075 Peachtree Street NE, Suite 1700
Atlanta, GA 30309-3929

6

AA 012

Accepted by FINRA:

Signed on behalf of the
Director of ODA, by delegated authority

July 12, 2024
_____

Date

_____

Lisa Lightbody
Counsel
FINRA
Department of Enforcement
Brookfield Place
200 Liberty Place
New York, NY 10281

7

AA 013

# EXHIBIT B

AA 014

# CHAMPΨON

Champion and or its sales representatives and affiliates are only acting in the capacity of sales agent(s) or sales broker(s) in this transaction. The fulfillment of all deliverables, maintenance, service, customer care, collection of any ongoing fees, including the operating expenses and revenue or profit sharing splits, shall be solely honored and serviced by the Provider: Jungle Consulting Group.

Champion does not make any promises as to the actual expected sales experience, performance or results. Due to the uniqueness of each store and its offered merchandise, as well as the availability of inventory, any sales projections which may be used throughout the sales process are speculative and we cannot guarantee results.

If there are any competing terms between Champion and Jungle Consulting Agreements, ultimately, the Service Agreement provided by Jungle Consulting Group shall prevail and govern.

Further, any future claims or disputes arising from this transaction related to your store account shall be directed to the Provider. The Provider alone shall be responsible for the advising, managing and facilitating transactions on the related account.

CLIENT:

DocuSigned by:

*Dane Daniel*

By: Client Name/Business name:

Date: 11/6/2023

AA 015

**SERVICE AGREEMENT**

This SERVICE AGREEMENT (hereinafter referred to as "the Agreement" or "Agreement") shall be effective on date of execution as indicated on the signature page (referred to as "Effective Date") and is entered into by" Jungle Consulting Group (referred to as "the Provider" or "Provider") **AND** Dane       Daniel          (referred to as "the Client" or "Client"). Both referred to as "the Party" or "Party" or collectively as "the Parties" or "Parties."

**CONTENTS OF TERMS:**

PREAMBLE ............................................................................................................ Page 2

INDEPENDENT CONTRACTOR RELATIONSHIP..................................................... Page 2

TERM OF AGREEMENT............................................................................................ Page 2

TERMINATION OF AGREEMENT ............................................................................ Page 2-3

TERMS OF SERVICES ............................................................................................. Page 3-4

RIGHT OF INDEMNIFICATION ................................................................................ Page 4

ACCESS AND MAINTENANCE OF FINANCIAL RECORDS ................................. Page 4

PROPRIETARY INFORMATION ............................................................................... Page 4-5

AMAZON STORE/NON-DISPARAGEMENT/NON-DISCLOSURE ........................ Page 5-6

WARRANTIES AND LIMITATIONS/BUSINESS RISK ........................................... Page 6-7

MISCELLANEOUS TERMS OF AGREEMENT ....................................................... Page 7-10

EXECUTION PAGE .................................................................................................. Page 11

SCHEDULE 1 ........................................................................................................... Page 12

AA 016

## PREAMBLE

WHEREAS, Client contracts with Provider for it to perform various Services (as to be defined in the Agreement) for Client; and

WHEREAS, Provider is willing and desires to be retained by Client, and Client is willing and desires to retain Provider, only on the terms, covenants, and conditions set forth in this Agreement.

THEREFORE, in consideration of the mutual covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## AGREEMENT

**1. INDEPENDENT CONTRACTOR RELATIONSHIP:**
Parties expressly state that their intention is that the Provider is an independent contractor. Neither Party is an agent, representative, joint venturer, or partner of the other Party. This Agreement will not be interpreted or construed to create an association, agency, joint venture, or partnership between the Parties or to impose any liability attributable to such a relationship upon either of the Parties.

**2. TERM OF AGREEMENT:**
　　2.1. Term. This Agreement will commence on the Effective Date and will continue for a one (1) year period from the Effective Date (the "Initial Term"). The term will renew automatically, without any action required by the Parties, for consecutive additional one (1) year periods unless and until otherwise terminated in accordance with Section 3.1 below (each additional one (1) year period a "Renewal Term" and collectively the "Renewal Terms"). The Initial Term and Renewal Terms, if any, are collectively referred to as the "Term."

**3. TERMINATION OF AGREEMENT:**
　　3.1. Termination. Provider may terminate this Agreement (i) immediately, at any time, upon a breach of this Agreement by Client, or (ii) upon thirty (30) days' prior written notice to Client made in accordance with Section 10.3 below. Client may terminate this Agreement by providing written notice to Provider, in accordance with Section 10.3 below, upon sixty (60) days' prior written notice. For avoidance of doubt, if Client fails to give Provider written notice at least sixty (60) days prior to the Initial Term or Renewal Term, as applicable, then Client must pay Provider the Renewal Term Payment for the next Renewal Term.



AA 017

3.2. <u>Survival</u>. Upon expiration or termination of the Term in accordance with the terms and conditions of this Agreement, all rights and duties of the Parties toward each other will cease except: (i) Client shall deliver to Provider the sum total of all costs incurred and paid by Provider while performing the Services under this Agreement, including, without limitation, any software fees and virtual assistant or virtual manager fees or costs, together with any other Compensation due and payable by Client or earned by Provider as of the date of expiration or termination of this Agreement, and (ii) Sections 3.3, 4.2, 6, 7, 8, 7, 9, and 10 will survive any expiration or termination of this Agreement.

**4. TERMS OF SERVICES:**

Client and Provider agree on certain services to be performed under this Agreement as more fully set forth in Schedule 1, attached hereto and incorporated herein (collectively, the "Services"). Prior to Provider's performance of the Services, Client shall set up an Amazon Store e-commerce store account (the "Account") with Amazon Store.com, Inc. or its applicable affiliate entity(ies) ("Amazon Store") and prepare and execute the necessary documentation and fulfill all other requirements necessary in order to establish Provider and its representatives as an "authorized user" on the Account, with full access and privileges to the Account. In the event the Parties desire to update, expand, revise, or otherwise amend the Services, such revision or amendment must be performed in accordance with the terms and conditions of Section 10.10 of this Agreement.

4.1. <u>Services</u>. Subject to the terms and conditions of this Agreement, and in consideration of the Compensation (as defined below), Provider shall render and perform the Services for Client during the Term (as defined below) set forth herein. The manner and means by which Provider chooses to complete the Services are in Provider's sole discretion and control. Provider has complete authority and final decision-making ability with respect to the Account and performing the Services in connection thereto. Client agrees to and shall execute any documents reasonably necessary to allow Provider to conduct the Services contemplated by this Agreement. When performing the Services, other than as may be otherwise set forth herein, Provider will provide its own equipment, tools, and other materials. Client shall make its facilities and equipment, if any,available to Provider when necessary to perform the Services. Provider will perform the services necessary to complete the Services in a timely and professional manner consistent with industry standards, and data location, place, and time that Provider deems appropriate.

4.2. <u>Compensation</u>. Client shall pay and deliver to Provider during the Term, and after the Term as applicable in accordance with Section 3.1, the following: (a) Initial Payment. Together with Client's execution and delivery of this Agreement to the Provider, Client shall remit a payment to Provider in an amount equal to Forty Five Thousand 00/100 Dollars ($45,000) the "Initial Payment.



AA 018

(b) <u>Monthly Payments</u>. On or prior to the tenth (10th) calendar day of each month during the Term hereof, Client shall remit payment to Provider (the "Monthly Payments") in an amount equal to Forty and 00/100 percent (40.00%) of the Net Revenue (as defined herein) for the prior month…commonly referred to as the "Rev Share" split. As used herein, "Net Revenue" means and is defined as the total gross revenues received or earned by Client from sales made under or relating to the Account less any credits and refunds actually issued and paid by Client to his/her/its customer during a monthly period. Provider may request from time to time, and Client shall deliver within five (5) days of such request, a statement detailing the total amounts of gross revenue and the resulting Net Revenue for the requested month, calculated based on the Net Revenue formula described herein. Additionally, Client shall be responsible for monthly operating expenses in the amount of Three Hundred 00/100 Dollars ($300), which shall be collected from Client by the Provider.

(c) <u>Reimbursement</u>. During the Term, Client shall reimburse Provider for costs incurred and paid by Provider while performing the Services under this Agreement (the "Reimbursement"), including, without limitation, any software fees or costs and virtual assistant or virtual manager fees or costs. The Initial Payment, the Monthly Payments, Renewal Term Payments, and the Reimbursement are collectively defined in this Agreement as the "Compensation." The Compensation will be payable by Client to Provider only by wire, cashier's check, teller's check, certified check, or in such other manner as Provider may agree to in writing from time to time.

4.3 Source of Funding.  Client understands that he/she is required to provide their own source of additional capital in order to purchase inventory to be sold.

**5. RIGHT OF INDEMNIFICATION:**

5.1. Client shall defend, indemnify, and hold Provider harmless from and against any claim, loss, costs, or damages, including, without limitation, reasonable attorneys' fees, arising out of or resulting from any action by any third party against Provider that is based upon (i) the Account or any of the products sold thereunder, (ii) any negligent, reckless, or intentionally wrongful act or omission of Client, (iii) any intellectual property claim related to the Account, the products sold thereunder, or the Proprietary Information created or used by Provider in its performance of the Services under this Agreement, (iv) any actual or alleged breach of Amazon Store's Policies, or (v) any breach by Client of any of the terms, conditions, covenants, representations, or warranties contained in this Agreement.

5.2. Subject to Sections 9.2 and 9.3, Provider shall indemnify Client harmless from and against any claim, loss, costs, or damages, including, without limitation, reasonable attorneys' fees, arising out of or resulting from any action by a third party against Client that is based upon any grossly negligent or intentionally wrongful act of Provider.



AA 019

## 6. ACCESS AND MAINTENANCE OF FINANCIAL RECORDS:

Client shall maintain complete and accurate records relating to Section 4.2 of this Agreement. Within ten (10) days of Provider's written request, Client shall either furnish or allow Provider and its authorized representatives to inspect and make copies of such records in connection with the provision of the Services, including, but not limited to, financial records.

## 7. PROPRIETARY INFORMATION:

7.1. Each Party may disclose certain information it considers confidential and/or proprietary to the other Party, whether before, during, or after the Term of this Agreement, including, but not limited to, tangible, intangible, visual, electronic, present, or future information such as (i) trade secrets, (ii) financial information, (iii) technical information, including, without limitation, technical drawings, techniques, inventions, methodologies, formulas, or developments used in its business, (iv) business information, including, without limitation, operations, planning, marketing interests, methods, files, credit collection techniques, electronic files, customers, and product strategies or methods, (v) the terms of any agreement entered into between a third party and such Party, including, but not limited to, this Agreement, its clients and customers and the discussions, negotiations, and proposals related thereto, and (vi) all information subject to this Agreement and any other information acquired or property exchanged during meetings, conversations, or communications with such Party, its members, managers, directors, officers, shareholders, employees, agents, contractors, affiliates, or assigns(the foregoing collectively defined as "Proprietary Information").

7.2. The Parties shall use and possess Proprietary Information only for the purpose of performing the terms and conditions of this Agreement. Each Party shall use the same degree of care, but no less than a reasonable degree of care, as such Party uses with respect to its own information of a similar nature to protect the Proprietary Information and to prevent (i) any use of Proprietary Information in violation of this Agreement, and/or (ii) communication of Proprietary Information to any unauthorized third parties. Each Party shall keep such Proprietary Information confidential during the Term hereof and for a period of five (5) years following the termination or expiration of the Term, and shall not disclose such Proprietary Information, in whole or in part, to any person other than such Party's representatives or agents who need to know such Proprietary Information in connection with such Party's involvement with the other Party under, in connection with, and pursuant to this Agreement; provided, however, the Parties acknowledge and agree that the duty of confidentiality related to trade secrets herein shall not expire.

7.3. This Agreement imposes no obligation upon a Party with respect to Proprietary Information that (i) is or becomes publicly available through no fault of such Party, (ii) is rightfully received by such Party from a third party without a duty of confidentiality owed to the other Party, (iii) is independently developed by such Party without breach of this Agreement, (iv) is disclosed by such Party with the other Party's prior written approval, or (v) is required to be disclosed by operation of law, court order, or other governmental demand ("Process"), provided that (A) such Party shall promptly and immediately notify the other Party of such Process, and (B) such Party

AA 020

shall not produce or disclose proprietary information in response to the Process unless the other Party has (1) requested protection from the legal or governmental authority requiring the Process and such request has been denied, (2) consented in writing to the production or disclosure of the Proprietary Information in response to the Process, or (3) taken no action to protect its interest in the Proprietary Information within twenty-one (21) business days after receipt of notice of its obligation to produce or disclose Proprietary Information in response to the Process.

## 8. AMAZON STORE PLATFORM AND NON-DISPARAGEMENT AND NON-DISCLOSURE:

8.1. Client acknowledges and agrees that Client's Account is a service hosted on the Amazon Store platform and not a distinct or severable product that can be ported, removed, or installed in or on a different place or platform. Client acknowledges that Amazon Store has the right to suspend or terminate Client's Account For violation of any of Amazon Store's policies, including, without limitation, the Conditions of Use and Selling Policies and Seller Code of Conduct (all of Amazon Store's policies relating to sellers on Amazon Store's platform collectively "Amazon Store's Policies"). Client represents and warrants that he/ she/it has read all of Amazon Store's Policies relating to the Account and has determined that the Services provided do not violate Amazon Store's Policies. Client also covenants that he/she/it will not take any action or allow any omission in violation ofAmazon Store's policies.

8.2. Each Party agrees not to make any statements, or cause or encourage others to make any statements that may be heard or read by a third-party, that defame, disparage, deride or in any way damage the personal or business reputation, practices, or conduct of the other Party regardless of whether such comments could be deemed factually true or false. The Parties further understand and agree that this Section 8.2 is a material provision of this Agreement and that any breach of this Section 8.2 would be a material breach of this Agreement, and that the non-breaching Party would be materially harmed by a violation of this provision.

## 9. EXPRESSED AND IMPLIED WARRANTIES AND LIMITATIONS; BUSINESS RISK:

9.1. Each Party hereto represents and warrants that (a) such Party has the full corporate or individual contractual capacity, right, power, and authority to enter this Agreement and to perform the acts required of such Party hereunder, (b) the execution of this Agreement by such Party, and the performance by such Party of its obligations and duties hereunder do not, and will not, violate any agreement to which such Party is bound, and (c) when executed and delivered by such Party, this Agreement will constitute the legal, valid, and binding obligation of such Party, enforceable against such Party in accordance with its terms.



AA 021

**9.2. OTHER THAN THE WARRANTIES SET FORTH IN SECTION 8.1 ABOVE,** Provider NOR ANY PERSON ACTING ON PROVIDER'S BEHALF, HAS MADE, MAKES, OR WILL MAKE FOR CLIENT'S, OR CLIENT'S CUSTOMERS, OR ANY OTHERS' BENEFIT, ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WHATSOEVER, INCLUDING, WITHOUT LIMITATION, ANY WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, OR NON-INFRINGEMENT, WHETHER ARISING BY LAW, COURSE OF DEALING, COURSE OF PERFORMANCE, USAGE OF TRADE, BY OPERATING OF LAW, ARISING FROM STATUTE, OR OTHERWISE, ALL OF WHICH ARE EXPRESSLY DISCLAIMED. CLIENT ACKNOWLEDGES THAT IT HAS NOT RELIED ON ANY REPRESENTATION OR WARRANTY MADE BY PROVIDER, OR ANY OTHER PERSON ON PROVIDER'S BEHALF OTHER THAN THE REPRESENTATIONS AND WARRANTIES EXPLICITLY SET FORTH IN THIS AGREEMENT. PROVIDER MAKES NO REPRESENTATIONS REGARDING THE SPECIFIC PROFITABILITY OF CLIENT'S ACCOUNT AND CLIENT FURTHER RECOGNIZES ANY INFORMATION OR DEMONSTRATIONS PROVIDED BY PROVIDER TO CLIENT REGARDING THE PROFITABILITY OF ANY THIRD PARTIES SHALL BE DEMONSTRATIVE IN NATURE ONLY AND CLIENT DOES NOT RELY UPON NOR DOES **Provide**r REPRESENT SUCH DEMONSTRATIVE THIRD PARTY SUCCESS AND/OR PERFORMANCE IN ANY MANNER WHATSOEVER CREATES ANY GUARANTEE, REPRESENTATION, WARRANTY, OR OTHERWISE REGARDING CLIENT'S ACCOUNT'S PROFITABILITY. NOTWITHSTANDING ANYTHING TO THE CONTRARY SET FORTH HEREIN, ANY PRODUCTS THAT ARE ORDERED BY CUSTOMERS OF CLIENT ON THE ACCOUNT WILL BE FULFILLED BY AMAZON (FBA), AND PROVIDER WILL AT NO TIME HAVE ANY RESPONSIBILITY OR LIABILITY FOR THE RECEIPT, SUFFICIENCY, OR ADEQUACY OF SUCH PRODUCTS, OR ANY CONSEQUENCES IMPOSED BY AMAZON STORE FOR ANY REASON, INCLUDING WITHOUT LIMITATION, AMAZON STORE'S CONDITIONS OF USE AND SELLING POLICIES AND SELLER CODE OF CONDUCT.

9.3. Provider DISCLAIMS ANY AND ALL LIABILITY FOR SPECIAL, INCIDENTAL, CONSEQUENTIAL, OR INDIRECT DAMAGES, INCLUDING LOSS OF USE AND PROFITS, ARISING OUT OF THIS AGREEMENT OR WITH RESPECT TO PROVIDER'S PERFORMANCE, OR FAILURE TO PERFORM, THE TERMS AND CONDITIONS OF THIS AGREEMENT, HOWEVER CAUSED, WHETHER FOR BREACH OF CONTRACT, NEGLIGENCE, OR OTHERWISE, EVEN IF PROVIDER HAS BEEN INFORMED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT IS PROVIDER OR ANY PROVIDER REPRESENTATIVES LIABLE FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE, OR ENHANCED DAMAGES, LOST PROFITS OR REVENUES, OR DIMINUTION OF VALUE, ARISING OUT OF OR RELATED TO ANY BREACH OF THIS AGREEMENT, REGARDLESS OF WHETHER THE DAMAGES WERE FORESEEABLE, WHETHER CLIENT OR ITS CUSTOMERS WERE ADVISED OF THE POSSIBILITY OF THE DAMAGES, AND REGARDLESS OF THE LEGAL OR EQUITABLE THEORY, WHETHER CONTRACT, TORT, OR OTHERWISE, ON WHICH THE CLAIM IS BASED. FURTHER, IN NO EVENT WILL PROVIDER'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT, TORT,OR OTHERWISE, EXCEED THE TOTAL OF THE MONTHLY PAYMENTS PAID AND ACTUALLY RECEIVED BY PROVIDER FROM CLIENT

AA 022

DURING THE PRIOR TWO (2) MONTHS UNDER THIS AGREEMENT. THE FOREGOING LIMITATIONS WILL APPLY NOTWITHSTANDING ANY FAILURE OF THE ESSENTIAL PURPOSE OF ANY LIMITED REMEDY.

8.3 While Provider exercises the best efforts to create and maintain stores that perform quickly, there may be a period of months or possibly years in which sales and/or Account performance may not result in a Net Profit to Client. Client also acknowledges and agrees that e-commerce is an ever-changing industry that is subject to many different types of business risk, including but not limited to: (a) a changing legal environment in which regulations can emerge or change that affects the marketability of Amazon Store products; (b) macroeconomic changes that affect consumer spending, the emergence of recessions and the like; (c) changes in the popular appeal of and demand for different types of Amazon Store products; (d) changes in Amazon Store's policies, to which Provider and Client are bound alike, which may affect the marketability of the products sold on Client's Account; (e) changes in international politics or economics, which may affect, among other things, the ability to package, distribute and/or ship Amazon Store products, and the costs thereof;

(f) market forces, including increased and/or changing levels of competition for any given product from other sellers of such product; or (g) unforeseen events, force majeure, and other external events that could affect the performance of any Amazon Store store.

## 10. MISCELLANEOUS TERMS OF AGREEMENT:

10.1. <u>Assignment</u>. The rights, duties, and obligations of Client are personal to Client, and it shall not voluntarily assign, pledge, or transfer any of the rights derived nor delegate its duties hereunder without the prior written consent of Provider. The rights and obligations of Provider hereunder will insure to the benefit of and be binding upon its successors and assigns.

10.2. <u>Absence of Restrictions.</u> Client represents and warrants to Provider that it is not under any obligation to any other party that is inconsistent with or in conflict with this Agreement or that would prevent, limit, or impair in any way Client's performance of this Agreement.

10.3. <u>Notices</u>. Any notice given or required to be given under this Agreement must be in writing and must be either hand delivered or mailed by certified mail, return receipt requested, postage prepaid, addressed to the other Party at the address stated below or at such other address as such Party from time to time designates in writing to the other Party, and will be effective from the date of hand delivery or mailing To the address listed on the signature page below, or if no address is written in, to the address Provider has on file for Client.



AA 023

**If to Provider:**
JUNGLE CONSULTING GROUP

10.4. DISPUTE RESOLUTION – MEDIATION AND ARBITRATION, NO CLASS ACTIONS. ANY DISPUTE, CLAIM, OR CONTROVERSY ARISING OUT OF OR RELATING IN ANY WAY TO THIS AGREEMENT OR THE SERVICES SHALL BE RESOLVED THROUGH A DISPUTE RESOLUTION APPROACH DESCRIBED BELOW.

(A) MEDIATION. THE PARTY INITIATING THE DISPUTE SHALL SEND WRITTEN NOTICE OF THE DISPUTE TO THE OTHER PARTY ("NOTICE"). THE NOTICE SHALL BE SENT PURSUANT TO SECTION 10.3 AND SHALL (A) DESCRIBE THE NATURE AND BASIS OF THE CLAIM OR DISPUTE; (B) SET FORTH THE SPECIFIC RELIEF SOUGHT; AND (C) INCLUDE THE NAMES OF THREE (3) PROSPECTIVE MEDIATORS. THE MEDIATION SHALLBE HELD IN THE CITY OF Phoenix, Arizona AND SHALL LAST NO LESS THAN EIGHT (8) HOURS. THE PARTIES SHALL EQUALLY SPLIT THE MEDIATOR'S FEES.

(B) ARBITRATION. IF THE DISPUTE IS UNABLE TO BE SETTLED AT MEDIATION, THE PARTIES SHALL SUBMIT THE DISPUTE TO ARBITRATION. THE ARBITRATION SHALL BE CONDUCTED BEFORE A NEUTRAL SINGLE ARBITRATOR WHOSE DECISION WILL BE FINAL AND BINDING. THE ARBITRAL PROCEEDINGS WILL BE GOVERNED BY THE AMERICAN ARBITRATION ASSOCIATION ARBITRATION RULES (THE "RULES"). IF THE PARTIES ARE UNABLE TO AGREE UPON THE SELECTION OF AN ARBITRATOR WITHIN THIRTY (30) DAYS AFTER THE DATE OF THE MEDIATION, THE ARBITRATOR WILL BE SELECTED BY THE MUTUAL AGREEMENT OF THE PARTIES. IF NO AGREEMENT IS POSSIBLE, THE PARTIES SHALL EACH SELECT AN ARBITRATOR WHO SHALL THEN SELECT THE ARBITRATOR. ALL ISSUES ARE FOR THE ARBITRATOR TO DECIDE, INCLUDING THE APPLICABILITY OR SCOPE OF THIS ARBITRATION CLAUSE, BUT THE ARBITRATOR IS BOUND BY THIS AGREEMENT. THE PARTIES AGREE TO SPLIT THE ARBITRATOR'S FEES EVENLY. THE ARBITRATION SHALL BE CONDUCTED IN PERSON IN Phoenix, Arizona AND SHALL BE GOVERNED BY THE LAWS OF THE STATE OF ARIZONA. THE ARBITRATION WILL BE CONDUCTED IN THE ENGLISH LANGUAGE. JUDGMENT ON THE AWARD RENDERED BY THE ARBITRATOR MAY BE ENTERED IN ANY COURT OF COMPETENT JURISDICTION. THE ARBITRATOR, AND NOT ANY FEDERAL, STATE, OR LOCAL COURT, SHALL HAVE EXCLUSIVE AUTHORITY TO RESOLVE ANY DISPUTE RELATING TO THE INTERPRETATION, APPLICABILITY, UNCONSCIONABILITY, ARBITRABILITY, ENFORCEABILITY, OR FORMATION OF THIS AGREEMENT, INCLUDING ANY CLAIM THAT ALL OR ANY PART OF THIS AGREEMENT IS VOID OR VOIDABLE.



AA 024

10.5. <u>No Class Action</u>. Each Party agrees that, to the fullest extent permitted by applicable law, any dispute resolution proceedings pursuant to this Agreement will be conducted only on an individual basis and not in a class, consolidated or representative action. Further, each Party agrees that the arbitrator may not consolidate proceedings or more than one party's claims, and may not otherwise preside over any form of a representative or class proceeding, and that if this specific proviso is found to be unenforceable, then the entirety of this arbitration clause shall be null and void.

10.6. <u>Waiver of Jury Trial</u>. If a court of competent jurisdiction finds the foregoing arbitration provision in Section 10.4 invalid, unenforceable, or inapplicable, the Parties waive any right to a jury trial.

10.7. <u>Venue</u>; Governing law. If a court of competent jurisdiction finds the foregoing arbitration provision in Section 10.4 invalid, unenforceable, or inapplicable, the Parties agree that any dispute or controversy arising out of, relating to, or in connection with the interpretation, validity, construction, performance, breach, or termination of this Agreement will be exclusively resolved in state or federal courts located in Arizona , United States of America; and each Party hereby consents to both the jurisdiction and exclusive venue of the state and federal courts located in Arizona, United States of America, and waives any objection as to inconvenient forum. The dispute shall be governed by and under the laws of the State of Arizona, without regard to its conflicts of laws principles.

10.8. <u>Equitable Relief</u>. If a court of competent jurisdiction finds the foregoing arbitration provision in Section 10.4 invalid, unenforceable, or inapplicable, the Parties may, without limiting any other remedies, rights, or recourse under the laws of the state apply and pray the State of Arizona any court of competent jurisdiction in the State of Arizona, for a temporary restraining order, preliminary injunction, or other interim or conservatory relief, as necessary, without the necessity of posting an injunction bond.

10.9. <u>Entire Agreement</u>. This Agreement, along with any Exhibits or Schedules expressly incorporated herein, is the entire agreement of the Parties and supersedes any prior agreements between them, whether written or oral, with respect to the subject matter hereof. No waiver, alteration, or modification of any of the provisions of this Agreement will be binding unless in writing and signed by duly authorized representatives of the Parties hereto.

10.10. <u>Amendments and Waivers</u>. Any term or provision of this Agreement may be amended, and the observance of any term waived, only by a writing signed by the Party to be bound. No waiver of any default of the terms or conditions of this Agreement will be deemed to be a waiver of any other default, or any subsequent default of any terms or conditions of this Agreement but will apply solely to the instance to which such waiver is directed.



AA 025

10.11. <u>Severability</u>. If a court of competent jurisdiction holds any provision of this Agreement, or its application to any person, place, or circumstance, to be invalid, unenforceable, or void, such provision will be enforced to the greatest extent permitted by law, and the remainder of this Agreement and such provision as applied to other persons, places, and circumstances, will remain in full force and effect.

10.12. <u>Assignment</u>. Client shall not transfer or assign any of its rights or delegate any of its obligations hereunder, in whole or in part, whether voluntarily or by operation of law, without Provider's prior written consent. Any purported transfer, assignment, or delegation by Client without such prior written consent will be null and void *ab initio* and of no force or effect. Subject to the foregoing, this Agreement will inure to the benefit of the Parties and their successors, transferees, and assignees.

10.13. <u>Counterparts</u>; Headings. This Agreement may be executed simultaneously and in any number of counterparts, each of which is deemed an original, but all of which together constitute one (1) and the same instrument. The headings provided for herein are for convenience and reference only, and are not to be deemed a substantive part of this Agreement.

10.14. <u>Force Majeure</u>. Provider will not be liable nor responsible, nor be deemed to have defaulted or breached this Agreement, for any failure or delay in fulfilling or performing any term of this Agreement when and to the extent such failure or delay is caused by or results from acts or circumstances beyond the reasonable control of Provider, including, without limitation, acts of God, flood, fire, earthquake, explosion, governmental actions, war, invasion, or hostilities (whether war is declared or not), terrorist threats or acts,riots, or other civil unrest, national emergency, revolution, insurrection, epidemic, lock-outs, strikes, or other labor disputes (whether or not relating to either Party's workforce), or restraints or delays affecting carriers, or inability or delay in obtaining supplies of adequate or suitable materials, materials or telecommunications breakdown or power outage, acts by Amazon Store or its affiliates, including, without limitation, changes by Amazon Store to its drop shipping policies, website, platform, or terms of use, or the failure of Client to meet all requirements in order to grant Provider the access required in order to perform the Services hereunder, provided that, if the event in question continues for a continuous period in excess of one hundred twenty (120) days, each Party is entitled to give notice in writing to the other Party to terminate this Agreement.

10.15. <u>Recitals</u>. The recitals contained in this Agreement above are incorporated into and made an integral and substantive part of this Agreement.

10.16. <u>Effect of Agreement</u>. This Agreement serves to replace all prior agreements, both oral and written, and now hereby constitutes the entire agreement and understanding of and between the Parties. The Parties are not bound by any oral or written expression or representation by either, or by any agent of either Party purporting to act for or on behalf of another, or by a commitment or arrangement not otherwise specified in this Agreement.



AA 026

10.17. Mutual Drafting; Gender. This Agreement is the result of the joint efforts of the Parties, and each provision has been subject to the mutual consultation, negotiation, and agreement of the Parties, and there will be no construction against either Party based on any presumption of that Party's involvement or role in the drafting of this Agreement. Whenever used herein, the singular number includes the plural, the plural the singular, and the usage of the masculine, feminine, or neuter gender includes all genders.

**IN WITNESS WHEREOF**, the Parties hereto have executed this Agreement and its terms are binding upon the Parties as of the Effective Date defined herein above.

**CLIENT:**

DocuSigned by:

*Dane Daniel*

AABCF7C417214F7...

By _____Dane_____ Daniel

Date: 11/6/2023

**PROVIDER:**

_____

Jungle Consulting Group A
limited liability company

AA 027

**SCHEDULE 1**
SERVICES

     1. Provider will act as authorized user on the Account for the purposes of advising Client and managing and facilitating transactions on the Account. Provider will create listings for the Account and will handle  certain customer services such as e-mail exchanges with Client's customers and assisting with coordinating customer returns, sales, and shipment. Provider will devote such amount of time as Provider deems necessary, in its sole discretion, to provide the Services hereunder.



AA 028

**DocuSign**

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: 54559942FFEB4A1C94C4056510FFD663 | | Status: Completed |
| Subject: Complete with DocuSign: E-Commerce Store Contract. | | |
| Source Envelope: | | |
| Document Pages: 14 | Signatures: 2 | Envelope Originator: |
| Certificate Pages: 4 | Initials: 14 | Sales Champion E-Comm |
| AutoNav: Enabled | | 510 Mermentau Rd |
| EnvelopeId Stamping: Enabled | | nil |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | Youngsville, LA  70592 |
| | | sales@championecom.com |
| | | IP Address: 54.227.5.194 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Sales Champion E-Comm | Location: DocuSign |
| 11/6/2023 9:31:15 AM | sales@championecom.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Dane Daniel<br>dkdanielservices@gmail.com<br>Security Level: Email, Account Authentication (None) | DocuSigned by:<br>*Dane Daniel*<br>AABCF7C417214F7...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 209.205.168.136 | Sent: 11/6/2023 9:31:17 AM<br>Viewed: 11/6/2023 9:31:36 AM<br>Signed: 11/6/2023 9:32:36 AM |

**Electronic Record and Signature Disclosure:**
Accepted: 11/6/2023 9:31:36 AM
ID: df789d69-456d-43b9-af83-f6849151b148

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 11/6/2023 9:31:17 AM |
| Certified Delivered | Security Checked | 11/6/2023 9:31:36 AM |
| Signing Complete | Security Checked | 11/6/2023 9:32:36 AM |
| Completed | Security Checked | 11/6/2023 9:32:36 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

## Electronic Record and Signature Disclosure

AA 029

Electronic Record and Signature Disclosure created on: 9/28/2021 8:32:48 AM
Parties agreed to: Dane Daniel

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Champion E-Com (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

AA 030

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Champion E-Com:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:
To contact us by email send messages to: melton@championecom.com

**To advise Champion E-Com of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at melton@championecom.com and in the body of such request you must state: your previous email address, your new email address.  We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Champion E-Com**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to melton@championecom.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Champion E-Com**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

AA 031

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to melton@championecom.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Champion E-Com as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Champion E-Com during the course of your relationship with Champion E-Com.

AA 032