| | |
|---|---|
| DANE DANIEL, JAMES GURTNER, and DEANNA NEASON, individually and on behalf of all others similarly situated,<br>    *Plaintiffs,*<br><br>v.<br><br>JAKE LOUIS FRUGE, IAN JAMES PRUKNER, BRAD ROMERO, MELTON WEAVER, AND PFSI INVESTMENTS, INC.,<br><br>    *Defendants.* | Case No.: 4:25-cv-04857<br><br>Hon. Keith P. Ellison |

**PLAINTIFF'S OPPOSITION TO IAN JAMES PRUKNER'S MOTION TO DISMISS UNDER FEDERAL RULES OF CIVIL PROCEDURE 12(B)(6) AND 12(B)(3)**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................... 1

STATEMENT OF ISSUES ....................................................................................... 1

NATURE AND STAGE OF PROCEEDINGS ........................................................ 2

STATEMENT OF FACTS ........................................................................................ 2

    I.     The Champion Offerings Were Marketed and Sold as "100% Passive" Investments – to be Funded with Victims' Retirement Savings ............................... .2

    II.    Champion Securities Were Marketed and Sold in Violation of Texas's Securities Laws ..................................................................................................... 4

    III.   PFSI Was Aware of and Approved the Champion Scheme, then Failed to Supervise it and Further Allowed it to Spread Through PFS's Network ................................... 5

    IV.   PFS Perpetuates the Champion Scheme By Filing Misleading Form U5s ................ 6

    V.    Defendant Prukner's Role in the Champion Scheme ................................................. 7

SUMMARY OF ARGUMENTS ............................................................................... 7

ARGUMENT .............................................................................................................. 8

    I.     Champion's LLC Form Does Not Sheild Prukner from Liability for His Own Misconduct ................................................................................................................ 8

    II.    The Champion Offerings Are Securities Under the TSA and Howey ...................... 9

         A.  Champion is a Common Enterprise ................................................................. 10

         B.  Profits Were "Essentially" Dependent on the Efforts of Others; "Solely" is Not Read Literally) ....................................................................................... 12

         C.  FINRA was Not Tasked with Determining Whether Champion's Offerings Were Securities ............................................................................................... 13

         D.  Unrelated FTC Enforcement Actions Are Of No Moment to the "Securities" Analysis ........................................................................................................... 14

    III.   SLUSA Preemption is Inapplicable Because the Champion Products Were Not Traded on a National Exchange ......................................................................... 14

    IV.   Plaintiffs Adequately State Claims Against Prukner ................................................. 15

    V.    There is No Basis to Require Plaintiff Daniel to Arbitrate Any of His Claims ........ 17

         A.  The "E-Commerce Store Agreement" Is Not Properly Before the Court ........... 18

PLAINTIFF'S OPPOSITION TO IAN JAMES PRUKNER'S MOTION TO DISMISS

B. Prukner's Ability to Enforce the Arbitration Agreement Must be Decided by this Court............................................................................................... 18

C. Prukner Has Not established His Ability to Enforce the Agreements as a Non-Party ........................................................................................................ 19

REQUEST FOR LEAVE TO AMEND IN THE EVENT OF DISMISSAL .............................. 21

PLAINTIFF'S OPPOSITION TO IAN JAMES PRUKNER'S MOTION TO DISMISS

<u>TABLE OF AUTHORITIES</u>

**Cases**                      **Page(s)**

*Air Line Pilots Ass'n v. Miller*,
523 U.S. 866 (1998) .......................................................................................... 17

*Bates Oil & Energy Gas v. Complete Oilfield Services*,
361 F.Supp.3d 633 (W.D. Tex. 2019) ................................................................. 9

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan*,
345 F.3d 347 (5th Cir. 2003) ........................................................................... 20

*Foman v. Davis*,
371 U.S. 178 (1962) ......................................................................................... 21

*Grigson v. Creative Artists Agency, L.L.C.*,
210 F.3d 524 (5th Cir. 2000) ........................................................................... 20

*In re Merrill Lynch Trust Co. FSB*,
235 S.W.3d 185 (Tex. 2007) ............................................................................ 18

*Jody James Farms, JV v. Altman Group, Inc.*,
547 S.W.3d 624 (Tex. 2018) ............................................................... 18, 19, 20

*Keyes v. Weller*,
692 S.W.3d 274 (Tex. 2024) .............................................................................. 9

*Life Partners, Inc. v. Arnold*,
464 S.W.3d 660 (Tex. 2015) ............................................................................ 11

*Long v. Shultz Cattle Co.*,
881 F.2d 129 (5th Cir. 1989) ....................................................................... 11, 13

*Matter of Living Benefits Asset Management, L.L.C.*,
916 F.3d 528 (5th Cir. 2019) ...................................................................... 11, 13

*Newman v. Plains All Am. Pipeline, L.P.*,
23 F.4th 393-- (5th Cir. 2022) ......................................................................... 18

*Owens v. Jastro*,
789 F. 3d 529 (5th Cir. 2015) .......................................................................... 16

*SEC v. Cont'l Commods. Corp.*,
497 F.2d 516 (5th Cir. 1974) ........................................................................... 11

PLAINTIFF'S OPPOSITION TO IAN JAMES PRUKNER'S MOTION TO DISMISS

*SEC v. Koscot Interplanetary, Inc.*,
   497 F.2d 473 (5th Cir. 1974) ............................................................................ 11

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946) ................................................................................... 10, 11

*Smith v. EMC Corp.*,
   393 F.3d 590 (5th Cir. 2004) ............................................................................ 22

*Southland Secs. Corp. v. INSpire Ins. Sols. Inc.*,
   365 F. 3d 353 (5th Cir. 2004) ........................................................................... 17

*VeroBlue Farms USA, Inc. v. Wulf*,
   465 F. Supp. 3d 633 (N.D. Tex. 2020) .............................................................. 17

*Wesdem, LLC v. Ill. Tool Works, Inc.*,
   70 F. 4th 285 (5th Cir. 2023) ............................................................................ 17

*Westmoreland v. Sadoux*,
   299 F.3d 462 (5th Cir. 2002) ............................................................................ 20

Statutes

Tex. Civ. Stat. Ann. Art. 581-4 ................................................................................. 8
Tex. Govt. Code Ann. § 4001.067(c) ......................................................................... 8
Tex. Rev. Civ. Stat. Ann. art. 581-7 .......................................................................... 8

Rules

Federal Rule of Civil Procedure 15(a)(2) ................................................................. 21
Rule 15(a) ................................................................................................................. 21

Plaintiffs Dane Daniel, James Gurtner, and Deanna Neason (together, "Plaintiffs"), individually and on behalf of all others similarly situated ("Class Members"), by and through their attorneys, respectfully submit this Opposition to Defendant Ian James Prukner's Motion to Dismiss Under Federal Rules of Civil Procedure 12(b)(6) and 12(b)(3) (ECF No. 30; hereafter, "Motion").

## INTRODUCTION

Defendant Ian James Prukner ("Prukner" or "Defendant") played an integral role in a Texas-based investment scheme that pilfered over $33 million from Plaintiffs and the class of investors they represent. The scheme, referred to in the Complaint as the "Champion Scheme," involved the sale of "business opportunities" promising "100 percent passive income" – classic investments under the Fifth Circuit's formulation of the *Howey* test. Consistent therewith, Plaintiffs have asserted claims against Prukner and others under the Texas Securities Act.

Prukner's Motion advances a number of legal arguments that he claims require dismissal under Rule 12(b)(6), and/or that this matter be compelled into arbitration under Rule 12(b)(3). As set forth below, these arguments are off-base and in clear derogation of applicable law, and Prukner's Motion should be denied.

## STATEMENT OF ISSUES TO BE DECIDED

Prukner's Motion presents the following issues: 1) is Prukner afforded any protection from personal liability for his own individual misconduct by virtue of his membership in an LLC that also committed misconduct; 2) do the Champion products and their promise of "100 percent passive income" constitute "securities" within the meaning of *Howey*; 3) does the Securities Litigation Uniform Securities Act ("SLUSA") apply to non-publicly traded securities like the Champion offerings and thus preempt Plaintiffs' claims; 4) have Plaintiffs otherwise satisfied the elements of their negligence and fraud claims as to Defendant Prukner; and 5) does the

PLAINTIFF'S OPPOSITION TO IAN JAMES PRUKNER'S MOTION TO DISMISS

unauthenticated agreement that Prukner attaches to his motion require all Plaintiffs to arbitrate all claims against the Defendants—none of whom are parties to that agreement?

## NATURE AND STAGE OF PROCEEDINGS

On October 10, 2025, Plaintiffs filed their Class Action Complaint against PFSI, its registered representatives Jake Louis Fruge, Melton Weaver, and Ian James Prukner (previously defined as the "PFSI Representatives"), and Brad Romero. Defendants Weaver, Romero, and Fruge have answered the Complaint, while PFSI and Defendant Prukner have filed motions to dismiss.

The Court recently entered a Scheduling Order fixing a trial date, discovery cut-off, class certification and other deadlines. ECF No. 39. The parties are scheduled to complete their Rule 26(f) conference by February 3, 2026 and thereafter Plaintiffs will begin discovery in earnest.

## STATEMENT OF FACTS

**I.      The Champion Offerings Were Marketed and Sold as "100% Passive" Investments – to be Funded with Victims' Retirement Savings.**

This case arises from a $33 million-plus scheme in which former registered representatives of PFS Investments, Inc. ("PFSI") marketed and sold two "business opportunity" investments as purportedly "**100% passive income**" investment vehicles. ECF No. 1 ("Compl.") ¶¶ 1–4, 10-11, 37-38, 49, 51-55, 61-63 (emphasis in original). Champion operated out of Houston, Texas, where Fruge resided, and disseminated its materials and sales pitches nationwide from that Texas base. *Id.* ¶¶ 35, 39–40.

As alleged in the Complaint, Defendants Fruge, Prukner, and Weaver (the "PFSI Representatives"), together with Romero, preyed on retail investors by urging them to convert and deploy retirement funds—specifically "401Ks and IRAs"—into purported "passive income solutions" that would generate returns or "profits" based on the efforts of the PFSI Representatives, Romero, and others on the Champion team. *Id.* ¶¶ 4, 10-11, 37-38, 49, 51-55, 61-63. Champion

offered and sold two primary investment products: (1) "Digital Real Estate" interests, and (2) "E-Commerce Store" interests. *Id.* ¶¶ 7, 10–11, 36. Both offerings were sold using uniform solicitation materials disseminated broadly to the public. *Id.* ¶¶ 37, 39–40, 49, 54, 62. These materials described Champion's offerings as investments in "turnkey" internet businesses that would generate "guaranteed" profits through Defendants' efforts, not the investors' labor. *Id.* ¶¶ 4, 10-11, 36-38, 49, 51-55, 61-63. The sales pitches repeatedly emphasized the purportedly "hands-off" experience for investors—no responsibilities, no operations, and monthly payments. *Id.* ¶¶ 11, 51, 55. For example, investors were promised that "There are no responsibilities on your end—your check will be deposited monthly into the account you provide via direct deposit." *Id.* ¶ 55.

Champion's Digital Real Estate offering charged investors $5,000 to $7,000 for units tied to lead-generation websites Champion would purportedly build, scale, and manage, with investor returns in the amount of $400 - $600 supposedly paid on a recurring monthly basis. *Id.* ¶¶ 10, 48–52. Purchases were made through written "subscription agreements" commonly used to purchase private placement investments. *Id.* ¶ 53. The Complaint further alleges the "24-month guarantee" (a promised buyback right) was memorialized in these subscription agreements. *Id.* ¶ 60.

Champion's E-Commerce Store offering likewise was sold through uniform offering materials and contracts, with investors paying $45,000 or more in exchange for a supposedly "100% passive" or "truly passive income experience" promising "guaranteed 15% profits." *Id.* ¶¶ 11, 62-66. Plaintiffs "partnered" with Champion, essentially becoming limited "partners" (technically members in an LLC) while Champion managed the business on their behalf, handling "market research," "inventory management," "accounting," and more. *Id.* ¶¶ 61-62.

PLAINTIFF'S OPPOSITION TO IAN JAMES PRUKNER'S MOTION TO DISMISS

**II.** <u>**Champion Securities Were Marketed and Sold in Violation of Texas's Securities Laws**</u>

Champion's marketing materials emphasized that investors would have no operational role in their investments—all they needed to do was invest with Champion and they, too, would earn "passive" income to support the lavish lifestyle that the PFS Representatives and Romero leveraged in their social media, internet, and live other solicitations. *Id.* ¶¶ 40-43.

Champion's solicitations were not confined to a limited, private circle; rather, they were public, aggressive, and national in scope—including through open webinars and broad social-media marketing—and further, were sold to accredited investors. *Id.* ¶¶ 7, 40–43. Because of those public solicitations, both the Digital Real Estate and E-Commerce Store offerings were required to be registered under the Texas Securities Act or, alternatively, sold pursuant to a valid exemption. *Id.* ¶ 41. Neither occurred. *Id.*

Plaintiffs further allege that they and the Class Members were induced to purchase the unregistered offerings on the basis of the misleading statements described in the Complaint. The promoters' projections and earnings claims were misleading and lacked any reasonable factual or historical basis as required by the FTC. *Id.* ¶¶ 12, 57, 66–69. For example, the E-Commerce Store materials allegedly claimed Champion had "a record of 100% successfully (sic) ecommerce seller accounts with minimum 15% profit margin at least," even though neither Champion nor its promoters had such a record. *Id.* ¶¶ 67–68. The Digital Real Estate offering materials claiming that investors could expect to receive $400 - $600 per month were likewise unsupported, both historically and otherwise. *Id.* ¶ 57.

The misrepresentations went far beyond overstated earnings. Fundamentally, both Champion offerings—the "Champion Scheme"—functioned as an undisclosed multi-level marketing/pyramid structure where investor "repayment" depended primarily on recruiting

additional investors, while "all or virtually all" investor money was paid out as commissions to Champion and sales representatives. *Id.* ¶¶ 12, 39, 81. The Complaint specifically alleges Defendants used social media to recruit new "employees" to sell Champion securities, consistent with an undisclosed multi-level marketing operation. *Id.* ¶ 81. Champion also concealed that it lacked the operational capability to support the investments—simply put, Champion's promises that it could and would handle all of the work necessary to generate the promised "passive" returns on investment were false when made. *Id.* ¶ 13, 57, 70-71, 187. Similarly, while Champion offered "24-month" guarantees allowing investors to sell investments back to Champion, Champion "never had the liquidity" to honor these guarantees. *Id.* ¶¶ 13, 72.

### III. PFSI Was Aware of and Approved the Champion Scheme, then Failed to Supervise it and Further Allowed it to Spread Through PFS's Network

The Champion Scheme was masterminded and orchestrated by PFSI agents and registered representatives Fruge, Prukner, and Weaver. *Id.* ¶ 3. Those individuals were registered representatives of PFS when they formed Champion and developed the scheme, and they continued soliciting participation throughout their relationships with PFSI—using PFSI resources and connections and inducing other PFSI Representatives and customers to invest. *Id.* ¶¶ 44, 80.

PFSI was legally obligated to supervise the PFSI Representatives' activities, including outside business activities like Champion, pursuant to FINRA Rules 3110, 3270, and 3280. *Id.* ¶¶ 45, 75. Consistent therewith, PFSI had the ability to control its representatives through training, contracts, ongoing supervision, and regulatory notices and filings. *Id.* ¶ 103. Through any and all of the foregoing, PFSI had actual knowledge of the PFSI Representatives' Champion activities, including the solicitation and sale of the unregistered Digital Real Estate and E-Commerce Store interests. *Id.* ¶¶ 16, 46, 119. Nonetheless, PFSI affirmatively "approved" the sale of both. *Id.* ¶¶ 16-17, 46, 86; *see also id.* at ¶100 (screenshot of Defendant Fruge's social media post confirming

that "ALL was approved" by PFSI). PFSI was sanctioned by FINRA for its failure to properly vet these offerings. *Id.* ¶¶ 32. Because the Champion offerings were in fact securities under *Howey*, once approved, FINRA Rule 3280 required PFSI to supervise the transactions as if executed on PFSI's behalf; in other words, those products became PFSI's products. *Id.* ¶¶ 87–88, 105.

Eventually, other PFSI representatives begun voicing complaints about the sale of Champion offerings. *Id.* ¶ 92. In response, PFSI's senior management instructed representatives "not to talk" about the Scheme. *Id*. ¶¶ 90–91. PFSI did this to protect itself from liability to the 1,000+ individuals who had invested in Champion Scheme at that point. *Id.* ¶¶ 90-92, 96, 125.

**IV.** **PFS Perpetuates the Champion Scheme By Filing Misleading Form U5s**

Eventually, the noise grew too loud and PFSI terminated its relationships with the PFSI Representatives based on their on-going involvement with Champion. *Id.* ¶¶ 97-100. Thereafter, PFSI was required by FINRA rules and applicable state law (including, but not limited to, Rule § 115.4 of the Texas State Securities Board, adopted pursuant to Section 28-1 of the Texas Securities Act) to promptly, truthfully, and accurately report the reasons for termination and known misconduct via Form U5. *Id.* ¶¶ 107-08. FINRA has expressly acknowledged that this information is used by regulators and the investing public to assess whether to do business with the individual. *Id.* ¶¶ 107–10, 112. Notably, PFSI's disclosure obligations are continuing. *Id.* ¶¶ 108–09.

PFSI filed misleading Form U5s that omitted the fraudulent sale of unregistered securities, affirmatively misled regulators and the public, and characterized the terminations as "voluntary." *Id.* ¶¶ 113–19. These filings were false, yet were represented as accurate and complete by a PFS vice president. *Id.* ¶ 122. Critically, these filings suppressed the truth in a way that foreseeably caused continuing harm to current and future investors by preventing them from discovering the

real reasons behind the terminations. *Id.* ¶¶ 123-27. In all, more than $33 million of investor dollars was lost through the above.

**V.      Defendant Prukner's Role in the Champion Scheme**

Prukner was a co-owner and promoter of Champion. *Id.* ¶ 30. In this capacity he had direct involvement in the development and dissemination of the uniform solicitation materials used to sell Champion's offerings, and he personally repeated the misleading statements about those offerings described at length *supra* through webinars and direct solicitation efforts. *Id.* ¶¶ 39–42, 49, 54, 62, 70, 81, 158, 167, 184, 208-10, 221-22. Prukner participated in numerous conversations with PFSI in which he explicitly disclosed his solicitation of Champion investments. *Id.* ¶¶ 73-74.

<u>**SUMMARY OF ARGUMENTS**</u>

1.      The law is clear that Prukner may not hide behind the shield of "Champion LLC" where, as here, he is sued for his own individual misconduct.

2.      Champion's Digital Real Estate and E-Commerce Store offerings qualify as "securities" under the Fifth Circuit's formulation of the *Howey* test. Broad vertical commonality is easily satisfied, as investors' fortunes are tied to Champion's and the Defendants' efforts. "Pooling" is not a requirement in this Circuit. Similarly, profits are substantially derived from the efforts of others—namely, Champion and the Defendants. The fact that neither FINRA nor the SEC have addressed the specific issue presented herein has no bearing on the Court's analysis.

3.      SLUSA preemption is absolutely inapplicable. It applies only to "covered securities," which are securities that are publicly-traded on a national exchange. There is no serious argument that the Champion products qualify.

4.      Plaintiffs' TSA, negligence, and fraud claims are well-pleaded. The only meaningful challenge Prukner raises to the former claims is that they do not involve "securities,"

which is addressed *supra*. The complaint sufficiently pleads the who, what, when, and where necessary to establish a fraud claim under Texas law.

5. There is no basis to require arbitration of Plaintiff Daniel's claims. The purported agreement or agreements that include the arbitration provision Prukner seeks to enforce are not properly before the Court, and moreover, as a non-party he is not entitled to enforce these agreements or their arbitration provision. Any suggestion that his ability to do so should be delegated to an arbitrator is directly contrary to recent decisions from the Texas Supreme Court and the Fifth Circuit.

**ARGUMENT**

**I.      Champion's LLC Form Does Not Shield Prukner
         From Liability for His Own Misconduct**

Prukner's lead argument is that as a member of "Champion LLC" he cannot be held personally liable for Champion's misconduct. Mtn. at pp. 4-7. This argument fundamentally misunderstands the nature of the claims asserted against Prukner. He is sued in his **individual capacity**, including under provisions of the Texas Securities Act that create individual liability for any person (like Prukner) who sold or offered a security in violation of the Act's registration requirements and/or prohibition on misleading sales. *See* Tex. Gov. Code Ann. § 4003.004 (formerly TSA art. 581-7); § 4008.051 (formerly TSA art. 581-33(A)(1)); and § 4008.52 (formerly TSA art. 581-33(A)(2)). The Act itself explicitly defines the terms "sale" and/or "offer for sale" to include the solicitation of an offer to buy and/or attempts or offers to sell a security, whether directly or by an agent. Tex. Govt. Code Ann. § 4001.067(c) (formerly TSA art. 581-4).

Consistent therewith, Plaintiffs' claims against Prukner are based on his own solicitation/sales activity (including his sale of unregistered securities) and the misleading statements he made in connection with those efforts. *See, e.g.*, Compl. ¶¶ 39–42, 49, 54, 62, 70,

81, 158, 167, 184, 208-10, 221-22. Veil-piercing and/or limited liability analyses are not relevant to these claims.

The Texas Supreme Court has made this point plainly: "in sum, we do not understand [the limited liability provisions of the Business Organizations Code] to shield a corporate agent who commits tortious conduct from direct liability merely because the officer or agent also possesses an ownership interest in the corporation." *Keyes v. Weller*, 692 S.W.3d 274, 282 (Tex. 2024). "Accordingly, we hold that [those provisions] have no effect on the independent common law principal that corporate agents who direct or engage in tortious conduct are personally liable for that conduct." *Id.*; *see also Bates Oil & Energy Gas v. Complete Oilfield Services*, 361 F.Supp.3d 633, 672-73 (W.D. Tex. 2019) ("the history of the statute and the statutory language indicate that it applies to veil piercing theories (for both contract and related tort claims), but not to direct liability claims for an individual's own tortious conduct"). As the *Bates* court recognized, limited liability protection applies **only** to claims seeking to hold an owner individually liable for a corporate obligation. *Bates*, 361 F. Supp. 3d at 673. Plaintiffs here assert claims against Prukner for his own individual liability derived from his pervasive solicitation efforts. Simply put, "veil piercing" and/or "limited liability" arguments do not apply, and dismissal on this basis is not appropriate.

## II. The Champion Offerings Are Securities Under the TSA and *Howey*

Prukner also disputes whether Champion's "Digital Real Estate" and "E-Commerce Store" offerings qualify as "securities" subject to the Texas Securities Act. Mtn. at pp. 7-11. His opening argument—suggesting that "no court in the country has ever held that the type of products offered and sold by Defendants are securities"—is circular, as no court has ever held that these products

are <u>not</u> securities, either. Business opportunity scams are a new breed, and as the world is now seeing with cryptocurrency, the law is still very much developing.

The Court should evaluate the Champion products as it would evaluate any product that was claimed to be a security: by evaluating whether the economic reality of the product fits the definition of an investment contract under *Howey*. *See SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946).[1] *Howey* is deliberately flexible; it was designed "to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits," including those marketed to the public as passive wealth-generators. *See* 328 U.S. at 299. The question is not how Defendants labeled the product (a "business opportunity," a "passive income solution," a "membership," or an "LLC interest"), but whether the economic reality of the product fits the definition of an "investment contract."

*Howey* identifies the following elements used to analyze whether a product is a security: (1) an investment of money; (2) in a common enterprise; (3) with an expectation of profits; (4) to be derived solely from the efforts of others. 328 U.S. at 301. Prukner's Motion challenges only the "common enterprise" and "profits from efforts of others" prongs of the analysis.

## A. Champion Is A Common Enterprise

Prukner argues Plaintiffs cannot establish a "common enterprise" because each investor supposedly received their own unique Digital Real Estate and/or E-Commerce Storefront. Mtn. at p. 8. He cites case law from outside the Fifth Circuit reciting that a "pooling of the investors' interests is necessary." *Id.*

---

[1] The Texas Securities Act "defines the terms 'security' and 'securities' broadly, to include such things as 'any limited partner interest in a limited partnership, share, stock, treasury stock, … *investment contract*, or any other instrument commonly known as a security, whether similar to those herein referred to or not." *Life Partners, Inc. v. Arnold*, 464 S.W.3d 660, 666-67 (Tex. 2015) (concluding that courts "must focus on the economic realities of the transaction at issue[, and], if the economic realities establish that a transaction is an investment contract, we must apply the statute regardless of any labels or terminology the parties may have used.").

PLAINTIFF'S OPPOSITION TO IAN JAMES PRUKNER'S MOTION TO DISMISS

The Fifth Circuit's interpretation of a "common enterprise" is far broader. It applies a "broad vertical commonality" analysis that focuses simply on the connection between an investor's fortunes and the promoter's expertise. *See*, *e.g.*, *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 479 (5th Cir. 1974); *SEC v. Cont'l Commods. Corp.*, 497 F.2d 516 (5th Cir. 1974); *Long v. Shultz Cattle Co.*, 881 F.2d 129 (5th Cir. 1989). A common enterprise thus exists wherever "the fortuity of the investments collectively is essentially dependent upon promoter expertise." *Cont'l Commods.*, 497 F. 2d at 522. As the Fifth Circuit recently re-affirmed, all that is required is "an investment of money in reliance on the promoter's expertise." *Matter of Living Benefits Asset Management, L.L.C.*, 916 F.3d 528, 536-37 (5th Cir. 2019) (analyzing *Koscot* and its progeny).

Plaintiffs pass this test with ease. Champion's Digital Real Estate and E-Commerce offerings were marketed as "turnkey" investments offering "guaranteed profits" based solely on the efforts and expertise of Defendants and others on the Champion team who were responsible for, *inter alia*, researching, building, managing, and servicing the Digital Real Estate and E-Commerce storefronts that were sold to Plaintiffs. *See, e.g..*, Compl. ¶¶ 10-11, 36-37. As Defendants put it, these investments were "completely passive," "100% passive," and "truly passive"—there were "no responsibilities on [Plaintiffs'] end." *See, e.g.*, *id*. ¶¶ 55, 62. Everything was left up to Plaintiffs' "partner," Champion, and Plaintiffs relied on that partner's expertise to generate profits. *See id*. ¶ 62.

Prukner attempts to muddy the analysis by arguing that profits were actually dependent upon third-party traffic to the Digital Real Estate and/or E-Commerce websites. Mtn. at pp. 9-10. That argument is a red herring—as described in the preceding paragraph, any third-party traffic that visited the sites was the direct result of Champion's work promoting, managing, and servicing

PLAINTIFF'S OPPOSITION TO IAN JAMES PRUKNER'S MOTION TO DISMISS

the sites.[2] In short, the Complaint plausibly alleges that investors' financial outcomes rose and fell with Defendants' managerial performance and the viability of Defendants' overall enterprise—precisely what the Fifth Circuit requires.

**B. Profits Were "Essentially" Dependent on the Efforts of Others; "Solely" is Not Read Literally**

Prukner also stretches *Howey's* "solely from the efforts of others" phrasing to argue that the fact that Plaintiffs completed certain limited functions in connection with their Champion purchases means that those products do not qualify as "securities" as a matter of law. Mtn. at p. 10. Prukner lists certain preparatory items, like preparing and executing purchase documentation, as examples of these responsibilities. *Id.*

As an initial matter, the agreement that Prukner relies upon to support these supposed responsibilities is not authenticated and thus not properly before the Court. *See* ECF No. 30-1. Indeed, the exhibit is not even attached to a declaration; it is simply appended to Prukner's Motion as a stand-alone document.

More substantively, the Fifth Circuit has roundly rejected the wooden reading that Prukner now advances. In *Long*, the Court recognized that "in order to ensure that the securities laws are not easily circumvented by agreements requiring a 'modicum of effort' on the part of investors, the word 'solely' in the third prong of the *Howey* test has not been construed literally." *Long*, 881 F.2d at 133. Instead, the Fifth Circuit applies a more realistic test: "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise" *Long*, 881 F.2d at 133 (citations omitted); *see also Living Benefits*, 916 F.3d at 535-6 (5th Cir. 2019).

---

[2] Just as the profitability of an investment in Apple is dependent upon Apple's ability to generate revenue by, *inter alia*, driving customer traffic to their stores and websites.

PLAINTIFF'S OPPOSITION TO IAN JAMES PRUKNER'S MOTION TO DISMISS

Applying this principle here, it is undeniable that the "significant" and "essential" efforts that affect the success or failure of the Champion investments are those efforts contributed by Champion and its employees, including Prukner. Signing up for an Amazon storefront account does not lead to profits, nor does preparing and executing supporting documentation. *See* Mtn. at 10. Researching, building, managing, and servicing the Digital Real Estate and E-Commerce storefronts that were sold to Plaintiffs is the "significant" conduct that generates the "completely passive" profits Champion promised—and here, all of that work was performed by Champion and its personnel. *See, e.g..*, Compl. ¶¶ 10-11, 36-37, 55, 62. Against this backdrop, Prukner cannot credibly argue that profits from Champion investments do not satisfy the "profits from the efforts of others" prong of *Howey* and its progeny.

**C. FINRA was Not Tasked with Determining Whether Champion's Offerings Were Securities**

Prukner's argument that FINRA did not explicitly determine Champion's offerings were securities is yet another red herring. Mtn. at pp. 11-12. FINRA's investigation into Prukner and the associated Letter of Acceptance, Waiver, and Consent No. 2022074939301 ("AWC") resulting from that investigation did not analyze whether or not the Champion "Digital Real Estate" or "E-Commerce Stores" products were securities, as it was not germane to the allegations of wrongdoing levied against Prukner. Instead, Prukner was accused of something simpler: a threshold failure to provide required written notice of his involvement in the Champion Scheme. *See* ECF 30-2 at p. 3(finding violations of FINRA Rule 3270).

Entirely absent from that AWC is any analysis of whether the Champion products qualified as a security under the Fifth Circuit's formulation of *Howey*. *See id*. Prukner may not use this negative (*i.e.*, the absence of analysis) to now prove another negative (*i.e.*, that the Champion products are not securities). The AWC should be seen for what it is: a document in which Prukner

PLAINTIFF'S OPPOSITION TO IAN JAMES PRUKNER'S MOTION TO DISMISS

consents to discipline for failing to provide written notice of involvement in the Champion Scheme, "without admitting or denying" anything contained therein. *Id.* at p. 1. This document thus has no bearing, let alone any authoritative weight, on this Court's determination of whether Champion products qualify as "securities."

**D. Unrelated FTC Enforcement Actions Are Of No Moment to the "Securities" Analysis**

The Complaint alleges that Prukner and the other Defendants marketed and sold interests in what the FTC has previously described as "business opportunity" scams. Compl. ¶ 2. Prukner tries to weaponize that allegation, suggesting that the FTC's regulation of an unrelated scam somehow precludes viewing the Champion offerings as "securities" – in other words, that the two concepts are mutually exclusive. Mtn. 13-14. Prukner does not and cannot explain the basis for his argument that civil and regulatory regimes may never overlap, and the fact that the FTC once brought a regulatory action in another court concerning the sale of an unrelated product has no bearing on this Court's analysis under *Howey*. The inquiry is on the "economic realities" associated the Champion products. Labels not considered by other courts on other products are of no moment.

**III.     SLUSA Preemption is Inapplicable Because the
<u>Champion Products Were Not Traded on a National Exchange</u>**

Prukner's fallback position—"if the products are securities, then SLUSA preempts this lawsuit"—quickly collapses under scrutiny. *See* Mtn. at pp. 15-16. SLUSA preemption requires, among other elements, that the case involve a "covered security"—a term SLUSA explicitly defines as (1) securities listed or authorized for listing on a national exchange (*e.g.*, the New York Stock Exchange, the Nasdaq, Cboe, etc.) or (2) securities issued by a registered investment company. *See* 15 U.S.C. § 78bb(f)(5)(E) (cross-referencing subsections (1) and (2), only, of 15. U.S.C. 77r(b)); 15 U.S.C. § 77r(b)(1)–(2); *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377

(2014). This is an absolute prerequisite to application of SLUSA preemption, as Congress only intended to regulate "nationally traded securities." *Merrill, Lynch v. Dabit*, 547 U.S. 71, 81 (2006).

The Champion securities at issue in this case are, unequivocally, not "covered securities" under SLUSA. They are not exchange-listed, and they are not issued by a registered investment company. Under *Troice*, it is not enough that victims may have liquidated or rolled over assets that were once invested in covered securities; rather, the alleged misrepresentation must be material to a decision to buy or sell a covered security. 571 U.S. at 377. The alleged misrepresentations here concern Champion's products themselves. Defendants' effort to shoehorn this case into SLUSA's public-market preemption framework is, at best, a serious misapprehension of SLUSA's scope and, at worst, a calculated attempt to mislead the Court into recognizing an immunity that Congress did not provide.

## IV. Plaintiffs Adequately State Claims Against Prukner

Prukner also seeks to dismiss Plaintiffs' claims pursuant to Fed. R. Civ. P. 12(b)(6). His only argument as to Plaintiff's TSA claims (Count I and Count IV) is that the Plaintiff has not adequately alleged that the Champion products are securities; that argument was addressed above. *See* Mtn. at p. 18. Prukner does not otherwise dispute that Plaintiffs have alleged all of the necessary elements for violation of the TSA's prohibitions on the sale of unregistered and non-exempt securities and/or misleading sale of securities, and his motion to dismiss these claims should accordingly be denied.

Similarly, the only challenge Prukner raises in response to Plaintiff's negligence claim (Count VII) is again that Plaintiffs have not established the Champion products were "securities" that give rise to any duties supporting a negligence claim. *Id.* at p. 19. Because that argument was addressed and refuted above, Prukner's motion to dismiss Count VII should likewise be denied.

Finally, Prukner seeks to dismiss Plaintiffs' fraud claims on the grounds that the Complaint lacks particularized factual support. Mtn. at pp. 19-22. As noted above, Plaintiffs allege that Prukner was a co-owner and promoter of Champion. *Id.* ¶ 30. In this capacity he had direct involvement in the development and dissemination of the uniform solicitation materials used to sell Champion's offerings, and he personally repeated the misleading statements about those offerings described at length *supra* through webinars and direct solicitation efforts. *Id.* ¶¶ 39–42, 49, 54, 62, 70, 81, 158, 167, 184, 208-10, 221-22. Those misleading statements included claims that the Champion securities offered "guaranteed income" and profits contrary to historical data, while omitting that Champion lacked the operational capacity or liquidity to provide the support it claimed, and instead functioned as a disguised multi-level marketing model dependent upon recruitment of new sales representatives. *Id.* ¶¶ 10-11, 36-37, 51-52, 55, 61-62, 64. These statements were contained in uniform offering materials that Prukner helped develop, and were repeated by Prukner and others at webinars and other sales events from March 2021 until the scheme collapsed in 2024. *Id.* ¶¶ 12, 15, 39, 40, 49, 54-56, 61-62, 66-67, 70, 143. Plaintiffs expressly allege that they relied on these statements in making their decisions to purchase Champion securities. *Id.* ¶ 223.

This level of detail survives Rule 9(b) scrutiny, particularly insofar as Prukner's state of mind may be alleged generally. *See, e.g.*, *Wesdem, LLC v. Ill. Tool Works, Inc.*, 70 F. 4th 285, 291 (5th Cir. 2023) (fraud requires a knowing or reckless material misrepresentation upon which the plaintiff was intended to and did in fact rely or act, resulting in injury).

Prukner's emphasis upon the Fifth Circuit's rejection of the group-pleading doctrine in a fraud context is overstated. Mtn. at p. 21, citing *Southland Secs. Corp. v. INSpire Ins. Sols. Inc.*, 365 F. 3d 353 (5th Cir. 2004). Post-*Southland* courts have recognized that "plaintiffs are permitted

under federal procedure to allege more than one defendant (i.e., a group of named defendants) committed the same alleged act." *VeroBlue Farms USA, Inc. v. Wulf*, 465 F. Supp. 3d 633, 655 (N.D. Tex. 2020). To that end, allegations levied against more than one defendant are permissible where connections between individual defendants and the allegedly fraudulent statements are specifically pleaded. *See Owens v. Jastro*, 789 F. 3d 529, 537 (5th Cir. 2015). Plaintiffs submit that their Complaint fits within these recognized exceptions—Prukner is apprised of his alleged role in making the misleading statements, where he made the misleading statements, and the time period during which he did so. Requiring separate allegations limited to only Prukner (and then only to Fruge, and only to Weaver, and only to Romero) where all are alleged to have engaged in functionally identical conduct would be an elevation of form over substance. Prukner's motion to dismiss Plaintiffs' fraud claim on "group pleading" grounds should be rejected accordingly.

### V. <u>There is No Basis to Require Plaintiff Daniel to Arbitrate Any of His Claims</u>

Additionally and/or alternatively, Prukner seeks dismissal of Plaintiff Daniel's E-Commerce claims under Rule 12(b)(3).[3] Prukner's argument is based on a purported arbitration provision contained in an "E-Commerce Store Agreement" that Prukner simply appends to his Motion without an accompanying declaration or other attempt to authenticate. *See* ECF No. 30-1. Notably, Prukner is not a party to that agreement, nor is Champion, and Prukner has failed to establish his right to enforce the purported arbitration provision contained therein. "As a rule," parties "ordinarily cannot be required to submit to arbitration any dispute which he or she has not agreed to submit." *Air Line Pilots Ass'n v. Miller*, 523 U.S. 866, 867 (1998).

---

[3] Prukner's "Summary of Argument" suggests that he believes all Plaintiffs' claims are subject to dismissal in favor of arbitration, *see* Mtn. at p. 1; however, he later appears to clarify that he seeks to arbitrate only Plaintiff Daniel's claims, Mtn. at p. 22.

PLAINTIFF'S OPPOSITION TO IAN JAMES PRUKNER'S MOTION TO DISMISS

**A. The "E-Commerce Store Agreement" Is Not Properly Before the Court**

Prukner's arbitration argument relies upon an unsupported, unverified copy of an alleged agreement signed by Plaintiff Daniels. Prukner provides no form of authentication via declaration or otherwise, which is not surprising as he concedes he is not a party to that agreement. *See* Mtn. at 24. Plaintiff thus objects to the Court's consideration of this agreement. This should end the arbitration inquiry, as there is no arbitration provision properly before the Court. Indeed, the "agreement" Prukner attaches to his declaration actually appears to be two separate agreements: a "sales agent/broker" agreement with Champion, and a separate "Service Agreement" with "Jungle Consulting Group." *Compare* ECF 30-1 at pp. 2 and 3.

**B. Prukner's Ability to Enforce the Arbitration Agreement Must be Decided by this Court**

Putting this evidentiary issue aside, Prukner also argues that the purported arbitration "agreements" preclude the Court from determining the threshold legal question of whether non-party Prukner is entitled to enforce the purported arbitration provision contained in one of the "agreements." Mtn. at pp. 23-22. Prukner claims that this issue is a question of arbitrability that must be "delegated" to an arbitrator on account of a generic reference to "AAA Rules." Prukner is sorely mistaken. As a non-party to the "agreements," he is not entitled to enforce any of their provisions—including any purported arbitration language—absent a threshold legal determination **by this Court** that one of the legal doctrines allowing non-party enforcement of an agreement is applicable here. And the law is clear that this determination **cannot be delegated to an arbitrator**. *See Jody James Farms, JV v. Altman Group, Inc.*, 547 S.W.3d 624, 631-- (Tex. 2018) (rejecting argument that an agreement that incorporates AAA rules serves to "delegate" questions relating to arbitration with a non-signatory); *Newman v. Plains All Am. Pipeline, L.P.*, 23 F.4th 393, 398-- (5th

PLAINTIFF'S OPPOSITION TO IAN JAMES PRUKNER'S MOTION TO DISMISS

Cir. 2022) (holding that a court, not an arbitrator, must decide whether a non-party can enforce a purported arbitration provision).

Viewed in this light, Prukner's motion to dismiss Plaintiff Daniel's claims in favor of arbitration is particularly egregious. Prukner has appended an unauthenticated agreement—an agreement to which he is not even a party—and now asks the Court to summarily dismiss Plaintiff Daniel's claims on the basis of that agreement without even considering whether Prukner has a cognizable legal basis to enforce that agreement. This result would stand due process on its head, and Prukner's request to dismiss in favor of arbitration should be denied.

**C. Prukner Has Not Established His Ability to Enforce the Agreements as a Non-Party**

Prukner appears to invoke the doctrines of "direct benefits estoppel" and/or "intertwined-claims estoppel" as legal bases that would allow Prukner, as a non-party, to enforce the arbitration language contained in the agreement(s). Mtn. at p. 24. Neither applies here.

Direct-benefits estoppel applies when a signatory sues to enforce a contract or seeks to obtain direct benefits under that contract while avoiding its arbitration clause. *See In re Merrill Lynch Trust Co. FSB*, 235 S.W.3d 185 (Tex. 2007). In this case, Plaintiff Daniels does not seek to do either of these things. He is not suing to enforce the "agreement" that Prukner attached—rather, Daniel's claims seek rescissionary and other damages based on Prukner's role in inducing Daniel to invest in unregistered securities through unlawful means. The terms of the "service agreement" that contains the arbitration provision have nothing to do with this dispute, and the performance of any obligations that exist under that agreement has no bearing on Plaintiff's claims. *See also Jody James Farms, JV v. Altman Grp., Inc.*, 547 S.W.3d 624, 638 (Tex. 2018) (rejecting estoppel theory where "[e]ven though Sapphire's claims against the engineers and insurance brokers might not have existed but for the general contract to construct the condominium project, those claims

PLAINTIFF'S OPPOSITION TO IAN JAMES PRUKNER'S MOTION TO DISMISS

relied on duties independent from it."). As the Fifth Circuit noted in refusing to enforce arbitration for a non-signatory in a comparable case,

> Westmoreland's suit does not rely upon the terms of the shareholder agreement or seek to enforce any duty created by the agreement, and there is no allegation that Sadoux acted in concert with anyone. Both Sadoux and Hendrickx elected to interpose liability insulating entities between themselves and Westmoreland. For reasons advantageous to themselves they were not parties to the shareholder agreement. And they did not negotiate an arbitration agreement regarding their personal claims and liabilities.

*Westmoreland v. Sadoux*, 299 F.3d 462, 467 (5th Cir. 2002).

Intertwined-claims estoppel requires both (i) claims intertwined with the agreement and (ii) a sufficiently close relationship between the nonsignatory and a signatory such that it would be inequitable to allow the signatory to avoid arbitration. *See Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524 (5th Cir. 2000); *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347 (5th Cir. 2003). Texas courts apply the doctrine cautiously; the Texas Supreme Court has suggested it will not apply absent a showing of a corporate affiliation between the signatory and non-signatory attempting to enforce the agreement. *Jody James Farms*, 547 S.W.3d at 640. In this case, Prukner has not established either element necessary to support "intertwined claims" estoppel. As discussed above, Prukner has not established that Daniel's claims are "intertwined" with the purported agreement that includes the arbitration provision; Daniel's claims can be proven entirely without reference to the agreement's terms or determination of whether they were performed. Similarly, Prukner has not carried his burden to establish any sort of "corporate affiliation" with the signatory to the agreement—which the Texas Supreme Court has held is a requirement before arbitration will be compelled. *Id.* at 640. Indeed, Prukner's nonsignatory request is precisely the sort of "arbitrate with me because your claims are loosely related to a contract I didn't sign" maneuver that *Jody James Farms* rejects. *Id.* ("Any arbitration doctrine forcing an unwilling party into

PLAINTIFF'S OPPOSITION TO IAN JAMES PRUKNER'S MOTION TO DISMISS

arbitration must thus have some basis in fairness and consent."); *see also Westmoreland*, 299 F. 3d at 467 ("the courts must not offer contracts to arbitrate to parties who failed to negotiate them before trouble arrives.")

**CONCLUSION AND REQUEST**
**FOR LEAVE TO AMEND IN THE EVENT OF DISMISSAL**

Plaintiffs believe that the Complaint in its current form is sufficient to survive Defendant's motion to dismiss, and respectfully request that that Motion be denied. However, should the Court determine that any of Plaintiffs' claims are not legally sufficient, then Plaintiffs respectfully request that they be granted leave to consider amending those claims in the event they believe they are able to do so. Federal Rule of Civil Procedure 15(a)(2) provides that "the court should freely give leave when justice so requires." The Fifth Circuit views this language as creating a strong presumption in favor of allowing amendment. *See, e.g.*, *Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004) (emphasizing that Rule 15(a) "requires a trial court to grant leave to amend 'freely,' and the language of this rule 'evinces a bias in favor of granting leave to amend.'"); *see also Foman v. Davis*, 371 U.S. 178 (1962) ("if the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits.").

DATED: January 28, 2026          Respectfully Submitted,

By:     */s/Daniel Centner*
        PEIFFER WOLF CARR KANE
        CONWAY & WISE LLPDaniel Centner
        LA Bar No. 3305
        SDTX Federal ID No. 3940226
        935 Gravier St., Suite 1600
        New Orleans, LA 70112
        dcentner@peifferwolf.com
        T (504) 523-2434

Andrew Ready Tate
PEIFFER WOLF CARR KANE
CONWAY & WISE LLP
GA Bar No. 518068
SDTX Federal ID No. 3854167
235 Peachtree St. NE, Suite 400
Atlanta, GA 30303
Main: 314-669-3600
Direct: 404-282-4806
atate@peifferwolf.com

Jason J. Kane (will seek admission pro hac vice)
PEIFFER WOLF CARR KANE
CONWAY & WISE LLP
160 Linden Oaks
Rochester, NY 14625
T (585) 310-5140
F (585) 397-3745
jkane@peifferwolf.com

Albert Copeland (will seek admission pro hac vice)
PEIFFER WOLF CARR KANE CONWAY &
WISE LLP
2100 Southbridge Parkway, Suite 650, #2636
Birmingham, AL 35209
T (205) 203-0363
acopeland@peifferwolf.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing document was filed via the Court's CM/ECF case management system on the 28th day of January 2026.

/s/*Daniel Centner*

PLAINTIFF'S OPPOSITION TO IAN JAMES PRUKNER'S MOTION TO DISMISS