**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

DANE DANIEL, JAMES GURTNER, and
DEANNA NEASON, individually and on behalf of
all others similarly situated,

*Plaintiffs,*

v.

JAKE LOUIS FRUGE, IAN JAMES PRUKNER,
BRAD ROMERO, MELTON WEAVER, AND
PFSI INVESTMENTS, INC.,

*Defendants.*

Case No.: 4:25-cv-04857

Hon. Keith P. Ellison

**PLAINTIFF'S OPPOSITION TO PFS INVESTMENTS, INC.'S MOTION TO DISMISS
UNDER FEDERAL RULES OF CIVIL PROCEDURE 12(b)(2), 12(b)(6) AND 12(b)(3)**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

STATEMENT OF ISSUES ................................................................................................. 1

NATURE AND STAGE OF PROCEEDINGS ................................................................... 1

STATEMENT OF FACTS .................................................................................................. 2

    I.     The Champion Offerings Were Marketed and Sold as "100% Passive" Investments – to be Funded with Victims' Retirement Savings ....................................................... .2

    II.    Champion Securities Were Marketed and Sold in Violation of Texas's Securities Laws .................................................................................................. 4

    III.   PFSI Was Aware of and Approved the Champion Scheme, then Failed to Supervise it and Further Allowed it to Spread Through PFS's Network ................................ 5

    IV.   PFS Perpetuates the Champion Scheme By Filing Misleading Form U5s ............... 6

SUMMARY OF ARGUMENTS .......................................................................................... 7

ARGUMENT ...................................................................................................................... 8

    I.     The Court Has Specific Personal Jurisdiction Over PSFI ................................... 8
         A.  Legal Principles Guiding the Personal Jurisdiction Analysis ............................ 9
         B.  Application of These Principles to This Case ................................................... 10

    II.    The Complaint Adequately States Claim for Relief Against PFSI ......................... 13
         A.  Texas Securities Acts Claims ....................................................................... 13
             1.  The Underlying Primary Violations of The Act Are Undisputed ................. 13
             2.  Plaintiffs' Secondary Liability Claims as to PFSI Are Well-Pleaded ........... 14
                 a.  Plaintiffs Allege General Awareness ....................................................... 18
                 b.  Plaintiffs Allege Substantial Assistance .................................................. 19
                 c.  Plaintiffs Allege Reckless Disregard and/or Intent to Deceive.............. 19
         B.  Plaintiffs Plead a Claim for Negligence Against PFSI ………………………….20
         C.  Plaintiffs Assert a Cognizable Fraud Claim ...................................................... 23

    III.   PFSI Cannot Compel Arbitration of Plaintiff Daniel's Claims ............................... 24

CONCLUSION AND REQUEST FOR LEAVE TO AMEND IN THE EVENT OF DISMISSAL ....................................................................................................................... 25

PLAINTIFF'S OPPOSITION TO PFS INVESTMENTS, INC.'S MOTION TO DISMISS

<u>TABLE OF AUTHORITIES</u>

Cases                                                                                              Page(s)

*Apollo Prop. Partners, LLC ex rel. Diamond Houston I, L.P. v. Newedge Fin., Inc.*,
    2009 WL 778108 (S.D. Tex. Mar. 20, 2009) ..................................................... 21

*Asarco, Inc. v. Glenara, Ltd.*,
    912 F.2d 784 (5th Cir.1990) ................................................................................. 9

*Barnes v. SWS Fin. Servs., Inc.*,
    97 S.W.3d 759 (Tex. Ct. App. 2003)............................................................. 15, 16

*Carmona v. Leo Ship Mgmt., Inc*, 924 F.3d 190 (5th Cir. 2019)
    *(quoting Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266 (5th Cir. 2006)............... 10

*Coleman v. Klockner & Co. AG*, 180 S.W. 3d 577 (Tex. Ct. App. 2005),
    citing *Walker Ins. Servs. v. Bottle Rock Power Corp.*, 108 S.W. 3d 538 (Tex. Ct. App.
    2003) ..................................................................................................................... 12

*Crescendo Inv., Inc. v. Brice*,
    61 S.W.3d 465 (Tex. App. 2003)......................................................................... 21

*Frank v. Bear, Stearns & Co.*,
    11 S.W.3d 380 (Tex. Ct. App. 2000). ................................................................. 15

*Foman v. Davis*,
    371 U.S. 178 (1962)............................................................................................. 25

*Freudensprung v. Offshore Tech. Servs., Inc.*,
    *379 F.3d(5th Cir. 2004)* ....................................................................................... 9

*G.A. Thompson & Co., Inc. v. Partridge*,
    636 F.2d 945 (5th Cir. 1981) .............................................................................. 15

*Garrison v. Sagepoint Fin., Inc.*,
    185 Wash. App. 461 (Wash. Ct. App. 2015) ..................................................... 22

*Hedley Feedlot, Inc. v. Weatherly Trust*,
    855 S.W.2d 826 (Tex. Ct. App. 1993)................................................................ 23

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
    466 U.S. 408 (1984).............................................................................................. 9

*In re Enron Corp. Sec., Derivative & Erisa Litig.*,
    762 F. Supp. 2d 942 (S.D. Tex. 2010)………………..………………………..…18

PLAINTIFF'S OPPOSITION TO PFS INVESTMENTS, INC.'S MOTION TO DISMISS

*In re TETRA Techs., Inc. Sec. Litig.,*
2009 WL 6326865 (S.D. Tex. Aug. 10, 2009). ................................................................. 16

*Javitch v. First Montauk Financial Corp.*,
279 F. Supp.2d 931 (N.D. Ohio 2003) ............................................................................. 22

*Jody James Farms, JV v. Altman Group, Inc.*,
547 S.W.3d 624 (Tex. 2018) ............................................................................................ 26

*Kneese v. Pershing, L.L.C.*,
2012 WL 13019677 (N.D. Tex. Nov. 14, 2012) ............................................................... 13

*Lange v. H. Hentz & Co.*,
418 F. Supp. 1376 (N.D. Tex. 1976) ................................................................................ 21

*Lewis v. Fresne*, 252 F.3d 352 (5th Cir. 2001) (citing *Brown v. Flowers Indus.*, 688 F.2d 328, 33
(5th Cir.1982)) ................................................................................................................... 8

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng*,
697 F. Supp. 1224 (D.D.C. 1988) .................................................................................... 22

*Miley v. Oppenheimer & Co.*,
637 F.2d 318 (5th Cir. 1981) ............................................................................................ 21

*Nelson v. Hench*,
428 F. Supp. 411 (D. Minn. 1977) ................................................................................... 22

*Newman v. Plains All Am. Pipeline, L.P.*,
23 F.4th 393 (5th Cir. 2022) ............................................................................................ 24

*Palmer v. Shearson Lehman Hutton Inc.*,
622 So. 2d 1085 (Fla. Ct. App. 1993) .............................................................................. 22

*Prymak v. Contemp. Fin. Sols., Inc.*,
2007 WL 4250020 (D. Colo. Nov. 29, 2007) ................................................................... 22

*Siedman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
465 F. Supp. 1233 (S.D.N.Y. 1979) ................................................................................ 20

*Smith v. EMC Corp.*,
393 F.3d 590 (5th Cir. 2004) ............................................................................................ 25

*Sterling Trust Co. v. Adderley,*
168 S.W.3d 835 (Tex. 2005). ..................................................................................... 13, 18

PLAINTIFF'S OPPOSITION TO PFS INVESTMENTS, INC.'S MOTION TO DISMISS

*Turner v. Harvard MedTech of Nev., LLC,*
    620 F. Supp. 3d 569 (W.D. Tex. 2022)...................................................................... 9

*Twiss v. Kury*,
    25 F.3d 1551 (11th Cir. 1994) .............................................................................. 24

*Walden v. Fiore*,
    571 U.S. 277 (2014)........................................................................................ 9, 10

*Ward v. Rhode, 544 F. App'x 349 (5th Cir. 2013) (citing McFadin v. Gerber,*
    587 F.3d 753 (5th Cir. 2009)................................................................................ 10

*Wesdem, LLC v. Ill. Tool Works, Inc.*,
    70 F. 4th 285 (5th Cir. 2023).............................................................................. 23

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980)......................................................................................... 13

*Zagami v. Nat. Health Trends Corp.*,
    540 F. Supp. 2d 705 (N.D. Tex. 2008) ................................................................. 18

<u>Rules</u>

Federal Rule of Civil Procedure 15(a)(2) ..................................................................25
FINRA Rule 3110 ................................................................................................ 11
FINRA RULE 3280 ............................................................................................. 11
7 Tex. Admin. Code § 115.4 (Evidence of Registration) ...............................................11

PLAINTIFF'S OPPOSITION TO PFS INVESTMENTS, INC.'S MOTION TO DISMISS

Plaintiffs Dane Daniel, James Gurtner, and Deanna Neason (together, "Plaintiffs"), individually and on behalf of all others similarly situated ("Class Members"), by and through their attorneys, respectfully submit this Opposition to Defendant PFS Investments, Inc.'s Motion to Dismiss Under Federal Rules of Civil Procedure 12(b)(2), 12(b)(6), and 12(b)(3) (ECF No. 31; hereafter, "Motion").

## INTRODUCTION

Defendant PFS Investments, Inc. ("PFSI") approved and perpetuated a Texas-based investment scheme that pilfered over $33 million from Plaintiffs and the class of investors they represent. The scheme, referred to in the Complaint as the "Champion Scheme," was carried out in Houston, Texas by PFSI's registered representatives (and co-Defendants) Jake Louis Fruge, Ian James Prunkner, and Melton Weaver (the "PFSI Representatives") and involved the sale of "business opportunities" promising "100 percent passive income" – classic investment contracts under the Fifth Circuit's formulation of the *Howey* test. PFSI played a pivotal role in the Scheme, but now seeks to rewrite history, and Plaintiffs' Complaint, by portraying itself as a distant observer that is not subject to personal jurisdiction in this Court and that bears no liability for Plaintiffs' losses. PFSI's Motion should be denied for the reasons set forth below.

## STATEMENT OF ISSUES TO BE DECIDED

Plaintiffs agree that the "Statement of the Issues" enumerated on page 3 of PFSI's Motion is a complete and accurate listing of the issues presented through PFSI's Motion.

## NATURE AND STAGE OF PROCEEDINGS

On October 10, 2025, Plaintiffs filed their Class Action Complaint against PFSI, its registered representatives Jake Louis Fruge, Melton Weaver, and Ian James Prukner (previously defined as the "PFSI Representatives"), and Brad Romero. Defendants Weaver, Romero, and Fruge

bar

1

have answered the Complaint, while PFSI and Defendant Prukner have filed motions to dismiss. Defendant PFSI is the only party to challenge personal jurisdiction.

There is some overlap between PFSI's and Prukner's motions—for example, both argue that Champion's "Digital Real Estate" and "E-Commerce Store" securities do not qualify as "securities" under *Howey,* and both argue that Plaintiff Dane Daniel (only) should be required to arbitrate his claims. To avoid redundancy Plaintiffs cross-reference and incorporate their responses to these overlapping arguments where appropriate.

The Court recently entered a Scheduling Order fixing a trial date, discovery cut-off, class certification and other deadlines. ECF No. 39. The parties are scheduled to complete their Rule 26(f) conference by February 3, 2026 and thereafter Plaintiffs will begin discovery in earnest.

## STATEMENT OF FACTS

**I.      The Champion Offerings Were Marketed and Sold as "100% Passive" Investments – to be Funded with Victims' Retirement Savings.**

This case arises from a $33 million-plus scheme in which former registered representatives of PFS Investments, Inc. ("PFSI") marketed and sold two "business opportunity" investments as purportedly "**100% passive income**" investment vehicles. ECF No. 1 ("Compl.") ¶¶ 1–4, 10-11, 37-38, 49, 51-55, 61-63 (emphasis in original). Champion operated out of Houston, Texas, where Fruge resided, and disseminated its materials and sales pitches nationwide from that Texas base. *Id.* ¶¶ 35, 39–40.

As alleged in the Complaint, Defendants Fruge, Prukner, and Weaver (the "PFSI Representatives"), together with Defendant Brad Romero, preyed on retail investors by urging them to convert and deploy retirement funds—specifically "401Ks and IRAs"—into purported "passive income solutions" that would generate returns or "profits" based on the efforts of the PFSI Representatives, Romero, and others on the Champion team. *Id.* ¶¶ 4, 10-11, 37-38, 49, 51-55, 61-

PLAINTIFF'S OPPOSITION TO PFS INVESTMENTS, INC.'S MOTION TO DISMISS

63. Champion offered and sold two primary investment products: (1) "Digital Real Estate" interests, and (2) "E-Commerce Store" interests. *Id.* ¶¶ 7, 10–11, 36. Both offerings were sold using uniform solicitation materials disseminated broadly to the public. *Id.* ¶¶ 37, 39–40, 49, 54, 62. These materials described Champion's offerings as investments in "turnkey" internet businesses that would generate "guaranteed" profits through Defendants' efforts, not the investors' labor. *Id.* ¶¶ 4, 10-11, 36-38, 49, 51-55, 61-63. The sales pitches repeatedly emphasized the purportedly "hands-off" experience for investors—no responsibilities, no operations, and monthly payments. *Id.* ¶¶ 11, 51, 55. For example, investors were explicitly promised that "There are no responsibilities on your end—your check will be deposited monthly into the account you provide via direct deposit." *Id.* ¶ 55.

Champion's Digital Real Estate offering charged investors $5,000 to $7,000 for units tied to lead-generation websites Champion would purportedly build, scale, and manage, with investor returns in the amount of $400 - $600 supposedly paid on a recurring monthly basis. *Id.* ¶¶ 10, 48–52. Purchases were made through written "subscription agreements" commonly used to purchase private placement investments. *Id.* ¶ 53. The Complaint further alleges that a "24-month guarantee" (promised buyback right) was memorialized in these subscription agreements. *Id.* ¶ 60.

Champion's E-Commerce Store offering likewise was sold through uniform offering materials and contracts, with investors paying $45,000 or more in exchange for a supposedly "100% passive" or "truly passive income experience" promising "guaranteed 15% profits." *Id.* ¶¶ 11, 62-66. Plaintiffs "partnered" with Champion, essentially becoming limited "partners" (technically members in an LLC) while Champion managed the business on their behalf, handling "market research," "inventory management," "accounting," and more. *Id.* ¶¶ 61-62.

PLAINTIFF'S OPPOSITION TO PFS INVESTMENTS, INC.'S MOTION TO DISMISS

**II.** **Champion Securities Were Marketed and Sold in Violation of Texas's Securities Laws**

Champion's marketing materials emphasized that investors would have no operational role in their investments—all they needed to do was invest with Champion and they, too, would earn "passive" income to support the lavish lifestyle that the PFS Representatives and Romero leveraged in their social media, internet, and live other solicitations. *Id.* ¶¶ 40-43.

Champion's solicitations were not confined to a limited, private circle; rather, they were public, aggressive, and national in scope—including through open webinars and broad social-media marketing—and further, were sold to accredited investors. *Id.* ¶¶ 7, 40–43. Because of those public solicitations, both the Digital Real Estate and E-Commerce Store offerings were required to be registered under the Texas Securities Act or, alternatively, sold pursuant to a valid exemption. *Id.* ¶ 41. Neither occurred. *Id.*

Plaintiffs further allege that they and the Class Members were induced to purchase the unregistered offerings on the basis of the misleading statements described in the Complaint. The promoters' projections and earnings claims were misleading and lacked any reasonable factual or historical basis as required by the FTC. *Id.* ¶¶ 12, 57, 66–69. For example, the E-Commerce Store materials allegedly claimed Champion had "a record of 100% successfully (sic) ecommerce seller accounts with minimum 15% profit margin at least," even though neither Champion nor its promoters had such a record. *Id.* ¶¶ 67–68. The Digital Real Estate offering materials claiming that investors could expect to receive $400 - $600 per month were likewise unsupported, both historically and otherwise. *Id.* ¶ 57.

The misrepresentations went far beyond overstated earnings. Fundamentally, both Champion offerings—the "Champion Scheme"—functioned as an undisclosed multi-level marketing/pyramid structure where investor "repayment" depended primarily on recruiting

additional investors, while "all or virtually all" investor money was paid out as commissions to Champion and sales representatives. *Id.* ¶¶ 12, 39, 81. The Complaint specifically alleges Defendants used social media to recruit new "employees" to sell Champion securities, consistent with an undisclosed multi-level marketing operation. *Id.* ¶ 81. Champion also concealed that it lacked the operational capability to support the investments—simply put, Champion's promises that it could and would handle all of the work necessary to generate the promised "passive" returns on investment were false when made. *Id*. ¶ 13, 57, 70-71, 187. Similarly, while Champion offered "24-month" guarantees allowing investors to sell investments back to Champion, Champion "never had the liquidity" to honor these guarantees. *Id.* ¶¶ 13, 72.

## III. PFSI Was Aware of and Approved the Champion Scheme, then Failed to Supervise it and Further Allowed it to Spread Through PFSI's Network

The Champion Scheme was masterminded and orchestrated by PFSI agents and registered representatives Fruge, Prukner, and Weaver. *Id.* ¶ 3. These individuals were registered representatives of PFS when they formed Champion and developed the scheme, and they continued soliciting participation throughout their relationships with PFSI—using PFSI resources and connections and inducing other PFSI Representatives and customers to invest. *Id.* ¶¶ 44, 80.

PFSI was legally obligated to supervise the PFSI Representatives' activities, including outside business activities like Champion, pursuant to FINRA Rules 3110, 3270, and 3280. *Id.* ¶¶ 45, 75. Consistent therewith, PFS had the ability to control its representatives through training, contracts, ongoing supervision, and regulatory notices and filings. *Id.* ¶ 103. Through the foregoing, PFSI had actual knowledge of the PFSI Representatives' Champion activities, including the solicitation and sale of the unregistered Digital Real Estate and E-Commerce Store interests. *Id.* ¶¶ 16, 46, 119. Nonetheless, PFSI affirmatively "approved" the sale of both. *Id.* ¶¶ 16-17, 46, 86; *see also id.* ¶ 100 (screenshot Defendant Fruge's social media post confirming that "ALL was

PLAINTIFF'S OPPOSITION TO PFS INVESTMENTS, INC.'S MOTION TO DISMISS

approved" by PFSI). PFSI was sanctioned by FINRA for its failure to properly vet these offerings. *Id.* ¶¶ 32. Because the Champion offerings were in fact securities under *Howey*, once approved, FINRA Rule 3280 required PFSI to supervise the transactions as if executed on PFSI's behalf; in other words, those products became PFSI's products. *Id.* ¶¶ 87–88, 105.

Eventually, other PFSI representatives began voicing complaints about the sale of Champion offerings. *Id.* ¶ 92. In response, PFSI's senior management instructed representatives "not to talk" about the Scheme. *Id.* ¶¶ 90–91. PFSI did this to protect itself from liability to the 1,000+ individuals who had invested in Champion Scheme by that point. *Id.* ¶¶ 90-92, 96, 125.

**IV.    PFS Perpetuates the Champion Scheme By Filing Misleading Form U5s**

Eventually the noise grew too loud and PFSI terminated its relationships with the PFSI Representatives based on their on-going involvement with Champion. *Id.* ¶¶ 97-100. Thereafter, PFSI was required by FINRA rules and applicable state law (including, but not limited to, Rule § 115.4 of the Texas State Securities Board, adopted pursuant to Section 28-1 of the Texas Securities Act) to promptly, truthfully, and accurately report the reasons for termination and known misconduct via Form U5. *Id.* ¶¶ 107-08. FINRA has expressly acknowledged that this information is used by regulators and the investing public to assess whether to do business with the departed individual. *Id.* ¶¶ 107–10, 112. Notably, PFSI's disclosure obligations are continuing. *Id.* ¶¶ 108–09.

PFSI filed misleading Form U5s that omitted the fraudulent sale of unregistered securities, affirmatively misled regulators and the public, and characterized the terminations as "voluntary." *Id.* ¶¶ 113–19. These filings were false, yet were represented as accurate and complete by a PFS vice president. *Id.* ¶ 122. Critically, these filings suppressed the truth in a way that foreseeably caused continuing harm to current and future investors by preventing them from discovering the

real reasons behind the terminations. *Id.* ¶¶ 123-27. In all, more than $33 million of investor dollars was lost through the above.

**SUMMARY OF ARGUMENTS**

1.      PFSI is subject to specific personal jurisdiction in this Court as it purposefully directed its conduct towards this State and availed itself of the privileges of doing business in this State through, *inter alia*, its deliberate and prolonged relationship with a Texas-based registered representative and its submission of a misleading termination document concerning that representative to the Texas Securities Commissioner. PFSI reasonably anticipated being haled into a Texas Court for litigation concerning the foregoing.

2.      Plaintiffs have adequately stated claims under the Texas Securities Act's secondary liability provisions. The allegations in the Complaint demonstrate that PFSI had the power to control the violations at issue—power that PFSI in fact exercised. The Complaint is replete with allegations establishing PFSI's general awareness of the PFSI Representatives' wrongdoing, and its approval and perpetuation of the Champion Scheme qualifies as substantial assistance that was rendered recklessly in light of PFSI's actual knowledge of the Champion Scheme, and indeed, with intent to deceive with respect to the misleading submission of Form U5s.

3.      Plaintiffs' negligence and fraud claims are well-pleaded. Plaintiffs rely on FINRA Rules to inform the specific duties that PFSI owed to the Plaintiffs, not as stand-alone causes of action. Additionally, Plaintiffs allege specific actions attributable to PFSI that constitute fraud under Texas law.

4.      PFSI has absolutely no basis to compel arbitration of Plaintiff Daniel's claims. The purported "agreement" that PFSI attempts to enforce is not properly before the Court, and PFSI misstates applicable law regarding the supposed "delegation" of relevant arbitrability issues.

**ARGUMENT**

**I.      The Court Has Specific Personal Jurisdiction Over PSFI**

Defendant PSFI argues that the Complaint fails to establish that this Court may exercise specific personal jurisdiction over PSFI. Notably, none of the other Defendants in this case—the parties whose conduct informs much of PFSI's legal liability—have contested personal jurisdiction.

As set forth in more detail below, PFSI's purposeful and continued interactions with Texas resident Fruge—beginning with PFSI's investigation into and eventual approval of his Texas-based business, continuing through to its failures to properly supervise that Texas-based business, and culminating in its eventual submission of a misleading Form U5 to the Texas Securities Commissioner—give rise to the claims against PFSI. The Fifth Circuit has recognized that even "[a] single act by a defendant can be enough to confer personal jurisdiction if that act gives rise to the claim being asserted," particularly in cases like this one that involve intentional torts. *See Lewis v. Fresne*, 252 F.3d 352, 358-59 (5th Cir. 2001) (citing *Brown v. Flowers Indus.*, 688 F.2d 328, 332-33 (5th Cir.1982)).

**A. Legal Principles Guiding the Personal Jurisdiction Analysis**

"A federal district court may exercise personal jurisdiction over a nonresident defendant if (1) the forum state's long-arm statute confers personal jurisdiction over that defendant; and (2) the exercise of personal jurisdiction comports with the Due Process Clause of the Fourteenth Amendment." *Freudensprung v. Offshore Tech. Servs., Inc.*, 379 F.3d 327, 343 (5th Cir. 2004). Because the "Texas long-arm statute has been interpreted as extending to the limits of due process," "the jurisdictional analysis is collapsed into one inquiry as to whether jurisdiction comports with

8

federal due process." *Turner v. Harvard MedTech of Nev.*, LLC, 620 F. Supp. 3d 569, 574 (W.D. Tex. 2022).

Federal due process requires that "(1) the nonresident must have minimum contacts with the forum state, and (2) subjecting the nonresident to jurisdiction must be consistent with 'traditional notions of fair play and substantial justice.'" *Freudensprung*, 379 F.3d at 343. The "minimum contacts" analysis is further subdivided into contacts that give rise to general jurisdiction and those that give rise to specific jurisdiction. *Id.* Plaintiffs contend that PFSI is subject to specific jurisdiction in this Court.

A court may exercise specific jurisdiction when (1) the defendant purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there; and (2) the controversy arises out of or is related to the defendant's contacts with the forum state. *Id.*, citing *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408 (1984); *Asarco, Inc. v. Glenara, Ltd.,* 912 F.2d 784 (5th Cir.1990). In short, the specific jurisdiction inquiry "focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quotation omitted).

Consistent with the foregoing, the Court may exercise specific jurisdiction over a defendant if (1) the defendant has minimum contacts with Texas, *i.e.*, purposely directed its activities toward Texas or purposefully availed itself of the privileges of conducting activities there; (2) plaintiff's cause of action arises out of or results from the individual defendants' forum-related contacts; and (3) the exercise of personal jurisdiction is fair and reasonable. *Ward v. Rhode*, 544 F. App'x 349, 352 (5th Cir. 2013) (citing *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009)). Once the plaintiff establishes the first two prongs, the burden shifts to the defendant to make a "compelling case" that the assertion of jurisdiction is not fair or reasonable. *Carmona v. Leo Ship Mgmt., Inc*,

924 F.3d 190, 193 (5th Cir. 2019) (quoting *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006).

**B. Application of These Principles to This Case**

1. *PFSI Satisfies Minimum Contacts with the State of Texas*

The first prong of the analysis, "minimum contacts," evaluates whether a defendant has "purposefully availed himself of the benefits and protections of the forum state such that he should reasonably anticipate being haled into court there." *Carmona*, 924 F. 3d at 193. "The plaintiff cannot supply 'the only link between the defendant and the forum.'" *Id.* at 194 (quoting *Walden*, 571 U.S. at 285). "Rather, jurisdiction is proper only where the defendant *himself* made deliberate contact with the forum." *Id.* (quoting *Walden*, 571 U.S. at 284).

In this case, PFSI engaged in continual and repeated deliberate contact with this forum, beginning with its hiring of Defendant Fruge, a Texas resident, as a "registered representative." *See, e.g.*, Compl. ¶¶ 3, 27. FINRA considers a registered representative as equivalent to "employee" with respect to compliance under the securities laws[1], and consistent therewith PFSI assumed an ongoing duty to supervise Fruge's activities[2]. By hiring and supervising Fruge, PFSI purposefully directed specific activities towards Texas, and further, purposefully availed itself of the benefits of Fruge's business in Texas. **Against this backdrop, PFSI could and should have reasonably anticipated being haled into a Texas court when its dealings with Fruge (including but not limited to PFSI's knowing approval of PFSI's sale of Champion securities) resulted in litigation.**

---

[1] *See* NTM 86-65, avail. at https://www.finra.org/rules-guidance/notices/86-65.
[2] *See, e.g.*, FINRA Rule 3110 (general duty to supervise representatives) and Rule 3280 (duty to supervise representative's participation in outside securities transactions "as if the transaction were executed on behalf of the member").

PLAINTIFF'S OPPOSITION TO PFS INVESTMENTS, INC.'S MOTION TO DISMISS

PFSI's contacts with Texas were not a chance or one-off occurrence. They were deliberate and frequent as PFSI continually sought, received, and considered verbal information from Texas-resident Fruge concerning his operation of Champion. *Id.* ¶¶ 73, 81-82, 95. PFSI exercised its discretion to approve Champion knowing that the company was based in Houston, Texas and that the vast majority of the conduct complained of in this lawsuit—for example, the development and dissemination of the solicitation materials used to sell Champion securities, which PFSI was legally required to actively supervise pursuant to FINRA Rule 3280—occurred in Texas. *Id.* ¶¶ 31, 35. **Again, PFSI could and should have reasonably anticipated that litigation concerning its role in the approval and supervision of Champion's business would take place in Texas.**

Critically, in April 2022 PFSI told the PFSI Representatives that they could no longer market the Champion scheme and started the long process of terminating Fruge and the other PFSI Representatives. *Id*. ¶¶ 97-100. The last of the PFSI Representatives was terminated from the company in March 2023. *Id.* Upon each Representative's departure, PFSI submitted Form U5s to applicable regulators—including the Texas Securities Commission in Fruge's case—that actively concealed the circumstances behind their departure and, more broadly, the scope and workings Champion Scheme. *Id.* ¶¶ 107-08, 114, 124. These misleading Form U5s perpetuated the Champion Scheme long after the PFSI Representatives left PFSI. *Id*. ¶¶ 127-33. **PFSI could and should have reasonably anticipated that litigation concerning its submission of a misleading Form U5 to the Texas Securities Commission would take place in Texas.**

As Defendant Fruge explained in a social media post, "All was approved by PFSI." *Id.* ¶ 100. Consistent therewith, PFSI's deliberate and continual business and legal relationships with Fruge and Champion constitute purposeful direction toward and availment of the State of Texas, thus satisfying constitutional "minimum contacts" requirements. *See Carmona,* 924 F. 3d at 196

(minimum contacts with Texas established where defendant's employees were aboard a vessel found in the state and the defendant had actual notice of their presence in Texas, even though the defendant had no control over the vessel's course, "because the defendant reasonably should have anticipated being haled into court" in Texas under these circumstances).

Additionally, Fruge and the other PFSI Representatives do not dispute that they are subject to specific personal jurisdiction in the State of Texas concerning their involvement in the Champion Scheme. These Representatives are considered PFSI's "employees" for purposes of assessing compliance with the securities laws, and "[u]nder agency principles, [their] contacts can be imputed to [PFSI] for purposes of examining personal jurisdiction." *See Coleman v. Klockner & Co. AG*, 180 S.W. 3d 577, 588 (Tex. Ct. App. 2005), citing *Walker Ins. Servs. v. Bottle Rock Power Corp.*, 108 S.W. 3d 538, 549 n.4 (Tex. Ct. App. 2003). Fruge's contacts with Texas, including his residency in the State and operation of Champion from its headquarters in Houston, Texas, are thus imputed to PFSI and provide additional support for this Court's exercise of personal jurisdiction over PFSI.

The same facts that establish PFSI's minimum contacts with the State of Texas demonstrate that Plaintiffs' claims arise out of PFSI's contacts with the State of Texas. PFSI's approval and continued enabling of the sale of Champion securities (including through the submission of a misleading Form U5 to Texas regulators) from the State of Texas are the basis for this lawsuit. *See Carmona*, 924 F. 3d at 197. And as discussed at length above, it is neither unfair nor unreasonable for PFSI to anticipate having to answer in a Texas Court, to a Texas jury, for its role in perpetrating the scheme. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) (exercising jurisdiction is fair and reasonable if "the defendant's conduct and connection with the forum State

are such that he should reasonably anticipate being haled into court there.”). Accordingly, Plaintiffs have carried their burden of establishing specific personal jurisdiction as to PFSI.

## II.     The Complaint Adequately States Claim for Relief Against PFSI

## A. Texas Securities Act Claims

*1. The Underlying Primary Violations of The Act Are Undisputed*

The TSA establishes both "primary" and "secondary" liability for securities violations. *See, e.g., Sterling Trust Co. v. Adderley,* 168 S.W.3d 835, 839 (Tex. 2005). Here, Plaintiffs allege two categories of "primary" violations against Defendants Fruge, Prukner, Weaver, and Romero:

> (i) the sale of unregistered and non-exempt securities in violation of Tex. Gov. Code Ann. § 4003.001  (formerly TSA art. 581-7(A))[3] and § 4008.051 (formerly TSA art. 581-33(A)(1)), and
>
> (ii) the sale of securities by means of a misleading statement of material fact in violation of Tex. Gov. Code Ann. § 4008.52 (formerly TSA art. 581-33(A)(2)).

*See* Compl. at Count I (¶¶ 156-71) (sale of unregistered securities) and Count IV (¶¶ 181-92) (misleading sales).

PFSI does not dispute that Plaintiffs have stated claims for primary violations as to Defendants Fruge, Prukner, Weaver, and Romero, save for a half-hearted footnote suggesting, without analysis, that Champion's Digital Real Estate and E-Commerce store investments are not "securities." Mot. at p. 10, n. 5. Plaintiffs have addressed that argument at length in connection with their contemporaneously-filed opposition to Defendant Prukner's motion to dismiss, and now incorporate those same arguments by reference herein.

---

[3] *See, e.g.*, *Kneese v. Pershing, L.L.C*., 2012 WL 13019677, at *3 (N.D. Tex. Nov. 14, 2012) ("In Texas, prior to issuing a security, a person must register or otherwise acquire a permit to sell from the Commissioner.") (citing Tex. Civ. Stat. art. 581-7). There are limited exceptions to this requirement that are inapplicable here. *Id.*, citing TSA art. 581-5(I)(a).

PLAINTIFF'S OPPOSITION TO PFS INVESTMENTS, INC.'S MOTION TO DISMISS

PFSI instead focuses on contesting Plaintiffs' secondary liability claims. As the Texas Supreme Court has explained, "[s]econdary liability is derivative liability for another person's securities violation; **it can attach to either a control person**, defined as a person who directly or indirectly controls a seller, buyer, or issuer of a security, **or to an aider**, defined as one who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security." *Sterling,* 168 S.W. 3d at 839 (emphases added) (internal quotations omitted). "Both control persons and aiders are jointly and severally liable with the primary violator to the same extent as if [they] were the primary violator." *Id.* PFSI's secondary liability is discussed in the following section.

*2. Plaintiffs' Secondary Liability Claims as to PFSI Are Well-Pleaded*

Plaintiffs allege that PFSI is secondarily liable for the individual Defendants' primary violations under both of the TSA's "control person" and "aiding and abetting" provisions. Compl. at Count II (¶¶ 165-72) (control person liability for sale of unregistered securities); Count III (¶¶ 173-80) (aiding and abetting sale of unregistered securities); Count V (¶¶ 193-99) (control person liability for misleading sale of securities); and Count VI (¶¶ 200-06) (aiding and abetting misleading sale of securities).

(i) <u>Facts Establishing "Control Person" Liability</u>

PFSI argues that Plaintiffs have failed to establish the requisite "control" over the PFSI Representatives necessary to sustain Counts II and V. Mot. at pp. 10-12. PFSI specifically disputes that Plaintiffs have adequately alleged PFSI's participation in the "specific transactions" upon which primary liability is predicated. *Id*. at pp. 10-11. That argument is misplaced; as demonstrated below, Plaintiffs do not need to show that PFSI actively participated in the primary violations—it

is sufficient to show that PFSI was in a position to *prevent* those violations and failed to do so. Plaintiffs have clearly carried that burden.

"Control means the possession, direct or indirect, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *Frank v. Bear, Stearns & Co.,* 11 S.W.3d 380, 384 (Tex. Ct. App. 2000). To plead that a defendant controlled a primary violator, a plaintiff must allege that the defendant (1) exercised control over a primary violator in general, and (2) had the power to control the specific transaction upon which the primary violation is predicated. *Barnes v. SWS Fin. Servs., Inc.*, 97 S.W.3d 759, 764 (Tex. Ct. App. 2003). *Barnes* makes clear that an injured investor is not required to allege that the defendant actually *participated* in the alleged violation to establish control person liability. *Id.* at 764 (emphasis added). The Fifth Circuit has likewise recognized that control person liability does not require participation in the wrongful transaction. *G.A. Thompson & Co., Inc. v. Partridge*, 636 F.2d 945, 958 (5th Cir. 1981). Rather, a showing that the defendant could have prevented the violation will suffice at the pleadings stage. *See id*. at 959 (noting that the defendant retains the right at trial to present an affirmative defense of lack of participation).

Consistent with the foregoing, Texas courts have upheld control person claims against defendants responsible for "reviewing and approving" transactions that gave rise to violations. *Zagami v. Nat. Health Trends Corp.*, 540 F. Supp. 2d 705, 716 (N.D. Tex. 2008). The ability to control disclosure of those transactions will also suffice to state a claim. *Id.* And as this Court has previously recognized, "the heightened pleading requirements of . . . Federal Rule 9(b) do not apply to control person violation claims." *In re TETRA Techs., Inc. Sec. Litig.*, 2009 WL 6326865, at *1 (S.D. Tex. Aug. 10, 2009).

Turning to the instant case, the Complaint clearly alleges that PFSI had a duty to review and approve (or deny) the sale of the Champion products at issue. *See, e.g.*, Compl. ¶ 17. The complaint further alleges that PFSI did in fact conduct that review and ultimately approved the PFSI Representatives' sale of Champion offerings. *Id.* ¶¶ 73-78. The Complaint also describes how PFSI had the power to compel the individual Defendants' disclosure of information regarding the sale of Champion products, and again describes how PFSI wielded that power. *Id.* ¶¶ 94-100. Plaintiffs also cite FINRA Rule 3280, which required PFSI to supervise the sale of Champion products just as it would have supervised the sale of PFSI's own products; inherent in that supervision is the right to terminate the sales and/or disclose those sales to regulators upon realization they were made in violation of applicable law. *See, e.g.*, *id.* ¶ 105. PFSI cannot have it both ways—it cannot on the one hand admit that it reviewed and exercised its right to approve the sales of Champion products, while on the other hand contest that Plaintiffs have adequately alleged PFSI's right to do so.

*Barnes*, which PFSI describes as "instructive," is readily distinguishable on these bases. As the *Barnes* court noted, "[n]one of [the primary violator's] transactions related to [outside] securities were reported" to the broker-dealer. *Barnes*, 97 S.W.3d at 765. Similarly, the plaintiffs therein "failed to produce a scintilla of evidence that [the broker-dealer] controlled [the] sale of [outside] securities." *Id.* These are critical distinctions where, as here, Plaintiffs have alleged PFSI's awareness of the Champion sales, and further, have alleged that PFSI in fact exercised its right to control those sales by first approving them before later changing course and forcing the PFSI Representatives to stop selling Champion products while registered with PFSI.

The *Barnes* court also stated that plaintiffs were "unfamiliar with the broker-dealer"; in contrast, the Complaint in this case alleges that many Champion victims were in fact PFSI

PLAINTIFF'S OPPOSITION TO PFS INVESTMENTS, INC.'S MOTION TO DISMISS

customers, as PFSI was well-aware. Compl. ¶ 4. Finally, the scheme in *Barnes* occurred **before** the primary violator became associated with his broker-dealer, and thus there was no evidence connecting the broker-dealer to the approval and perpetuation of the scheme. In this case, the Complaint alleges that PFSI both approved the sales at issue and then perpetuated them by filing misleading Form U5s that misstated the circumstances for the PFSI Representatives' termination and concealed the sale of Champion securities from regulators and the public at large. *Id.* ¶¶ 113-18, 122.

As set forth above, Plaintiffs have adequately alleged that PFSI had the power to control numerous acts of the sales of Champion securities, and PFSI's motion to dismiss Counts II and V of the Complaint should accordingly be denied.

(ii) <u>Facts Establishing "Aiding and Abetting" Liability</u>

Plaintiffs also allege that PFSI aided and abetted the PFSI Representatives' sale of unregistered Champion securities through materially misleading statements. *See* Compl. Count III (aiding and abetting unregistered sales) and Count VI (aiding and abetting misleading sales).

To establish aider and abettor liability under the TSA, a plaintiff must demonstrate that (1) a primary violation of the securities laws occurred; (2) the alleged aider had "general awareness" of its role in the violation; (3) the actor rendered "substantial assistance" to the violation; and (4) the alleged aider either (a) intended to deceive plaintiff or (b) acted with reckless disregard for the truth of the representations made by the primary violator. *See, e.g., In re Enron Corp. Sec., Derivative & Erisa Litig.*, 762 F. Supp. 2d 942, 977 (S.D. Tex. 2010).

PFSI argues that the Complaint does not satisfy prongs 2, 3 and 4 of this analysis. PFSI's arguments ignore well-pleaded allegations establishing PFSI's general awareness of the Champion scheme and its reckless disregard of the fact that the PFSI Representatives were violating the Texas

PLAINTIFF'S OPPOSITION TO PFS INVESTMENTS, INC.'S MOTION TO DISMISS

Securities laws, as well as the substantial assistance that PFSI provided to the PFSI Representatives.

### a. Plaintiffs Allege General Awareness

PFSI argues that Plaintiffs have not alleged "general awareness" with particularity. Mtn. at p. 13. This is demonstrably false. First, "knowledge, and other conditions of a person's mind may be alleged generally" under Rule 9(b). Consistent therewith, the Texas Supreme Court has held that general awareness does not require that the aider know the exact nature of the misrepresentations made by the primary violator of the TSA, nor even the exact nature of the illegal scheme—all that is required is a general awareness of **some improper activity**. *See Sterling,*168 S.W.3d at 840-41. In this case the Complaint is replete with allegations describing PFSI's awareness of improper activity. To that end, at all relevant times hereto PFSI was aware that it approved the sale of Champion securities in violation of FINRA Rules and its own internal policies and procedures. *See, e.g.*, Compl. ¶¶ 16-17, 46, 73-78. Moreover, PFSI was generally aware of complaints that other PFSI registered representatives voiced about the Champion Scheme as early as 2021, in response to which PFSI's national sales director specifically instructed others in the company "not to talk about the Champion scheme." *Id*. ¶¶ 91-92. The Complaint further alleges that PFSI was aware of the PFSI Representatives' solicitation efforts via social media and otherwise—solicitations repeatedly promising "100% passive income" with "no responsibilities"—and that the PFSI Representatives continued to solicit these misleading sales even after PFSI directed them to stop doing so. *Id*. ¶¶ 55, 62, 94, 98. Perhaps most damning of all, the Complaint describes how PFSI concealed the circumstances surrounding the PFSI Representatives' departure from the company in order to hide what PFSI knew had been the

widespread, and fraudulent, sale of unregistered securities. *Id*. ¶¶ 114-15, 125. PFSI's general awareness of improper activity is satisfied here.

### b. Plaintiffs Allege Substantial Assistance

An aider can provide "substantial assistance" without any direct dealings with the defrauded party; "indeed, a person who materially aids a seller may have no contact at all with the investors." *Sterling*, 168 S.W. 3d at 843. PFSI provided that substantial assistance first by approving the PFSI Representative's illegal sale of unregistered securities in violation of FINRA Rules (*e.g.*, outside the course of any legitimate business activity[4]), and critically, by filing misleading Form U5s for each of the PFSI Representatives that allowed them to continue engaging in the illegal scheme even after they left PFSI. After the termination by PFSI, one of the PFSI Representatives, Fruge, even proclaimed on own social media that "All was approved by [PFSI] with OUTSIDE BUSINESS was legal," implying that PFSI had specifically lent its own legitimacy as a broker-dealer to Fruge and the other PFSI Representatives to continue operating the Champion Scheme. Compl. ¶ 100. This conduct directly assisted the PFSI Representatives in committing their violations, thus satisfying the standard for substantial assistance.

### c. Plaintiffs Allege Reckless Disregard and/or Intent to Deceive

Under *Sterling*, the "reckless disregard" analysis is closely related to the "general awareness" analysis.168 S.W.3d at 842. A plaintiff may establish reckless disregard by showing that "an alleged aider . . . rendered assistance 'in the face of a perceived risk' that its assistance would facilitate untruthful or illegal activity by the primary violator." *Id.* "In order to perceive such a risk, the alleged aider must possess a general awareness that his role was part of an overall activity that is improper." *Id.*

---

[4] This renders PFSI's citation to *Crescendo Inv., Inc. v. Brice*, 61 S.W.3d 465 (Tex. App. 2003) inapposite, as the substantial assistance alleged in that case was found to be a legitimate business activity.

PLAINTIFF'S OPPOSITION TO PFS INVESTMENTS, INC.'S MOTION TO DISMISS

Here, the Complaint alleges that PFSI investigated the Champion Scheme at length over a period of several months and obtained actual knowledge of the PFSI Representatives' widespread and misleading solicitations of "100 percent passive" investments. The Complaint further describes how PFSI sought to conceal the true circumstances behind the Champion Scheme (including PFSI's approval and continued monitoring of that scheme) to protect PFSI's business interests and to avoid liability to the PFS customers and other investors who it knew had been harmed by the Scheme. Compl. ¶¶ 113-25. This conduct demonstrates reckless disregard for the truth, along with an intent to deceive, sufficient to state a claim for aiding and abetting liability.

Plaintiffs have therefore stated claims against PFSI under Counts II, III, V, and VI.

**B. Plaintiffs Also Plead a Claim for Negligence Against PFSI**

PFSI argues that Plaintiffs are attempting to assert "a private right of action for violations" of FINRA Rules. Mtn. at p. 16. This misinterprets Plaintiffs' arguments. To be clear, Plaintiffs are not claiming that FINRA Rules in and of themselves are duties owed to the public at large. However, there is no doubt that FINRA's Rules, regulatory notices, and enforcement actions at a minimum help establish the standard of care for brokerage firms like PFSI.[5] Consistent therewith,

---

[5] *See, e.g.*, *Javitch v. First Montauk Financial Corp.*, 279 F. Supp.2d 931, 938 (N.D. Ohio 2003) ("The standard in the industry is reflected in the rules of both NASD and NYSE."); *Nelson v. Hench*, 428 F. Supp. 411, 420 (D. Minn. 1977) ("In essence, the NYSE and NASD have incorporated into their rules one standard by which defendant firms' duty could be measured in a negligence action; violation of rules is evidence of negligence toward customers."); *Siedman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 465 F. Supp. 1233, 1236 (S.D.N.Y. 1979) ("[NYSE] rules have been promulgated by the Exchange so as to give brokers a standard of conduct to which they should adhere."); *Mihara v. Dean Witter*, 619 F.2d 814, 821–22 (9th Cir. 1980) (NYSE and NASD rules are admissible precisely because they "reflect the standards to which all brokers are held."); *Milliner v. Mutual Securities*, 207 F. Supp. 3d 1060, 1065–66 (N.D. Cal. 2016) (confirming that FINRA rules may define a firm's common law duty to supervise its representatives). *Ginzkey v. National Securities Corp.*, 2022 U.S. Dist. LEXIS 42985*11 (W.D. Wash. March 10, 2022) (FINRA rules inform the standard of care in a negligence claim, especially where the defendant has incorporated such rules into its own internal policies); *Siedman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 465 F. Supp. 1233, 1236 (S.D.N.Y. 1979) ("[NYSE] rules have been promulgated by the Exchange so as to give brokers a standard of conduct to which they should adhere."); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cheng*, 697 F. Supp. 1224, 1227 (D.D.C. 1988) (violation of NASD's "suitability rule," requiring evaluation of a customer's financial situation and investment suitability, was a factor the jury could weigh in assessing whether [the broker] acted as a "reasonable" person); *Garrison v. Sagepoint Fin., Inc.*, 185 Wash. App. 461, 484–85 (Wash. Ct. App. 2015) (recognizing that SRO rules may inform the common law standard of care for broker-dealers, serve as "excellent tools" to assess the reasonableness of a broker's conduct, and may define the scope of a duty of a broker-dealer)

PLAINTIFF'S OPPOSITION TO PFS INVESTMENTS, INC.'S MOTION TO DISMISS

some federal courts have indeed recognized that a private cause of action can be maintained under FINRA or NYSE Rules. *See Miley v. Oppenheimer & Co.*, 637 F.2d 318, 333 (5th Cir. 1981), *abrogated on other grounds by Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213 (1985) (noting that "[t]he federal circuit courts are divided on the very complex question as to whether a private cause of action can be maintained under" the FINRA or NYSE rules.").

Thus, while "[t]he Fifth Circuit has deliberately chosen not to decide whether rules for brokers established by national exchanges and SROS [such as FINRA or the NYSE] provide a private cause of action for individual investors, [it has] found they may be used as evidence of industry standards and practices." *In re Enron*, 2016 WL 4095973, at *15 (S.D. Tex. Aug. 2, 2016), *aff'd sub nom. Giancarlo v. UBS Fin. Servs., Inc.*, 725 F. App'x 278 (5th Cir. 2018); *see also Miley*, 637 F. 2d at 333 (observing that NYSE or FINRA rules "are excellent tools against which to assess in part the reasonableness or excessiveness of a broker's handling of an investor's account."); *Apollo Prop. Partners, LLC ex rel. Diamond Houston I, L.P. v. Newedge Fin., Inc.*, 2009 WL 778108, at *2 (S.D. Tex. Mar. 20, 2009) ("The [FINRA] Rules . . . are evidence of the standard of conduct by which the actions of brokers are judged for the purposes of negligence actions…."); *Lange v. H. Hentz & Co.,* 418 F. Supp. 1376, 1384 (N.D. Tex. 1976) ("It is therefore the decision of this Court that the NASD Rules may be used as evidence of the present standard of care which the NASD member should achieve.").

Against this backdrop, Plaintiffs' negligence claim, which relies upon FINRA Rules to help establish PFSI's duty to supervise the PFSI Representatives and to shape the standard of care PFSI owed in evaluating, approving and supervising the Champion Scheme, is well-pleaded. *See generally* Compl. ¶¶ 207-14.

Further, Plaintiffs also allege that PFSI owed a duty under FINRA Rules, Texas statutes,

PLAINTIFF'S OPPOSITION TO PFS INVESTMENTS, INC.'S MOTION TO DISMISS

and otherwise, to file truthful termination notices, also known as Form U5s, accurately describing the circumstances behind the PFSI Representatives' departures from the company and the role their involvement in the Champion Scheme played in that departure. *See id.* at ¶¶ 108-09 (citing , *inter alia*, FINRA NTM 10-39 and Rule § 115.4(d) of the Texas State Securities Board (adopted pursuant to Section 28-1 of the TSA). These rules and regulations create duties to the investing public. *See, e.g.*, *Palmer v. Shearson Lehman Hutton Inc.*, 622 So. 2d 1085 (Fla. Ct. App. 1993).

In *Palmer*, an investor sued a brokerage firm for the negligent actions of a broker who was previously employed by the firm. *See* 622 So. 2d at 1086–88. Similar to this case, the broker in *Palmer* had been terminated by the firm for misconduct, but the firm falsely reported that the broker had "voluntarily resigned." *Id.* at 1087. The investor advanced two negligence theories: 1) that the firm breached a common law duty to take sufficient precautions to ensure prospective investors were not going to be harmed by its former employee; and 2) that the firm knowingly and willfully filed false documents misstating the cause for the broker's termination in violation of Florida law. *Id.* at 1089–90. The court held that even though the plaintiffs never had a relationship with the brokerage firm and were never in privity with the brokerage, the legislative enactments "impose legal duties on [the brokerage firm] that will support a cause of action for negligence." *Id*. at 1090-92. The Court concluded that the broker was legally obligated to report the employee's termination, to accurately state the reasons for that termination, and to specify any illegal activity he committed on a Form U5. *Id.* at 1090. This duty extended to the investing public at large, who were intended beneficiaries of the information contained on the Form U5 regardless of whether they were in privity with the brokerage firm. *Id.* The result in *Palmer* has been confirmed by other courts as well. *See, e.g., Twiss v. Kury*, 25 F.3d 1551, 1555–57 (11th Cir. 1994) (calling *Palmer* "controlling authority"); *Prymak v. Contemp. Fin. Sols., Inc.*, 2007 WL 4250020, at *8–10 (D.

Colo. Nov. 29, 2007) (holding that similar claims were sufficient to support claims of negligence since the plaintiffs were members of the class of individuals the statutes were designed to protect).

Turning back to this case, PFSI's attempts to avoid liability for a negligence claim on foreseeability/causation grounds fall flat in light of the foregoing. So, too, do PFSI's attempts to minimize Plaintiffs' harm as a simple failure to honor a contractual guarantee. *See* Mtn. at p. 17. The fundamental harm here is that Plaintiffs and others purchased worthless securities not worth the paper their offering documents are written on—harm that is directly attributable to PFSI's negligent approval and continued enablement of the Champion Scheme.

**D. Plaintiffs Assert a Cognizable Fraud Claim**

Plaintiffs allege PFSI knowingly reported false and/or misleading information on the PFSI Representative's Form U-5s. Compl. ¶¶ 113-33; 227. These allegations state a claim for fraud. *See, e.g.*, *Wesdem, LLC v. Ill. Tool Works, Inc.*, 70 F. 4th 285, 291 (5th Cir. 2023) (fraud requires a knowing or reckless material misrepresentation upon which the plaintiff was intended to and did in fact rely or act, resulting in injury). PFSI's reckless approval of the Champion Scheme in the face of obvious evidence of its illegality likewise supports a fraud claim. *Id.* Additionally, PFSI is also liable for the fraudulent acts and omissions committed by the PFSI Representatives—namely, the sale of Champion securities on the basis of knowingly false and misleading statements. Compl. ¶¶ 220-25; *see, e.g.*, *Hedley Feedlot, Inc. v. Weatherly Trust*, 855 S.W.2d 826, 837 (Tex. Ct. App. 1993) (principal subject to vicarious liability for fraudulent ats of agents, "even if the principal received no benefit from the fraud or misrepresentations").

**III.     PFSI Cannot Compel Arbitration of Plaintiff Daniel's Claims**

PFSI seeks to compel arbitration of one of the three Plaintiffs' claims (those belonging to Plaintiff Daniel, only), pursuant to a purported "agreement with Champion." Mtn. at p. 18. This

purported "agreement" is submitted as Exhibit B to PFSI's Motion. PFSI attempts to authenticate the claimed "agreement" through a declaration from attorney Brian M. Lutz of Gibson, Dunn & Crutcher LLP. *See* ECF No. 31-1. The declaration does not describe how Mr. Lutz purports to have knowledge of the supposed "agreement"—neither he, his law firm, nor his client are parties to it, and this case has not yet entered discovery—nor does it provide a basis for the statement that the purported "agreement" is a "true and correct" copy thereof. Consistent therewith, Plaintiffs object to the Court's consideration of this document. Indeed, the "agreement" Mr. Lutz attaches to his declaration actually appears to be two separate documents: a "sales agent/broker" agreement with Champion, and a separate "Service Agreement" with "Jungle Consulting Group." *Compare* ECF 31-1 at pp. 15 and 16.

Putting this evidentiary issue aside, PFSI also argues that Mr. Lutz's purported "agreements" preclude the Court from determining the threshold legal question of whether non-party PFSI is entitled to enforce the purported arbitration provision contained in one of the "agreements." Mtn. at pp. 21-22. PFSI claims that this issue is a question of arbitrability that must be "delegated" to an arbitrator on account of a generic reference to "AAA Rules." PFSI is sorely mistaken. As a non-party to the "agreements," PFSI is not entitled to enforce any of their provisions—including any purported arbitration language—absent a threshold legal determination **by this Court** that one of the legal doctrines allowing non-party enforcement of an agreement is applicable here. And the law is clear that this determination **cannot be delegated to an arbitrator**. *See Jody James Farms, JV v. Altman Group, Inc.*, 547 S.W.3d 624, 631-- (Tex. 2018) (rejecting argument that an agreement that incorporates AAA rules serves to "delegate" questions relating to arbitration with a non-signatory); *Newman v. Plains All Am. Pipeline, L.P.*, 23 F.4th 393, 398-- (5th

PLAINTIFF'S OPPOSITION TO PFS INVESTMENTS, INC.'S MOTION TO DISMISS

Cir. 2022) (holding that a court, not an arbitrator, must decide whether a non-party can enforce a purported arbitration provision).

Viewed in this light, PFSI's motion to dismiss Plaintiff Daniel's claims in favor of arbitration is particularly egregious. PFSI has appended an unauthenticated agreement gleaned from its lawyers' files—an agreement to which PFSI is not even a party—and now asks the Court to summarily dismiss Plaintiff Daniel's claims on the basis of that agreement without even considering whether PFSI has a cognizable legal basis to enforce that agreement.[6] This result would stand due process on its head, and PFSI's request to arbitrate should be denied.

## CONCLUSION AND REQUEST FOR LEAVE TO AMEND IN THE EVENT OF DISMISSAL

Plaintiffs believe that the Complaint in its current form is sufficient to survive Defendant's motions to dismiss and respectfully request that that Motion be denied. However, should the Court determine that PFSI is not subject to personal jurisdiction in this Court, and/or that any of Plaintiffs' claims are not legally sufficient, then Plaintiffs respectfully request that they be granted leave to consider amending those claims in the event they believe they are able to do so. Federal Rule of Civil Procedure 15(a)(2) provides that "the court should freely give leave when justice so requires." The Fifth Circuit views this language as creating a strong presumption in favor of allowing amendment. *See, e.g.*, *Smith v. EMC Corp.*, 393 F.3d 590, 595 (5th Cir. 2004) (emphasizing that Rule 15(a) "requires a trial court to grant leave to amend 'freely,' and the language of this rule 'evinces a bias in favor of granting leave to amend.'"); *Foman v. Davis*, 371 U.S. 178 (1962) ("if the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits.").

---

[6] Subject to and without waiving the foregoing objections, PFSI, as a non-party to the "agreements" at issue, is not entitled to enforce them under an estoppel or similar theory for the reasons set forth in Plaintiffs' Opposition to Defendant Prukner's Motion, which are hereby incorporated by reference as if set forth in full herein.

PLAINTIFF'S OPPOSITION TO PFS INVESTMENTS, INC.'S MOTION TO DISMISS

Dated January 28, 2026

Respectfully Submitted,

By:     */s/Daniel Centner*
PEIFFER WOLF CARR KANE
CONWAY & WISE LLP
Daniel Centner
LA Bar No. 3305
SDTX Federal ID No. 3940226
935 Gravier St., Suite 1600
New Orleans, LA 70112
dcentner@peifferwolf.com
T (504) 523-2434

Andrew Ready Tate
PEIFFER WOLF CARR KANE
CONWAY & WISE LLP
GA Bar No. 518068
SDTX Federal ID No. 3854167
235 Peachtree St. NE, Suite 400
Atlanta, GA 30303
Main: 314-669-3600
Direct: 404-282-4806
atate@peifferwolf.com

Jason J. Kane (will seek admission pro hac vice)
PEIFFER WOLF CARR KANE CONWAY &
WISE LLP
160 Linden Oaks
Rochester, NY 14625
T (585) 310-5140
F (585) 397-3745
jkane@peifferwolf.com

Albert Copeland (will seek admission pro hac vice)
PEIFFER WOLF CARR KANE CONWAY &
WISE LLP
2100 Southbridge Parkway, Suite 650, #2636
Birmingham, AL 35209
T (205) 203-0363
acopeland@peifferwolf.com

PLAINTIFF'S OPPOSITION TO PFS INVESTMENTS, INC.'S MOTION TO DISMISS

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that the foregoing document was filed via the Court's CM/ECF case management system on the 28th day of January 2026.

/s/*Daniel Centner*

PLAINTIFF'S OPPOSITION TO PFS INVESTMENTS, INC.'S MOTION TO DISMISS